# Exhibit 11

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

1. The earliest application leading to the 120 patent, EP743, was filed on March 22, 2012. 120 patent at cover page, col. 1, ll. 10-11.

2. EP743 included the following claims:

> 1. A pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the release of said salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is simultaneous with or faster than the release of said GLP-1 peptide as determined by dissolution testing using Assay (I).
>
> 2. A pharmaceutical composition according to any one of the preceding claims, wherein the dissolved amount of the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid peaks within the first 30 minutes as determined by dissolution testing using Assay (I) at pH 2.5.
>
> 3. A pharmaceutical composition according to claim 2, wherein the dissolved amount of the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid peaks within 31 minutes, such as within 32, 33, 34, 35, 36, 37, 38, 39, 40, 45, 50, 55, or 60 minutes as determined by dissolution testing using Assay (I) at pH 2.5.
>
> 4. A pharmaceutical composition according to any one of the preceding claims, wherein said dissolution testing using Assay (I) is carried out at any one of pH 1.0-8.0, such as pH 1.0, 2.5, or 6.8.
>
> 5. A pharmaceutical composition comprising a first type and a second type of granules, wherein said first type of granules comprises a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and said second type of granules comprises a GLP-1 peptide.
>
> 6. A pharmaceutical composition according to any one of the preceding claims, wherein the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is SNAC.
>
> 7. A pharmaceutical composition according to any one of the preceding claims, wherein the GLP-1 peptide comprises an albumin binding moiety.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

8. A pharmaceutical composition according to any one of the preceding claims, wherein the GLP-1 peptide is N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-heptadecanoylamino) butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl] [Aib8,Arg34]GLP-1(7-37).

9. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a GLP-1 peptide with a filler and/or a binder;
b) dry granulation of the mixture of step a;
c) mixing the granules obtained in step b with a composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid; and
d) optionally adding further lubricant.

10. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid with a lubricant and/or a filler;
b) dry granulation of the mixture of step a;
c) mixing the granules obtained in step b with a composition comprising a GLP-1 peptide; and
d) optionally adding further lubricant.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

11. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a GLP-1 peptide with a filler and/or a binder;
b) dry granulation of the mixture of step a;
c) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, optionally a lubricant and/or a filler;
d) dry granulation of the mixture of step c;
e) mixing the granules obtained in step b with the granules obtained in step d; and
f) optionally adding further lubricant.

12. A pharmaceutical composition obtained by the process as defined in any one of claims 9-11.

13. A process of producing a granule comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, wherein the process comprises the steps:

a) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid (such as SNAC) with a lubricant and/or a filler; and
b) dry granulation of the mixture of step a.

14. A granule obtained by the process as defined in claim 13.

15. A composition as defined in any one of claims 1-8 or 12 or a granule as defined in claim 14 for use in medicine, such as for treatment of diabetes or obesity, wherein said composition is administered orally.

(120 PH at APOSEM0028478-80.)

3. The next application, EP459, was filed on January 31, 2013.

4. EP459 included the following claims:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

1. A pharmaceutical composition comprising a first type of granules and a second type of granules, wherein said first type of granules comprises a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and no GLP-1 peptide, and wherein said second type of granules comprises a GLP-1 peptide and no salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid.

2. A pharmaceutical composition according to any one of the preceding claims, wherein the release of said salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is simultaneous with or faster than the release of said GLP-1 peptide as determined by dissolution testing using Assay (I) and wherein said release is optionally determined within 30 minutes of said dissolution testing.

3. A pharmaceutical composition according to any one of the preceding claims, wherein the dissolved amount of the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid peaks within the first 60 minutes, such as within 55, 50, 45, 40, 39, 38, 37, 36, 35, 34, 33, 32, 31, or 30 minutes, as determined by dissolution testing using Assay (I) at pH 2.5.

. A pharmaceutical composition according to any one of the preceding claims, wherein said dissolution testing using Assay (I) is carried out at any one of pH 1.0-8.0, such as pH 1.0, 2.5, or 6.8.

5. A pharmaceutical composition according to any one of the preceding claims, wherein said first type of granules and said second type of granules comprises at least 50 % (w/w) of said composition.

6. A pharmaceutical composition according to any one of the preceding claims, wherein the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is SNAC.

7. A pharmaceutical composition according to any one of the preceding claims, wherein the GLP-1 peptide comprises an albumin binding moiety.

8. A pharmaceutical composition according to any one of the preceding claims, wherein the GLP-1 peptide is N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

heptadecanoylamino) butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl][Aib8,Arg34]GLP-1(7-37) or N-epsilon26-{2-[2-(2-{2-[2-(2-{(S)-4-carboxy-4-[10-(4-carboxyphenoxy) decanoylamino]butyrylamino}ethoxy)ethoxy] acetylamino}ethoxy) ethoxy]acetyl}, N-epsilon37-{2-[2-(2-{2-[2-(2-{(S)-4-carboxy-4-[10-(4-carboxy-phenoxy) decanoylamino] butyrylamino}ethoxy)ethoxy]acetylamino}ethoxy) ethoxy]acetyl}-[Aib8,Arg34,Lys37]GLP-1(7-37)-OH.

9. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a GLP-1 peptide with a filler and/or a binder;
b) dry granulation of the mixture of step a;
c) mixing the granules obtained in step b with a composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid; and
d) optionally adding further lubricant,

wherein the mixture of step a does not comprise a salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid.

10. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid with a lubricant and/or a filler;
b) dry granulation of the mixture of step a;
c) mixing the granules obtained in step b with a composition comprising a GLP-1 peptide; and
d) optionally adding further lubricant

wherein the mixture of step a does not comprise a GLP-1 peptide.

11. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a GLP-1 peptide with a filler and/or a binder;
b) dry granulation of the mixture of step a;

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

c) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, optionally a lubricant and/or a filler;

d) dry granulation of the mixture of step c;

e) mixing the granules obtained in step b with the granules obtained in step d; and

f) optionally adding further lubricant,

wherein the mixture of step a does not comprise a salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid and wherein the mixture of step c does not comprise a GLP-1 peptide.

12. A pharmaceutical composition obtained by the process as defined in any one of claims 9-11.

13. A process of producing a granule comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, wherein the process comprises the steps:

a) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid (such as SNAC) with a lubricant and/or a filler; and

b) dry granulation of the mixture of step a,

wherein the mixture of step a does not comprise a GLP-1 peptide.

14. A granule obtained by the process as defined in claim 13.

15. A composition as defined in any one of claims 1-8 or 12 or a granule as defined in claim 14 for use in medicine, such as for treatment of diabetes or obesity, wherein said composition is administered orally.

(*Id.* at APOSEM0028434-36).

5. The next application, the 840 provisional, was filed on January 4, 2013.

6. The 840 provisional included the following claims:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

1. A pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the release of said salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is simultaneous with or faster than the release of said GLP-1 peptide as determined by dissolution testing using Assay (I).

2. A pharmaceutical composition according to the preceding aspect, wherein the dissolved amount of the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid peaks within the first 30 minutes as determined by dissolution testing using Assay (I) at pH 2.5.

3. A pharmaceutical composition according to aspect 2, wherein the dissolved amount of the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid peaks within 31 minutes, such as within 32, 33, 34, 35, 36, 37, 38, 39, 40, 45, 50, 55, or 60 minutes as determined by dissolution testing using Assay (I) at pH 2.5.

4. A pharmaceutical composition according to any one of the preceding aspects, wherein said dissolution testing using Assay (I) is carried out at any one of pH 1.0-8.0, such as pH 1.0, 2.5, or 6.8.

5. A pharmaceutical composition comprising a first type and a second type of granules, wherein said first type of granules comprises a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and said second type of granules comprises a GLP-1 peptide.

6. A pharmaceutical composition according to any one of the preceding aspects, wherein the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is SNAC.

7. A pharmaceutical composition according to any one of the preceding aspects, wherein the GLP-1 peptide comprises an albumin binding moiety.

8. A pharmaceutical composition according to any one of the preceding aspects, wherein the GLP-1 peptide is N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-heptadecanoylamino) butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl][Aib8,Arg34]GLP-1(7-37).

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

9. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a GLP-1 peptide with a filler and/or a binder;
b) dry granulation of the mixture of step a;
c) mixing the granules obtained in step b with a composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid; and
d) optionally adding further lubricant.

10. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid with a lubricant and/or a filler;
b) dry granulation of the mixture of step a;
c) mixing the granules obtained in step b with a composition comprising a GLP-1 peptide; and
d) optionally adding further lubricant.

11. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a GLP-1 peptide with a filler and/or a binder;
b) dry granulation of the mixture of step a;
c) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, optionally a lubricant and/or a filler;
d) dry granulation of the mixture of step c;
e) mixing the granules obtained in step b with the granules obtained in step d; and
f) optionally adding further lubricant.

12. A pharmaceutical composition obtained by the process as defined in any one of aspects 9-11.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

13. A process of producing a granule comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, wherein the process comprises the steps:

a) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid (such as SNAC) with a lubricant and/or a filler; and

b) dry granulation of the mixture of step a.

14. A granule obtained by the process as defined in aspect 13.

15. A composition as defined in any one of aspects 1-8 or 12 or a granule as defined in aspect 14 for use in medicine, such as for treatment of diabetes or obesity, wherein said composition is administered orally.

(*Id.* at APOSEM0028374-76).

7. The PCT was filed on March 15, 2013, and was published as the 694 publication on September 26, 2013.

8. The 694 publication included the following claims:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

1. A pharmaceutical composition comprising a first type of granules and a second type of granules, wherein said first type of granules comprises a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and no GLP-1 peptide, and wherein said second type of granules comprises a GLP-1 peptide and no salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid.

2. A pharmaceutical composition according to any one of the preceding claims, wherein the release of said salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is simultaneous with or faster than the release of said GLP-1 peptide as determined by dissolution testing using Assay (I) and wherein said release is optionally determined within 30 minutes of said dissolution testing.

3. A pharmaceutical composition according to any one of the preceding claims, wherein the dissolved amount of the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid peaks within the first 60 minutes, such as within 55, 50, 45, 40, 39, 38, 37, 36, 35, 34, 33, 32, 31, or 30 minutes, as determined by dissolution testing using Assay (I) at pH 2.5.

4. A pharmaceutical composition according to any one of the preceding claims, wherein said dissolution testing using Assay (I) is carried out at any one of pH 1.0-8.0, such as pH 1.0, 2.5, or 6.8.

5. A pharmaceutical composition according to any one of the preceding claims, wherein said first type of granules and said second type of granules comprises at least 50 % (w/w) of said composition.

6. A pharmaceutical composition according to any one of the preceding claims, wherein the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is SNAC.

7. A pharmaceutical composition according to any one of the preceding claims, wherein the GLP-1 peptide comprises an albumin binding moiety.

8. A pharmaceutical composition according to any one of the preceding claims, wherein the GLP-1 peptide is N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

heptadecanoylamino) butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl] [Aib8,Arg34]GLP-1(7-37) or N-epsilon26-{2-[2-(2-{2-[2-(2-{(S)-4-carboxy-4-[10-(4-carboxyphenoxy) decanoylamino]butyrylamino}ethoxy)ethoxy] acetylamino}ethoxy) ethoxy]acetyl}, N-epsilon37-{2-[2-(2-{2-[2-(2-{(S)-4-carboxy-4-[10-(4-carboxy-phenoxy) decanoylamino] butyrylamino}ethoxy)ethoxy]acetylamino}ethoxy) ethoxy]acetyl}-[Aib8,Arg34,Lys37]GLP-1(7-37)-OH.

9. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a GLP-1 peptide with a filler and/or a binder;
b) dry granulation of the mixture of step a;
c) mixing the granules obtained in step b with a composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid; and
d) optionally adding further lubricant,

wherein the mixture of step a does not comprise a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid.

10. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid with a lubricant and/or a filler;
b) dry granulation of the mixture of step a;
c) mixing the granules obtained in step b with a composition comprising a GLP-1 peptide; and
d) optionally adding further lubricant

wherein the mixture of step a does not comprise a GLP-1 peptide.

11. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a GLP-1 peptide with a filler and/or a binder;
b) dry granulation of the mixture of step a;

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

c) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, optionally a lubricant and/or a filler;

d) dry granulation of the mixture of step c;

e) mixing the granules obtained in step b with the granules obtained in step d; and

f) optionally adding further lubricant,

wherein the mixture of step a does not comprise a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and wherein the mixture of step c does not comprise a GLP-1 peptide.

12. A pharmaceutical composition obtained by the process as defined in any one of claims 9-11.

13. A process of producing a granule comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, wherein the process comprises the steps:

a) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid (such as SNAC) with a lubricant and/or a filler; and

b) dry granulation of the mixture of step a,

wherein the mixture of step a does not comprise a GLP-1 peptide.

14. A granule obtained by the process as defined in claim 13.

15. A composition as defined in any one of claims 1-8 or 12 or a granule as defined in claim 14 for use in medicine, such as for treatment of diabetes or obesity, wherein said composition is administered orally.

(*Id.* at APOSEM0028537-39).

9. On September 19, 2014, the claims were preliminarily amended as follows:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

1. (Original) A pharmaceutical composition comprising a first type of granules and a second type of granules, wherein said first type of granules comprises a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and no GLP-1 peptide, and wherein said second type of granules comprises a GLP-1 peptide and no salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid.

2. (Currently Amended) A pharmaceutical composition according to claim 1 ~~any one of the preceding claims~~, wherein the release of said salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is simultaneous with or faster than the release of said GLP-1 peptide as determined by dissolution testing using Assay (I) and wherein said release is optionally determined within 30 minutes of said dissolution testing.

3. (Currently Amended) A pharmaceutical composition according to claim 2 ~~any one of the preceding claims~~, wherein the dissolved amount of the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid peaks within the first 60 minutes~~, such as within 55, 50, 45, 40, 39, 38, 37, 36, 35, 34, 33, 32, 31, or 30 minutes,~~ as determined by dissolution testing using Assay (I) at pH 2.5.

4. (Currently Amended) A pharmaceutical composition according to claim 3 ~~any one of the preceding claims~~, wherein said dissolution testing using Assay (I) is carried out at any one of pH 1.0-8.0~~, such as pH 1.0, 2.5, or 6.8~~.

5. (Currently Amended) A pharmaceutical composition according to claim 1 ~~any one of the preceding claims~~, wherein said first type of granules and said second type of granules comprises at least 50 % (w/w) of said composition.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

6. (Currently Amended) A pharmaceutical composition according to claim 1 ~~any one of the preceding claims~~, wherein the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is SNAC.

7. (Currently Amended) A pharmaceutical composition according to claim 1 ~~any one of the preceding claims~~, wherein the GLP-1 peptide comprises an albumin binding moiety.

8. (Currently Amended) A pharmaceutical composition according to claim 1 ~~any one of the preceding claims~~, wherein the GLP-1 peptide is N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-heptadecanoylamino) butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl] [Aib8,Arg34]GLP-1(7-37) or N-epsilon26-{2-[2-(2-{2-[2-(2-{(S)-4-carboxy-4-[10-(4-carboxyphenoxy) decanoylamino]butyrylamino}ethoxy)ethoxy] acetylamino}ethoxy) ethoxy]acetyl}, N-epsilon37-{2-[2-(2-{2-[2-(2-{(S)-4-carboxy-4-[10-(4-carboxy-phenoxy) decanoylamino] butyrylamino}ethoxy)ethoxy]acetylamino}ethoxy) ethoxy]acetyl}-[Aib8,Arg34,Lys37]GLP-1(7-37)-OH.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

9. (Original) A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a GLP-1 peptide with a filler and/or a binder;

b) dry granulation of the mixture of step a;

c) mixing the granules obtained in step b with a composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid; and

d) optionally adding further lubricant,

wherein the mixture of step a does not comprise a salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

10. (Original) A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid with a lubricant and/or a filler;
b) dry granulation of the mixture of step a;
c) mixing the granules obtained in step b with a composition comprising a GLP-1 peptide; and
d) optionally adding further lubricant

wherein the mixture of step a does not comprise a GLP-1 peptide.

11. (Original) A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a GLP-1 peptide with a filler and/or a binder;
b) dry granulation of the mixture of step a;
c) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, optionally a lubricant and/or a filler;
d) dry granulation of the mixture of step c;
e) mixing the granules obtained in step b with the granules obtained in step d; and
f) optionally adding further lubricant,

wherein the mixture of step a does not comprise a salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid and wherein the mixture of step c does not comprise a GLP-1 peptide.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

12. (Currently Amended) A pharmaceutical composition obtained by the process as defined in ~~any one of~~ claim[[s]] 9[[-11]].

13. (Original) A process of producing a granule comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, wherein the process comprises the steps:

a) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid (such as SNAC) with a lubricant and/or a filler; and

b) dry granulation of the mixture of step a,

wherein the mixture of step a does not comprise a GLP-1 peptide.

14. (Original) A granule obtained by the process as defined in claim 13.

15. (Cancelled)

16. (New) A method for treating diabetes or obesity in a subject in need of such treatment, said method comprising orally administering to said subject a therapeutically effective amount of the pharmaceutical composition of claim 1.

(*Id.* at APOSEM0028292-95).

10. On May 15, 2015, the PTO issued an Office Action stating:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

**Disposition of Claims***
5)☒ Claim(s) *1-14 and 16* is/are pending in the application.
5a) Of the above claim(s) _____ is/are withdrawn from consideration.
6)☐ Claim(s) _____ is/are allowed.
7)☐ Claim(s) _____ is/are rejected.
8)☐ Claim(s) _____ is/are objected to.
9)☒ Claim(s) *1-14 and 16* are subject to restriction and/or election requirement.
* If any claims have been determined allowable, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

(*Id.* at APOSEM0028567).

11. The detailed action described seven groups of claims, including Group I:

> In accordance with **37 CFR 1.499**, applicant is required, in reply to this action, to elect a single invention to which the claims must be restricted.
>
> Group I, claim(s) 1-8 and 12 drawn to 1 a pharmaceutical composition comprising a first type of granules and a second type of granules, wherein said first type of granules comprises a salt of N-(8-(2- hydroxybenzoyl)amino)caprylic acid and no GLP-1 peptide, and wherein said second type of granules comprises a GLP-1 peptide and no salt of N-(8-(2- hydroxybenzoyl)amino)caprylic acid.

(*Id.* at APOSEM0028568).

12. On July 13, 2015, Novo elected Group I. (*Id.* at APOSEM0028576).

13. On October 27, 2015, the PTO rejected then-pending claims 1-8. (*Id.* at APOSEM0028696).

14. Then-pending claims 1-8 covered:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

1. (Original) A pharmaceutical composition comprising a first type of granules and a second type of granules, wherein said first type of granules comprises a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and no GLP-1 peptide, and wherein said second type of granules comprises a GLP-1 peptide and no salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid.

2. (Currently Amended) A pharmaceutical composition according to claim 1 ~~any one of the preceding claims~~, wherein the release of said salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is simultaneous with or faster than the release of said GLP-1 peptide as determined by dissolution testing using Assay (I) and wherein said release is optionally determined within 30 minutes of said dissolution testing.

3. (Currently Amended) A pharmaceutical composition according to claim 2 ~~any one of the preceding claims~~, wherein the dissolved amount of the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid peaks within the first 60 minutes~~, such as within 55, 50, 45, 40, 39, 38, 37, 36, 35, 34, 33, 32, 31, or 30 minutes,~~ as determined by dissolution testing using Assay (I) at pH 2.5.

4. (Currently Amended) A pharmaceutical composition according to claim 3 ~~any one of the preceding claims~~, wherein said dissolution testing using Assay (I) is carried out at any one of pH 1.0-8.0~~, such as pH 1.0, 2.5, or 6.8~~.

5. (Currently Amended) A pharmaceutical composition according to claim 1 ~~any one of the preceding claims~~, wherein said first type of granules and said second type of granules comprises at least 50 % (w/w) of said composition.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

6. (Currently Amended) A pharmaceutical composition according to claim 1 ~~any one of the preceding claims~~, wherein the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is SNAC.

7. (Currently Amended) A pharmaceutical composition according to claim 1 ~~any one of the preceding claims~~, wherein the GLP-1 peptide comprises an albumin binding moiety.

8. (Currently Amended) A pharmaceutical composition according to claim 1 ~~any one of the preceding claims~~, wherein the GLP-1 peptide is N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-heptadecanoylamino) butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl] [Aib8,Arg34]GLP-1(7-37) or N-epsilon26-{2-[2-(2-{2-[2-(2-{(S)-4-carboxy-4-[10-(4-carboxyphenoxy) decanoylamino]butyrylamino}ethoxy)ethoxy] acetylamino}ethoxy) ethoxy]acetyl}, N-epsilon37-{2-[2-(2-{2-[2-(2-{(S)-4-carboxy-4-[10-(4-carboxy-phenoxy) decanoylamino] butyrylamino}ethoxy)ethoxy]acetylamino}ethoxy) ethoxy]acetyl}-[Aib8,Arg34,Lys37]GLP-1(7-37)-OH.

(*Id.* at APOSEM0028292-95).

15. Claims 1-8 were rejected as obvious over 497 publication and WO 471. (*Id.* at APOSEM0028698-701). The Examiner stated:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

Claims 1-8 are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Khan, M., US 20050148497 in view of WO 2012/080471 (from Applicant's IDS).

The instant invention is drawn to a pharmaceutical composition comprising a first type of granules and a second type of granules, wherein said first type of granules comprises a salt of N-(8-(2- hydroxybenzoyl)amino)caprylic acid and no GLP-1 peptide, and wherein said second type of granules comprises a GLP-1 peptide and no salt of N-(8-(2- hydroxybenzoyl)amino)caprylic acid. Note N-(8-(2-hydroxybenzoyl)amino)caprylate is referred to as "SNAC" in the specification, and also known as sodium 8-(salicyloylamino) octanoate, and 8-[(2-hydroxybenzoyl)amino]-Octanoic acid from the STN search report included with this office action.

Khan teaches GLP-1 peptides in the present of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, see page 24. Tablet form are also taught, see paragraph [0035].

Sauerberg, P et al teaches N-(8-(2- hydroxybenzoyl)amino)caprylic acid and GLP-1 together as a composition. Sauerberg further teaches solid composition for oral administration comprising a GLP-1 agonist and a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, wherein a) the amount of said salt of N-(8-(2-

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

hydroxybenzoyl)amino)caprylic acid is at least 0.6 mmol or at least 0.8 mmol. Further, Sauerberg teaches relative amounts readable on Claim 5 as well as the specific peptide of Claim 8, known as semaglutide. Given that Applicants have not defined an albumin binding moiety, it would appear that this moiety is intrinsic with GLP-1 peptide and that of Claim 1, absent evidence to the contrary.

It would have been obvious to one of ordinary skill in the art to use either that salt forms of SNAC or the acid form as taught by Khan or Sauerberg. One would have been motivated to use either one as they have both been shown to be an effective co-agent for administration. Applicant's specification is already supportive of this fom the rather broad statement on page one that SNAC has previously been shown to improve the bioavailability of orally administered peptides, see page 1 of the PG Pub. One would have had a reasonable expectation of success in using SNAC in either salt form or acid form, as both have been shown to be effective in providing oral availability of GLP-1. Given that either on is a functional equivalent, one is also motivated to use both in combination as set forth in *In re Kerkhoven*, 205 USPQ 1069 (CCPA 1980), "It is *prima facie* obvious to combine two compositions each of which is taught by prior art to be useful for same purpose in order to form third composition that is to be used for very same purpose; the idea of combining them flows logically from their having been individually taught in prior art." This is especially true since the acid forms are still likely to have a salt form and vice versa simply through impurities and equilibrium.

Note that Claims 2-4 are claims to results that are the effective outcome of resulting product of Claim1.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

It would have been obvious to one skilled in the art at the time of invention to determine all operable and optimum components of the SNAC ratios as well as their amounts in the claimed invention because these component are an art-recognized result-effective variable that is routinely determined and optimized in the medicinal and pharmaceutical arts. Where the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation. *In re Aller,* 220 F.2d 454, 456, 105 USPQ 233, 235.

Further, the Supreme Court in *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S. Ct. 1727, 82 USPQ2d 1385, 1395-97 (2007) identified a number of rationales to support a conclusion of obviousness which are consistent with the proper "functional approach" to the determination of obviousness as laid down in *Graham*. The key to supporting any rejection under 35 U.S.C. 103 is the clear articulation of the reason(s) why the claimed invention would have been obvious. The Supreme Court in *KSR* noted that the analysis supporting a rejection under 35 U.S.C. 103 should be made explicit. Exemplary rationales that may support a conclusion of obviousness include:

(A) Combining prior art elements according to known methods to yield predictable results;
(B) Simple substitution of one known element for another to obtain predictable results;
(C) Use of known technique to improve similar devices (methods, or products) in the same way;
(D) Applying a known technique to a known device (method, or product) ready for improvement to yield predictable results;
(E) "Obvious to try" – choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success;
(F) Known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations are predictable to one of ordinary skill in the art;

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

(G) Some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention.

Note that the list of rationales provided is **not** intended to be an all-inclusive list, nor do they need to all be present to make a case for obviousness. Other rationales to support a conclusion of obviousness may be relied upon by Office personnel based upon the findings of the prior art.

In the instant case, (A) above has been presented to demonstrate combining of prior art teachings to arrive at the instantly claimed invention. Further consideration shows that the combination for (A) also embraces (B). (C)-(G) follow with the claimed invention as SNAC is already known to be used with GLP-1, and many other variants of SNAC are taught in the references above.

In conclusion, a reference is good not only for what it teaches by direct anticipation but also for what one of ordinary skill in the art might reasonably infer from the teachings. (In re Opprecht 12 USPQ 2d 1235, 1236 (Fed Cir. 1989); In re Bode 193 USPQ 12 (CCPA) 1976). In light of the foregoing discussion, the subject matter defined by the instant claims would have been obvious within the meaning of 35 USC 103(a). From the teachings of the references, it is apparent that one of ordinary skill in the art would have had a reasonable expectation of success in producing the claimed invention. Therefore, the invention as a whole was *prima facie* obvious to one of ordinary skill in the art at the time the invention was made, as evidenced by the references, especially in the absence of evidence to the contrary.

(*Id.*).

16. Claims 2-4 were rejected as indefinite. (*Id.* at APOSEM0028702). The Examiner stated:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

Claims 2-4 are rejected under 35 U.S.C. 112(b) or 35 U.S.C. 112 (pre-AIA), second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which the inventor or a joint inventor, or for pre-AIA the applicant regards as the invention.

These claims do not further limit. They simply state inherent properties of the composition that are not severable from the composition.

(*Id.*).

17. Claims 1-7 were rejected as failing to comply with the written description requirement. (*Id.* at APOSEM0028703-05). The Examiner stated:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

Claims 1-7 are rejected under 35 U.S.C. 112(a) or 35 U.S.C. 112 (pre-AIA), first paragraph, as failing to comply with the written description requirement. The claim(s) contains subject matter which was not described in the specification in such a way as to reasonably convey to one skilled in the relevant art that the inventor or a joint inventor, or for pre-AIA the inventor(s), at the time the application was filed, had possession of the claimed invention. The instant invention is drawn to compounds of GLP-1. Applicants have support for numerous peptide of GLP-1 as specifically recited in the specification. However, 37 CFR 1.57(c) states that "Essential material" may be incorporated by reference, but only by way of an incorporation by reference to a U.S. patent or U.S. patent application publication, which patent or patent application publication does not itself incorporate such essential material by reference. "Essential material" is material that is necessary to:

> (1) Provide a written description of the claimed invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and set forth the best mode contemplated by the inventor of carrying out the invention as required by the first paragraph of 35 U.S.C. 112;
> (2) Describe the claimed invention in terms that particularly point out and distinctly claim the invention as required by the second paragraph of 35 U.S.C. 112; or
> (3) Describe the structure, material, or acts that correspond to a claimed means or step for performing a specified function as required by the sixth paragraph of 35 U.S.C. 112.

Here, the specification simply points to WO documents without providing specifics as to which GLP-1 peptides are to be incorporated by reference. This also raises potential SEQ ID issues. While the claims recite GLP-1, the specification refers to US patents or WO documents and implicitly states that they are incorporated by reference. Such a

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

> disclosure does not provide ample written description for the claimed invention. The decision of Ex Parte Raible, 8 USPQ2d 1709 (BPAI) states:In Raible., Appellants attempted to use the doctrine of incorporation by reference to provide support for a claimed limitation. The Board stated the doctrine of incorporation by reference could not be used by Appellant since the specification did not contain a specific indication of the features disclosed by the incorporating reference which corresponded to the features specifically claimed. See Raible at 1710. Since the specification did not "identify the specific portions of the patent which appellant may have intended to rely upon to supplement his disclosure." Raible at 1710. The Board concluded "[t]he purpose of incorporation by reference in an application of matter elsewhere written down is for economy, amplification, or clarity of exposition, by means of an incorporating statement clearly identifying the subject matter which is incorporated and where it is to be found. " Raible at 1710. The same can be said for the SNAC compounds on page 5 of the instant specification. Lastly, the specification lack written description of albumin binding sites and how they are related to all of the GLP-1 peptides. It is not readily apparent if these sites are to be added sequences or ones added within the GLP-1. Felix Kratz, "A clinical update of using albumin as a drug vehicle — A commentary Journal of Controlled Release 190 (2014) 331–336, make it clear that the strategy of using the most abundant protein in serum for increasing the half-life of drug is well known as a strategy, but Applicants have not provided the necessary structure function for the present GLP-1 molecules so as to inform the skilled artisan of this important

> relationship. For purposes of art, they are held to be intrinsic to the GLP-1 peptides claimed and disclosed.

(*Id.*).

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

18. On January 27, 2016, Novo amended the claims as follows:

1. (Original) A pharmaceutical composition comprising a first type of granules and a second type of granules, wherein said first type of granules comprises a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and no GLP-1 peptide, and wherein said second type of granules comprises a GLP-1 peptide and no salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid.

2. (Previously Presented) A pharmaceutical composition according to claim 1, wherein the release of said salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is simultaneous with or faster than the release of said GLP-1 peptide as determined by dissolution testing using Assay (I) and wherein said release is optionally determined within 30 minutes of said dissolution testing.

3. (Currently Amended) A pharmaceutical composition according to claim 2, wherein the dissolved amount of the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid peaks within the first 60 minutes as determined by dissolution testing using Assay (I) at ~~pH 2.5~~ <u>any one of pH 1.0-8.0</u>.

4. (Currently Amended) A pharmaceutical composition according to claim 3, wherein said dissolution testing using Assay (I) is carried out at ~~any one of pH 1.0-8.0~~ <u>pH 2.5</u>.

5. (Previously Presented) A pharmaceutical composition according to claim 1, wherein said first type of granules and said second type of granules comprises at least 50 % (w/w) of said composition.

6. (Currently Amended) A pharmaceutical composition according to claim 1, wherein the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is <u>sodium N-(8-(2-hydroxybenzoyl)amino)caprylate (</u>SNAC<u>)</u>.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

7. (Currently Amended) A pharmaceutical composition according to claim 1, wherein the GLP-1 peptide comprises ~~an albumin binding moiety~~ a substituent which is covalently attached to the peptide and which substituent comprises a fatty acid or a fatty diacid.

8. (Previously Presented) A pharmaceutical composition according to claim 1, wherein the GLP-1 peptide is N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-heptadecanoylamino) butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl][Aib8,Arg34]GLP-1(7-37) or N-epsilon26-{2-[2-(2-{2-[2-(2-{(S)-4-carboxy-4-[10-(4-carboxyphenoxy) decanoylamino]butyrylamino}ethoxy)ethoxy] acetylamino}ethoxy) ethoxy]acetyl}, N-epsilon37-{2-[2-(2-{2-[2-(2-{(S)-4-carboxy-4-[10-(4-carboxy-phenoxy) decanoylamino] butyrylamino}ethoxy)ethoxy]acetylamino}ethoxy) ethoxy]acetyl}-[Aib8,Arg34,Lys37]GLP-1(7-37)-OH.

* * *

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

17. (New) A pharmaceutical composition according to claim 8, wherein the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is sodium N-(8-(2-hydroxybenzoyl)amino)caprylate (SNAC).

18. (New) A pharmaceutical composition according to claim 1, wherein the composition further comprises one or more pharmaceutically acceptable excipients.

19. (New) A pharmaceutical composition according to claim 1, wherein said first type of granules further comprises a lubricant.

20. (New) A pharmaceutical composition according to claim 19, wherein said second type of granules further comprises a filler.

21. (New) A pharmaceutical composition according to claim 20, wherein said second type of granules further comprises a binder.

22. (New) A pharmaceutical composition according to claim 21, wherein said first type of granules further comprises a filler.

23. (New) A pharmaceutical composition according to claim 22, wherein said composition comprises at least 60 % (w/w) of a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, less than 10 % (w/w) binder, 5-40 % (w/w) filler, and less than 10 % (w/w) lubricant.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

24. (New) A pharmaceutical composition according to claim 23, wherein said binder is povidone.

25. (New) A pharmaceutical composition according to claim 23, wherein said filler is microcrystalline cellulose.

26. (New) A pharmaceutical composition according to claim 23 wherein said lubricant is magnesium stearate.

27. (New) A pharmaceutical composition according to claim 1, wherein said composition is in the form of a tablet, wherein the weight of said tablet is in the range of 150 mg to 1000 mg.

28. (New) A pharmaceutical composition according to claim 17, wherein said first type of granules further comprises a lubricant.

29. (New) A pharmaceutical composition according to claim 28, wherein said second type of granules further comprises a filler.

30. (New) A pharmaceutical composition according to claim 29, wherein said second type of granules further comprises a binder.

31. (New) A pharmaceutical composition according to claim 30, wherein said first type of granules further comprises a filler.

32. (New) A pharmaceutical composition according to claim 31, wherein said composition comprises at least 60 % (w/w) of SNAC, less than 10 % (w/w) binder, 5-40 % (w/w) filler, and less than 10 % (w/w) lubricant.

33. (New) A pharmaceutical composition according to claim 32, wherein said binder is povidone.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

> 34. (New) A pharmaceutical composition according to claim 33, wherein said filler is microcrystalline cellulose.
>
> 35. (New) A pharmaceutical composition according to claim 34 wherein said lubricant is magnesium stearate.

(*Id.* at APOSEM0028978-83).

19. Novo stated:

> **<u>Summary of Claim Amendments and Pending Claims</u>**
>
> Upon entry of the present amendment, claims 3-4 and 6-7 are amended; claim 15 is cancelled without prejudice or disclaimer; claims 17-35 are added and claims 9-14 and 16 are withdrawn. No new matter is added.
>
> The originally filed specification and claims, including those of the priority documents, support the present amendments. By entry of the present amendment, claims 1-8 and 17-35 are pending and at issue, and claim 1 is an independent claim.
>
> Applicants reserve the right to file continuation and/or divisional applications directed to subject matter canceled in claim 15.

(*Id.* at APOSEM0028984).

20. Novo attempted to distinguish the 497 publication and WO 471, including as follows:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

The Office's rejection fails to address the requirement of the present claims that the claimed compositions contain the GLP-1 peptide and the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid respectively in **different granules**.

For the reasons set forth below, a composition containing the active agent (GLP-1 peptide) and the delivery agent (salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid) in different granules is neither taught nor suggested by the prior art, either alone or in combination.

Khan does not even mention that its composition may be granulated and merely describes mixing the GLP-1 and the delivery agent together prior to dosing (see Example 9). There is no teaching or suggestion in Khan of producing a pharmaceutical composition where the GLP-1 peptide and the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acidare in different granules.

Sauerberg, on page 14, lines 28-36, does disclose that his composition may be granulated and may comprise i) an intragranular part comprising the GLP-1 agonist, the delivery agent (i.e. SNAC), a binder and povidone and ii) an extragranular part comprising a filler a lubricant and/or a glidant. However, Sauerberg does not disclose that the GLP-1 peptide and the SNAC are in different granules.

Moreover, Example 7 of the present application shows that bioavailability of semaglutide is higher in compositions with semaglutide and SNAC in different granules (see compositions B and F) when compared with compositions where semaglutide and SNAC are together in the same granules (see compositions C, E and F).

Accordingly, the present claims cannot be held to be obvious over the combination of Khan with Sauerberg and withdrawal of this rejection is therefore respectfully requested.

(*Id.* at APOSEM0028984-85).

21. Novo also argued the rejection of claims 2-4:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

> The Office's assertion is incorrect. For example, claims 1 and 2 are properly of different scope such that a composition that would infringe claim 1 would not infringe claim 2 if the release of the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid from the composition that infringed claim 1 was **not** simultaneous with or faster than the release of said GLP-1 peptide as required by claim 2. Thus, the limitation in claims 2, like those in claims 3 and 4, properly specify an additional limitation of the claim from which they depend.

(*Id.* at APOSEM0028985).

22. Novo also argued the rejection of claims 1-7 based on written description:

> First, Applicants note that the claims are **not** drawn to GLP-1 compounds. Rather, the claims are drawn to **pharmaceutical compositions** comprising **a first type of granules** comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and no GLP-1 peptide, and **a second type of granules** comprising a GLP-1 peptide and no salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid.
>
> The present specification clearly describes and exemplifies **the claimed pharmaceutical compositions** in sufficient detail that one skilled in the art can reasonably conclude that the inventor had possession of the claimed pharmaceutical compositions.

> Second, with respect to the GLP-1 peptides that may be contained within the second type of granules, the present specification clearly describes what "GLP-1 peptides" are both functionally and structurally (see page 13, line 28 to page 15, line 32) and as the Office notes, provides numerous specific examples of such peptides ( see page 16, line 17 to page 22, line 16). Given this description, one would clearly understand what GLP-1 peptides could be included in the claimed compositions. While the Office does not specify where in the specification WO documents are pointed to without providing specifics as to which GLP-1 peptides are to be incorporated (Applicants assume the Office is referring to page 16, lines 11-16 "In some embodiments the GLP-1 peptide is selected from…"), such reference to WO documents is clearly not incorporating "essential material" as the claims are directed to pharmaceutical compositions rather than to GLP-1 compounds. Further, the paragraph at page 16, lines 11-16 of the specification merely refers to

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

> some embodiments that may fall within the scope of "GLP-1 peptides" as that term has already been described at page 14, line 28 to page 15, line 32 of the present application.
>
> With respect to the Office's reference to the SNAC compounds described on page 5 of the application as apparently lacking written description, Applicants do not understand this assertion. The claims recite a composition containing a first type of granules comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is clearly described on page 23, lines 7-18 of the application. Applicants cannot envision what more is needed to describe a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid than what the present application provides.
>
> Finally, as to the Office's assertion regarding "albumin binding sites", Applicants submit that this is rendered moot be the amendment to claim 7 presented herein. This amendment finds support in the specification at page 15, lines 10-12.
>
> In sum, in view of the above remarks and the amendment to claim 7, Applicants respectfully request withdrawal of the section 112, first paragraph rejection of the claims.

(*Id.* at APOSEM0028986-87).

23. On April 14, 2016, the PTO rejected then-pending claims 1-10 and 17-35. (*Id.* at APOSEM0029295).

24. Claims 1-10 and 17-35 were rejected as obvious over the 497 publication and WO 471. (*Id.* at APOSEM0029296-303). The Examiner stated:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

Claims 1-10 and 17-35 stand rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Khan, M., US 20050148497 in view of Sauerberg WO 2012/080471 (from Applicant's IDS).

The instant invention is drawn to a pharmaceutical composition comprising a first type of granules and a second type of granules, wherein said first type of granules comprises a salt of N-(8-(2- hydroxybenzoyl)amino)caprylic acid and no GLP-1 peptide, and wherein said second type of granules comprises a GLP-1 peptide and no salt of N-(8-(2- hydroxybenzoyl)amino)caprylic acid. Note N-(8-(2 hydroxybenzoyl)amino) caprylate is referred to as "SNAC" in the specification, and also known as sodium 8-(salicyloylamino) octanoate, and 8-[(2-hydroxybenzoyl)amino]- Octanoic acid from the STN search report included with this office action.

Khan teaches GLP-1 peptides in the present of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, see page 24. Tablet form are also taught, see paragraph [0035].

Sauerberg, P et al teaches N-(8-(2- hydroxybenzoyl)amino)caprylic acid and GLP-1 together as a composition. Sauerberg further teaches solid composition for oral administration comprising a GLP-1 agonist and a salt of N-(8-(2-hydroxybenzoyl)amino)

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

caprylic acid, wherein a) the amount of said salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid is at least 0.6 mmol or at least 0.8 mmol. Sodium salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid is taught on page 12, readable on Claim 17, for example. Further, Sauerberg teaches relative amounts readable on Claim 5 as well as the specific peptide of Claim 8, known as semaglutide, see Claim 11. Sauerberg teaches the covalent attachment of fatty acids or fatty diacids, see page 21 under forms of composition starting on page 19 as well as Claim 10. All of the excipients, fillers, binders, etc… of the new claims are taught on page 12-15 of the WO document, those of povidone, microcrystalline cellulose, and magnesium stearate. The ranges taught are nearly identical to those claimed, see page 11 for SMAC and pages 13-14 for the filler, binders, delivery agents, lubricants, etc…

It would have been obvious to one of ordinary skill in the art to use either that salt forms of SNAC or the acid form as taught by Khan or Sauerberg. One would have been motivated to use either one as they have both been shown to be an effective co-agent for administration. Applicant's specification is already supportive of this from the rather broad statement on page one that SNAC has previously been shown to improve the bioavailability of orally administered peptides, see page 1 of the PG Pub. One would have had a reasonable expectation of success in using SNAC in either salt form or acid form, as both have been shown to be effective in providing oral availability of GLP-1. Given that either one is a functional equivalent, one is also motivated to use both in combination as set forth in *In re Kerkhoven*, 205 USPQ 1069 (CCPA 1980), "It is *prima facie* obvious to combine two compositions each of which is taught by prior art to be

[redacted]



useful for same purpose in order to form third composition that is to be used for very same purpose; the idea of combining them flows logically from their having been individually taught in prior art." This is especially true since the acid forms are still likely to have a salt form and vice versa simply through impurities and equilibrium.

Note that Claims 2-4 are claims to results that are the effective outcome of resulting product of Claim 1 and logically flow as properties of the molecule from the assay.

It would have been obvious to one skilled in the art at the time of invention to determine all operable and optimum components of the SNAC ratios as well as their amounts in the claimed invention because these component are an art-recognized result-effective variables that are routinely determined and optimized in the medicinal and pharmaceutical arts. Where the **general conditions** of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation. *In re Aller,* 220 F.2d 454, 456, 105 USPQ 233, 235. In the instant case, ranges of Claims 23 and 32, for example, are of overlapping scope from the teaching of the WO document, see pages 12-15.

Further, the Supreme Court in *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S. Ct. 1727, 82 USPQ2d 1385, 1395-97 (2007) identified a number of rationales to support a conclusion of obviousness which are consistent with the proper "functional approach" to the determination of obviousness as laid down in *Graham*. The key to supporting any rejection under 35 U.S.C. 103 is the clear articulation of the reason(s) why the claimed invention would have been obvious. The Supreme Court in

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

*KSR* noted that the analysis supporting a rejection under 35 U.S.C. 103 should be made explicit. Exemplary rationales that may support a conclusion of obviousness include:

(A) Combining prior art elements according to known methods to yield predictable results;
(B) Simple substitution of one known element for another to obtain predictable results;
(C) Use of known technique to improve similar devices (methods, or products) in the same way;
(D) Applying a known technique to a known device (method, or product) ready for improvement to yield predictable results;
(E) "Obvious to try" – choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success;
(F) Known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations are predictable to one of ordinary skill in the art;
(G) Some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention.

Note that the list of rationales provided is **not** intended to be an all-inclusive list, nor do they need to all be present to make a case for obviousness. Other rationales to support a conclusion of obviousness may be relied upon by Office personnel based upon the findings of the prior art.

In the instant case, (A) above has been presented to demonstrate combining of prior art teachings to arrive at the instantly claimed invention. Further consideration shows that the combination for (A) also embraces (B). (C)-(G) follow with the claimed invention as SNAC is already known to be used with GLP-1, and many other variants of SNAC are taught in the references above.

In conclusion, a reference is good not only for what it teaches by direct anticipation but also for what one of ordinary skill in the art might reasonably infer from the teachings. (In re Opprecht 12 USPQ 2d 1235, 1236 (Fed Cir. 1989); In re Bode 193

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

USPQ 12 (CCPA) 1976). In light of the foregoing discussion, the subject matter defined by the instant claims would have been obvious within the meaning of 35 USC 103(a). From the teachings of the references, it is apparent that one of ordinary skill in the art would have had a reasonable expectation of success in producing the claimed invention. Therefore, the invention as a whole was *prima facie* obvious to one of ordinary skill in the art at the time the invention was made, as evidenced by the references, especially in the absence of evidence to the contrary.

***Applicant's Arguments***

Applicant's arguments are found on page 8 and 9 of the remarks filed 1/27/2016.

***Response to Applicants Arguments***

Applicant's arguments have been carefully considered but are not deemed persuasive to overcome the rejection. In response to applicant's arguments against the references individually, one cannot show nonobviousness by attacking references individually where the rejections are based on combinations of references. See *In re Keller*, 642 F.2d 413, 208 USPQ 871 (CCPA 1981); *In re Merck & Co.*, 800 F.2d 1091, 231 USPQ 375 (Fed. Cir. 1986). This is seen in most of the arguments present.

Applicants remarks are generally drawn to arguments that "a composition containing the active agent (GLP-1 peptide) and the delivery agent (salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid) in different granules is neither taught nor suggested by the prior art, either alone or in combination." However,

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

(1) Claim 1 is drawn to a granule of N-(8-(2- hydroxybenzoyl)amino)caprylic acid and no GLP-1 peptide, and

(2) second type of granules comprises a GLP-1 peptide and no salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid.

Said differently,

(1) Claim 1 is drawn to a granule of N-(8-(2- hydroxybenzoyl)amino)caprylic acid ~~and no GLP-1 peptide~~, and

(2) second type of granules comprises a GLP-1 peptide ~~and no salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid~~.

Therefore, there are two things to be put together, N-(8-(2-hydroxybenzoyl)amino)caprylic acid and GLP-1. The comprising language is there to be inclusive of other things, but it is not obligatory to incorporate the dependent claims into Claim 1 to exclude prior art. The limitation of the dependent claims, if incorporated into claim one **<u>may</u>** overcome the rejection, but for now, the Claim 1 is drawn to two things that are obvious to combine, GLP-1 and N-(8-(2- hydroxybenzoyl)amino)caprylic acid. That they are solid (granule) does not overcome the rejection as it is still two known compounds to be combined.

Lastly, Applicant's have stated the following in the specification: "In some embodiments the term "granule" refers to particles gathered into larger particles." This is quite broad. Therefore, particles of GLP-1 and particles of N-(8-(2-

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

> hydroxybenzoyl)amino)caprylic acid brought together to make a table read on smaller particles being combined to make a larger particle.
>
> Applicant's arguments to improved bioavailability cannot overcome a generic claim. The "unexpected result" is not extended to any and all combination of the instantly claimed invention, such as in Claim 1.

(*Id.*).

25. Claims 1-14 and 16-35 were rejected as failing to comply with the written description requirement. (*Id.* at APOSEM0029303-06). The Examiner stated:

> Claims 1-14 and 16-35 are rejected under 35 U.S.C. 112(a) or 35 U.S.C. 112 (pre-AIA), first paragraph, as failing to comply with the written description requirement. The claim(s) contains subject matter which was not described in the specification in such a way as to reasonably convey to one skilled in the relevant art that the inventor or a joint inventor, or for pre-AIA the inventor(s), at the time the application was filed, had possession of the claimed invention. The instant invention is drawn to compounds of GLP-1. Applicants have support for numerous peptide of GLP-1 as specifically recited in

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

the specification. However, 37 CFR 1.57(c) states that "Essential material" may be incorporated by reference, but only by way of an incorporation by reference to a U.S. patent or U.S. patent application publication, which patent or patent application publication does not itself incorporate such essential material by reference. "Essential material" is material that is necessary to:

> (1) Provide a written description of the claimed invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and set forth the best mode contemplated by the inventor of carrying out the invention as required by the first paragraph of 35 U.S.C. 112;
> (2) Describe the claimed invention in terms that particularly point out and distinctly claim the invention as required by the second paragraph of 35 U.S.C. 112; or
> (3) Describe the structure, material, or acts that correspond to a claimed means or step for performing a specified function as required by the sixth paragraph of 35 U.S.C. 112.

Here, the specification simply points to WO documents without providing specifics as to which GLP-1 peptides are to be incorporated by reference. This also raises potential SEQ ID issues. While the claims recite GLP-1, the specification refers to US patents or WO documents and implicitly states that they are incorporated by reference. Such a disclosure does not provide ample written description for the claimed invention. The decision of Ex Parte Raible, 8 USPQ2d 1709 (BPAI) states:In Raible., Appellants attempted to use the doctrine of incorporation by reference to provide support for a claimed limitation. The Board stated the doctrine of incorporation by reference could not be used by Appellant since the specification did not contain a specific indication of the features disclosed by the incorporating reference which corresponded to the features specifically claimed. See Raible at 1710. Since the specification did not "identify the

[redacted]



specific portions of the patent which appellant may have intended to rely upon to supplement his disclosure." Raible at 1710. The Board concluded "[t]he purpose of incorporation by reference in an application of matter elsewhere written down is for economy, amplification, or clarity of exposition, by means of an incorporating statement clearly identifying the subject matter which is incorporated and where it is to be found. " Raible at 1710. Thus, written description is found for specific GLP-1 compound recited in the specification but not incorporated by reference.

***Applicant's Arguments***

Applicant's arguments are found on page 10 and 11 of the remarks filed 1/27/2016.

***Response to Applicants Arguments***

Applicant's arguments have been carefully considered but are not deemed persuasive to overcome the rejection.

Applicants following remarks are curious (see page 10):

"First, Applicants note that the claims are not drawn to GLP-1 compounds. Rather, the claims are drawn to pharmaceutical compositions comprising a first type of granules comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and no GLP-1 peptide, and a second type of granules comprising a GLP-1 peptide and no salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid."

First, since GLP-1 peptide is present, it is a GLP-1 compound, and a pharmaceutical composition of GLP-1 is still a GLP-1 compound given that it is the active agent for therapy. If other GLP-1 compounds could not be combined with N-(8-(2-hydroxybenzoyl)amino) caprylic acid, then Claim 8 lacks antecedence. Since it is

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

believed that the compounds of Claim 8 are GLP-1 compounds, a GLP-1 peptide is inclusive of many other GLP-1 peptides.

Applicants then argue (see page 10 also):

Second, with respect to the GLP-1 peptides that may be contained within the second type of granules, the present specification clearly describes what "GLP-1 peptides" are both functionally and structurally (see page 13, line 28 to page 15, line 32) and as the Office notes, provides numerous specific examples of such peptides ( see page 16, line 17 to page 22, line 16).

It is understood that the specification does recite specific GLP-1 peptides, and there is ample description for those peptides. But, Applicant's statement in the specification on page 16 support the rejection:

In some embodiments the GLP-1 peptide is selected from one or more of the GLP-1 peptides mentioned in WO93/19175, WO96/29342, WO98/08871, WO99/43707, WO99/43706, WO99/43341, WO99/43708, WO2005/027978, WO2005/058954, WO2005/058958, WO2006/005667, WO2006/037810, WO2006/037811, WO2006/097537, WO2006/097538, WO2008/023050, WO2009/030738, WO2009/030771 and WO2009/030774.

This clearly points out that improper incorporation by reference is found in the instant specification.

(*Id.*).

26. On August 15, 2016, Novo stated:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

<u>**Summary of Claim Amendments and Pending Claims**</u>

Upon entry of the present amendment, claims 1-2 are amended; claims 3-4, 7-8, 15 and 17 are canceled without prejudice or disclaimer and claims 9-14 and 16 are withdrawn. No new matter is added.

The originally filed specification and claims support the present amendments. By entry of the present amendment, claims 1-2, 5-6 and 18-35 are pending and at issue, and claim 1 is an independent claim. Applicants recognize that these claim amendments are made after a final rejection but respectfully request entry as this Amendment is submitted concurrently with an RCE.

Applicants reserve the right to file continuation and/or divisional applications directed to subject matter canceled in claims 3-4, 7-8, 15 and 17.

Applicants note that the present Office Action indicates that claims 1-10 and 17-35, drawn to elected group I, are examined on the merits. However, Applicants note that in the previous October 27, 2015 Office Action, the Office indicated on page 2 under the heading Election/Restrictions that claims 9-14 and 16 were withdrawn from consideration. In particular, the Office noted that claim 12, originally in Group I, had been regrouped with non-elected Group II. In the present Amendment, Applicants have indicated, consistent with the October 27, 2015 Office Action and the May 15, 2015 Office Action, that claims 9-14 and 16 are withdrawn but request confirmation and/or clarification from the Office on this issue.

(*Id.* at APOSEM0029854).

27. Novo amended claims 1 and 2 as follows:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

> 1. (Currently Amended) A pharmaceutical composition comprising a first type of granules and a second type of granules, wherein said first type of granules comprises a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and no GLP-1 peptide, and wherein said second type of granules comprises a GLP-1 peptide and no salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and wherein the GLP-1 peptide in the second type of granules is N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-heptadecanoylamino) butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl] [Aib8,Arg34]GLP-1(7-37).
>
> 2. (Currently Amended) A pharmaceutical composition according to claim 1, wherein the release of said salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is simultaneous with or faster than the release of said GLP-1 peptide in the first 20 minutes of dissolution as determined by dissolution testing using Assay (I) ~~and wherein said release is optionally determined within 30 minutes of said dissolution testing~~ carried out at pH 2.5.

(*Id.* at APOSEM0029849).

28. Novo attempted to distinguish the 497 publication and WO 471, including as follows:

> Amended claim 1 is directed to
>
> A pharmaceutical composition comprising a first type of granules and a second type of granules, wherein said **first type of granules** comprises a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid **and no GLP-1 peptide**, and wherein said **second type of granules** comprises a GLP-1 peptide **and no salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid** and **wherein the GLP-1 peptide in the second type of granules is N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-heptadecanoylamino) butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl] [Aib8,Arg34]GLP-1(7-37).** (emphases added)

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

The Office in its remarks on page 8 of the Office Action, has read key limitations (first type of granule, second type of granule, no GLP-1 in the first granule and no N-(8-(2-hydroxybenzoyl)amino)caprylic acid in the second granule) out of the claims in maintaining this rejection. Further, the Office's reading of the claims ignores the first paragraph of the description of the invention:

> The present inventors have surprisingly found that the dissolution properties of tablets manufactured from the same composition (i.e. same type and the same amounts excipients and delivery agent) **was determined by the design of the granules from which the tablets were formed** (emphasis added).

The impact of the design of the granules on dissolution properties of the tablets is clearly illustrated in the data presented in the Examples where Tablet compositions B and F with SNAC and semaglutide in different granules (as in the claims) show SNAC is released faster than semaglutide during the initial 20 minutes of dissolution (see Examples 2 and 6 and Tables 4 and 8) whereas Tablet compositions C, D and E with SNAC and semaglutide together (as in the prior art) show that SNAC is released more slowly than semaglutide after the first 5-10 minutes of dissolution (see Examples 3-5 and Tables 5-7).

Moreover, as noted previously, the difference in the dissolution rates results in differences in bioavailability between the Tablets with different granules (see Example 7 and Table 9).

In sum to read limitations out of the claims as the Office has done ignores what Applicants have stated is their invention in the specification and claims as well as the data presented in the Examples.

What Applicants claim (a composition containing the active agent (GLP-1 peptide) and the delivery agent (salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid) in different granules), and the differences in dissolution rates and bioavailability that flow from such a composition, is neither taught nor suggested by the combination of Khan and Sauerberg, who at best teach a composition in which GLP-1 and the delivery agent are mixed together in the tablet.

(*Id.* at APOSEM0029855-56).

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

29. In response to the rejection of claims 1-14 and 16-35 for lack of written description support, Novo stated:

> The Office Action rejected claims 1-14 and 16-35 under 35 U.S.C. §112 first paragraph as failing to comply with the written description requirement. In particular, the Office asserts on pages 11-12 of the present Office Action that while "the instant invention is drawn to compounds of GLP-1" and "Applicants have support for numerous peptides of GLP-1 as specifically recited in the specification", there is nonetheless not ample written description for the claimed invention because of a single paragraph in the specification (page 16, lines 11-16) that the Office alleges "clearly points out that improper incorporation by reference is found in the instant specification" (page 12 of the Office Action).
>
> Applicants respectfully traverse this rejection.
>
> While Applicants do not agree with the Office's above assertions and believe the specification provides written support for the claimed invention, Applicants have, in an effort to move forward prosecution, limited the GLP-1 peptide in independent claim 1 to semaglutide.
>
> Accordingly, withdrawal of this rejection is respectfully requested.

(*Id.* at APOSEM0029857).

30. On February 2, 2017, the PTO rejected then-pending claims 1, 2, 5, 6, and 18-35. (*Id.* at APOSEM0029875).

31. Claims 1, 2, 5, 6 and 18-35 were rejected as obvious over the 497 publication and WO 471. (*Id.* at APOSEM0029877-82). The Examiner stated:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

Claims 1, 2, 5, 6 and 18-35 are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Khan, M., US 20050148497 in view of Sauerberg WO 2012/080471 (US 9,278,123), from Applicant's IDS. The references are relied upon for their full even if specific teachings are not addressed in full.

The instant invention is drawn to a pharmaceutical composition comprising a first type of granules and a second type of granules, wherein said first type of granules comprises a salt of N-(8-(2- hydroxybenzoyl)amino)caprylic acid and no GLP-1 peptide, and wherein said second type of granules comprises a GLP-1 peptide (semaglutide) and no salt of N-(8-(2- hydroxybenzoyl)amino)caprylic acid. Note N-(8-(2 hydroxybenzoyl)amino) caprylate is referred to as "SNAC" in the specification, and also

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

known as sodium 8-(salicyloylamino) octanoate, and 8-[(2-hydroxybenzoyl)amino]-Octanoic acid from the STN search report included with this office action.

Khan teaches GLP-1 peptides in the present of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, see page 24. Tablet form are also taught, see paragraph [0035].

Sauerberg, P et al teaches N-(8-(2- hydroxybenzoyl)amino)caprylic acid and GLP-1 together as a composition. Sauerberg further teaches solid composition for oral administration comprising a GLP-1 agonist and a salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid, wherein a) the amount of said salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid is at least 0.6 mmol or at least 0.8 mmol. Sodium salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid is taught on page 12, readable on Claim 17, for example. Further, Sauerberg teaches relative amounts readable on Claim 5 as well as the specific peptide of Claim 1, known as semaglutide. Sauerberg teaches the covalent attachment of fatty acids or fatty diacids, see page 21 under forms of composition starting on page 19 as well as Claim 10. All of the excipients, fillers, binders, etc… of the new claims are taught on page 12-15 of the WO document, those of povidone, microcrystalline cellulose, and magnesium stearate. The ranges taught are nearly identical to those claimed, see page 11 for SMAC and pages 13-14 for the filler, binders, delivery agents, lubricants, etc…

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

It would have been obvious to one of ordinary skill in the art to use either that salt forms of SNAC or the acid form as taught by Khan or Sauerberg. One would have been motivated to use either one as they have both been shown to be an effective co-agent for administration. Applicant's specification is already supportive of this from the rather broad statement on page one that SNAC has previously been shown to improve the bioavailability of orally administered peptides, see page 1 of the PG Pub. One would have had a reasonable expectation of success in using SNAC in either salt form or acid form, as both have been shown to be effective in providing oral availability of GLP-1. Given that either one is a functional equivalent, one is also motivated to use both in combination as set forth in *In re Kerkhoven*, 205 USPQ 1069 (CCPA 1980), "It is *prima facie* obvious to combine two compositions each of which is taught by prior art to be useful for same purpose in order to form third composition that is to be used for very same purpose; the idea of combining them flows logically from their having been individually taught in prior art." This is especially true since the acid forms are still likely to have a salt form and vice versa simply through impurities and equilibrium.

Note that Claims 2 and 5 are claims to results that are the effective outcome of resulting product of Claim 1 and logically flow as properties of the molecule from the assay.

It would have been obvious to one skilled in the art at the time of invention to determine all operable and optimum components of the SNAC ratios as well as their amounts in the claimed invention because these component are an art-recognized

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

result-effective variables that are routinely determined and optimized in the medicinal and pharmaceutical arts. Where the **general conditions** of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation. *In re Aller,* 220 F.2d 454, 456, 105 USPQ 233, 235. In the instant case, ranges of Claims 23 and 32, for example, are of overlapping scope from the teaching of the WO document, see pages 12-15.

Further, the Supreme Court in *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S. Ct. 1727, 82 USPQ2d 1385, 1395-97 (2007) identified a number of rationales to support a conclusion of obviousness which are consistent with the proper "functional approach" to the determination of obviousness as laid down in *Graham*. The key to supporting any rejection under 35 U.S.C. 103 is the clear articulation of the reason(s) why the claimed invention would have been obvious. The Supreme Court in *KSR* noted that the analysis supporting a rejection under 35 U.S.C. 103 should be made explicit. Exemplary rationales that may support a conclusion of obviousness include:

(A) Combining prior art elements according to known methods to yield predictable results;
(B) Simple substitution of one known element for another to obtain predictable results;
(C) Use of known technique to improve similar devices (methods, or products) in the same way;
(D) Applying a known technique to a known device (method, or product) ready for improvement to yield predictable results;
(E) "Obvious to try" – choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success;
(F) Known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations are predictable to one of ordinary skill in the art;

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

(G) Some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention.

Note that the list of rationales provided is **not** intended to be an all-inclusive list, nor do they need to all be present to make a case for obviousness. Other rationales to support a conclusion of obviousness may be relied upon by Office personnel based upon the findings of the prior art.

In the instant case, (A) above has been presented to demonstrate combining of prior art teachings to arrive at the instantly claimed invention. Further consideration shows that the combination for (A) also embraces (B). (C)-(G) follow with the claimed invention as SNAC is already known to be used with GLP-1, and many other variants of SNAC are taught in the references above.

In conclusion, a reference is good not only for what it teaches by direct anticipation but also for what one of ordinary skill in the art might reasonably infer from the teachings. (In re Opprecht 12 USPQ 2d 1235, 1236 (Fed Cir. 1989); In re Bode 193 USPQ 12 (CCPA) 1976). In light of the foregoing discussion, the subject matter defined by the instant claims would have been obvious within the meaning of 35 USC 103(a). From the teachings of the references, it is apparent that one of ordinary skill in the art would have had a reasonable expectation of success in producing the claimed invention. Therefore, the invention as a whole was *prima facie* obvious to one of ordinary skill in the art at the time the invention was made, as evidenced by the references, especially in the absence of evidence to the contrary.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

***Applicant's Arguments***

Applicants have argued:

The impact of the design of the granules on dissolution properties of the tablets is clearly illustrated in the data presented in the Examples where Tablet compositions B and F with SNAC and semaglutide in different granules (as in the claims) show SNAC is released faster than semaglutide during the initial 20 minutes of dissolution (see Examples 2 and 6 and Tables 4 and 8) whereas Tablet compositions C, D and E with SNAC and semaglutide together (as in the prior art) show that SNAC is released more slowly than semaglutide after the first 5-10 minutes of dissolution (see Examples 3-5 and Tables 5-7).

***Response to Applicants Arguments***

Applicant's arguments have been carefully considered but are not deemed persuasive to overcome the rejection.

Applicants Claims are to the mixing of two ingredients, SNAC and a GLP-1 compound called semaglutide. The amendment merely incorporate a species in a dependent claim into the dependent claim. The previous rejection is still valid. Looking to how Applicants are making the composition, they are taking two substances and mixing them. Sauerberg speaks to granulation and combining granulated components, see preparation of composition. It appears that one is mixing two substances by the claims and the specification. Thus, the teachings of Khan, M., and Sauerberg appear to render the instant invention obvious over the prior art.

(*Id.*).

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

32. Claims 1, 2, 5, 6 and 18-35 were rejected in the ground of nonstatutory double patenting as being unpatentable over claims 1-14 of U.S. Patent No. 9,278,123. (*Id.* at APOSEM0029883-84). The Examiner stated:

> Claims 1, 2, 5, 6 and 18-35 are rejected on the ground of nonstatutory double patenting as being unpatentable over Claims 1-14 of U.S. Patent No. 9,278,123. Although the claims at issue are not identical, they are not patentably distinct from each other because the '123 patent is drawn to a composition of semaglutide and SNAC. Looking to the specification, granulation is taught as well as all of the excipients, fillers, binders, etc… of the new claims are taught on page 12-15 of the WO document, those

> of povidone, microcrystalline cellulose, and magnesium stearate. The ranges taught are nearly identical to those claimed, see page 11 for SMAC and pages 13-14 for the filler, binders, delivery agents, lubricants, etc… Therefore, the invention is obvious over the teaching of the '123 patent.

(*Id.*).

33. On May 2, 2017, Novo stated:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

> **<u>Summary of Claim Amendments and Pending Claims</u>**
>
> Upon entry of the present amendment, claim 28 is amended; claims 3, 7-8, 15 and 17 are canceled without prejudice or disclaimer; and claims 9-14 and 16 are withdrawn. No new matter is added.
>
> The originally filed specification and claims support the present amendments. By entry of the present amendment, claims 1-2, 5-6 and 18-35 are pending and at issue, and claim 1 is an independent claim.
>
> Applicants reserve the right to file continuation and/or divisional applications directed to subject matter canceled in claims 3, 7-8, 15 and 17.

(*Id.* at APOSEM0029904).

34. Claim 28 was amended as follows:

> 28. (Currently Amended) A pharmaceutical composition according to claim ~~17~~ 6, wherein said first type of granules further comprises a lubricant.

(*Id.* at APOSEM0029902).

35. Novo attempted to distinguish the 497 publication and WO 471, including as follows:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

The Office Action rejected claims 1, 2, 5, 6 and 18-35 under pre-AIA 35 U.S.C. §103(a) as being unpatentable over Khan, M., US 20050148497 in view of Sauerberg WO 2012/080471 (US 9,278,123), from Applicant's IDS.

Applicants respectfully traverse this rejection.

The Sauerberg WO published June 21st, 2012 and the Sauerberg US patent 9,278,123 issued as a patent on March 8, 2016 and published as US publication 2013-0345134 on December 26, 2013.

By comparison, the present application claims as its earliest priority filing date an EP application filed March 22, 2012: i.e. a date that is before the Sauerberg WO and US publication dates and before the issue date of the Sauerberg US patent. As the present claims find support in, and are entitled to, the March 22, 2012 EP priority filing, the Sauerberg WO is not available as prior art and the Sauerberg US patent is only available as prior art under 102(e)/103. Further, since the present application is being examined under the pre-AIA provisions, Applicants hereby remove the Sauerberg US patent 9,278,123 as prior art under 35 USC 103(c) by stating that the subject matter of US patent 9,278,123 and the presently claimed invention were, at the time the presently claimed invention was made, owned by the same person or subject to an obligation of assignment to the same person as evidenced by the assignment for US patent 9,278,123 at Reel/Frame 030952/0031 and the assignment for the present application at Reel/Frame 034438/0552.

Accordingly as the present rejection is now based only on the Khan US publication that merely discloses GLP-1 peptides in the presence of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, Applicants respectfully submit that the present claims are non-obvious over the cited art and withdrawal of this rejection is respectfully requested.

(*Id.* at APOSEM0029904-05).

36. In response to the double patenting rejection, Novo stated:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

The Office Action rejected claims 1, 2, 5, 6 and 18-35 on the grounds of nonstatutory obviousness-type double patenting as being unpatentable over claims 1-14 of U.S. Patent No. 9,278, 123.

Applicants respectfully traverse this rejection.

The Office has based the present obviousness-type double patenting rejection on the assertion that Applicants' claims are to the mixing of two ingredients SNAC and semaglutide.

This is incorrect.

The present claims are to a pharmaceutical composition where the SNAC and semaglutide are **not** mixed together. Rather, they are kept in separate granules; hence the language in independent claim 1 that the first type of granule contains a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid but no semaglutide and the second type of granule contains semaglutide but no salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid. The existence of the two types of granules enables the independent release of the components of each granule type. By comparison, in the compositions of Sauerberg, the SNAC and semaglutide are mixed together.

As noted at page 9 of the previous Amendment where the prior art referred to is the compositions of Sauerberg:

"The impact of the design of the granules on dissolution properties of the tablets is clearly illustrated in the data presented in the Examples where Tablet compositions B and F with SNAC and semaglutide in different granules (as in the claims) show SNAC is released faster than semaglutide during the initial 20 minutes of dissolution (see Examples 2 and 6 and Tables 4 and 8) whereas Tablet compositions C, D and E with SNAC and semaglutide together (as in the prior art) show that SNAC is released more slowly than semaglutide after the first 5-10 minutes of dissolution (see Examples 3-5 and Tables 5-7).

Moreover, as noted previously, the difference in the dissolution rates results in differences in bioavailability between the Tablets with different granules (see Example 7 and Table 9)."

Applicants submit that these differences in dissolution rates and bioavailability that flow from the claimed compositions are neither taught nor suggested by the claims of Sauerberg which are directed to a composition where the SNAC and semaglutide are mixed together. Accordingly, withdrawal of this obviousness-type double patenting rejection is respectfully requested.

[redacted]



(*Id.* at APOSEM0029905-06).

37. On July 24, 2017, the PTO rejected then-pending claims 1, 2, 5, 6, and 18-35. (*Id.* at APOSEM0030080).

38. Claims 1, 2, 5, 6 and 18-35 were rejected as obvious over the 497 publication and WO 471. (*Id.* at APOSEM0030082-87). The Examiner stated:

> Claims 1, 2, 5, 6 and 18-35 stand rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Khan, M., US 20050148497 in view of Sauerberg WO 2012/080471 (US 9,278,123), from Applicant's IDS. The references are relied upon for their full even if specific teachings are not addressed in full.
>
> The instant invention is drawn to a pharmaceutical composition comprising a first type of granules and a second type of granules, wherein said first type of granules comprises a salt of N-(8-(2- hydroxybenzoyl)amino)caprylic acid and no GLP-1 peptide, and wherein said second type of granules comprises a GLP-1 peptide (semaglutide) and no salt of N-(8-(2- hydroxybenzoyl)amino)caprylic acid. Note N-(8-(2 hydroxybenzoyl)amino) caprylate is referred to as "SNAC" in the specification, and also known as sodium 8-(salicyloylamino) octanoate, and 8-[(2-hydroxybenzoyl)amino]-Octanoic acid from the STN search report included with this office action.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

Khan teaches GLP-1 peptides in the present of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, see page 24. Tablet form are also taught, see paragraph [0035].

Sauerberg, P et al teaches N-(8-(2- hydroxybenzoyl)amino)caprylic acid and GLP-1 together as a composition. Sauerberg further teaches solid composition for oral administration comprising a GLP-1 agonist and a salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid, wherein a) the amount of said salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid is at least 0.6 mmol or at least 0.8 mmol. Sodium salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid is taught on page 12, readable on Claim 17, for example. Further, Sauerberg teaches relative amounts readable on Claim 5 as well as the specific peptide of Claim 1, known as semaglutide. Sauerberg teaches the covalent attachment of fatty acids or fatty diacids, see page 21 under forms of composition starting on page 19 as well as Claim 10. All of the excipients, fillers, binders, etc… of the new claims are taught on page 12-15 of the WO document, those of povidone, microcrystalline cellulose, and magnesium stearate. The ranges taught are nearly identical to those claimed, see page 11 for SMAC and pages 13-14 for the filler, binders, delivery agents, lubricants, etc…

It would have been obvious to one of ordinary skill in the art to use either that salt forms of SNAC or the acid form as taught by Khan or Sauerberg. One would have been motivated to use either one as they have both been shown to be an effective co-agent for administration. Applicant's specification is already supportive of this from the rather broad statement on page one that SNAC has previously been shown to improve the

[redacted]



bioavailability of orally administered peptides, see page 1 of the PG Pub. One would have had a reasonable expectation of success in using SNAC in either salt form or acid form, as both have been shown to be effective in providing oral availability of GLP-1. Given that either one is a functional equivalent, one is also motivated to use both in combination as set forth in *In re Kerkhoven*, 205 USPQ 1069 (CCPA 1980), "It is *prima facie* obvious to combine two compositions each of which is taught by prior art to be useful for same purpose in order to form third composition that is to be used for very same purpose; the idea of combining them flows logically from their having been individually taught in prior art." This is especially true since the acid forms are still likely to have a salt form and vice versa simply through impurities and equilibrium.

Note that Claims 2 and 5 are claims to results that are the effective outcome of resulting product of Claim 1 and logically flow as properties of the molecule from the assay.

It would have been obvious to one skilled in the art at the time of invention to determine all operable and optimum components of the SNAC ratios as well as their amounts in the claimed invention because these component are an art-recognized result-effective variables that are routinely determined and optimized in the medicinal and pharmaceutical arts. Where the **general conditions** of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation. *In re Aller,* 220 F.2d 454, 456, 105 USPQ 233, 235. In the instant

[redacted]



case, ranges of Claims 23 and 32, for example, are of overlapping scope from the teaching of the WO document, see pages 12-15.

Further, the Supreme Court in *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S. Ct. 1727, 82 USPQ2d 1385, 1395-97 (2007) identified a number of rationales to support a conclusion of obviousness which are consistent with the proper "functional approach" to the determination of obviousness as laid down in *Graham*. The key to supporting any rejection under 35 U.S.C. 103 is the clear articulation of the reason(s) why the claimed invention would have been obvious. The Supreme Court in *KSR* noted that the analysis supporting a rejection under 35 U.S.C. 103 should be made explicit. Exemplary rationales that may support a conclusion of obviousness include:

(A) Combining prior art elements according to known methods to yield predictable results;
(B) Simple substitution of one known element for another to obtain predictable results;
(C) Use of known technique to improve similar devices (methods, or products) in the same way;
(D) Applying a known technique to a known device (method, or product) ready for improvement to yield predictable results;
(E) "Obvious to try" – choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success;
(F) Known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations are predictable to one of ordinary skill in the art;
(G) Some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention.

Note that the list of rationales provided is **not** intended to be an all-inclusive list, nor do they need to all be present to make a case for obviousness. Other rationales to

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

support a conclusion of obviousness may be relied upon by Office personnel based upon the findings of the prior art.

In the instant case, (A) above has been presented to demonstrate combining of prior art teachings to arrive at the instantly claimed invention. Further consideration shows that the combination for (A) also embraces (B). (C)-(G) follow with the claimed invention as SNAC is already known to be used with GLP-1, and many other variants of SNAC are taught in the references above.

In conclusion, a reference is good not only for what it teaches by direct anticipation but also for what one of ordinary skill in the art might reasonably infer from the teachings. (In re Opprecht 12 USPQ 2d 1235, 1236 (Fed Cir. 1989); In re Bode 193 USPQ 12 (CCPA) 1976). In light of the foregoing discussion, the subject matter defined by the instant claims would have been obvious within the meaning of 35 USC 103(a). From the teachings of the references, it is apparent that one of ordinary skill in the art would have had a reasonable expectation of success in producing the claimed invention. Therefore, the invention as a whole was *prima facie* obvious to one of ordinary skill in the art at the time the invention was made, as evidenced by the references, especially in the absence of evidence to the contrary.

***Applicant's Arguments***

Applicants have argued that the WO 2012/080471 is not prior art, see page page 7 and 8.

[redacted]



> ***Response to Applicants Arguments***
>
> Applicant's arguments have been carefully considered but are not deemed persuasive to overcome the rejection.
>
> The WO 2012/080471 document has a priority to 16 of December 2010 and 20 December 2010 and is therefore prior art.

(*Id.*).

39. Claims 1, 2, 5, 6 and 18-35 were rejected in the ground of nonstatutory double patenting as being unpatentable over claims 1-14 of U.S. Patent No. 9,278,123. (*Id.* at APOSEM0030087-88). The Examiner stated:

> Claims 1, 2, 5, 6 and 18-35 are rejected on the ground of nonstatutory double patenting as being unpatentable over Claims 1-14 of U.S. Patent No. 9,278,123.

[redacted]



Although the claims at issue are not identical, they are not patentably distinct from each other because the '123 patent is drawn to a composition of semaglutide and SNAC. Looking to the specification, granulation is taught as well as all of the excipients, fillers, binders, etc… of the new claims are taught on page 12-15 of the WO document, those of povidone, microcrystalline cellulose, and magnesium stearate. The ranges taught are nearly identical to those claimed, see page 11 for SMAC and pages 13-14 for the filler, binders, delivery agents, lubricants, etc… Therefore, the invention is obvious over the teaching of the '123 patent.

***Applicant's Arguments***

Applicant's arguments are found on pages 8 and 9 of the remarks filed 05/02/2017.

***Response to Applicants Arguments***

Applicant's arguments have been carefully considered but are not deemed persuasive to overcome the rejection.

The components claimed are found in the claims, and the specification further teaches these components granulated. Further, the size of the granule has not been defined in the instant spec, at paragraph [0003] the term "granule" refers to small particles gathered into a large mass. Small particles could be a powder.

(*Id.*).

40. On October 24, 2017, Novo stated:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

> Claims numbered 1, 2, 5, 6, 9-14, 16, and 18-35 are pending and at issue; claims numbered 9-14 and 16 are withdrawn from consideration. The Office has rejected claims numbered 1, 2, 5, 6 and 18-35.
>
> By the present Amendment/Response claim number 1 is amended and claims numbered 28-35 are cancelled. Accordingly, claims numbered 1, 2, 5, 6, 9-14, 16, and 18-27 are pending and at issue. No new matter is believed presented, and all pending claims are believed allowable.

(*Id.* at APOSEM0030278).

41. Claim 1 was amended as follows:

> 1. (**Currently Amended**) A pharmaceutical composition comprising a first type of granules and a second type of granules, wherein said first type of granules comprises a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and no GLP-1 peptide, and wherein said second type of granules comprises ~~**a GLP-1 peptide**~~ **N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-heptadecanoylamino)butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl][Aib8,Arg34]GLP-1(7-37)** and no salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid ~~**and wherein the GLP-1 peptide in the second type of granules is N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-heptadecanoylamino)butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl][Aib8,Arg34]GLP-1(7-37)**~~.

(*Id.* at APOSEM0030273).

42. Novo attempted to distinguish the 497 publication and WO 471, including as follows:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

The Office has rejected claims 1, 2, 5, 6 and 18-35 under 35 U.S.C. §103 as being unpatentable over Khan US 2005/0148497 in view of Sauerberg WO 2012/080471/US 9,278,123.

The Office again cited Khan as teaching GLP-1 peptides in the presence of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and Sauerberg as teaching solid compositions for oral administration comprising a GLP-1 agonist and a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid. Applicants respectfully traverse this rejection.

The Office **has read key limitations** (first type of granule, second type of granule, no GLP-1 in the first granule and no N-(8-(2-hydroxybenzoyl)amino)caprylic acid in the second granule) **out**

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

**of the claims** in maintaining this rejection. Further, the Office's reading of the claims ignores the first paragraph of the description of the invention:

> *The present inventors have surprisingly found that the dissolution properties of tablets manufactured from the same composition (i.e. same type and the same amounts excipients and delivery agent)* ***was determined by the design of the granules from which the tablets were formed*** *(emphasis added).*

The impact of the design of the granules on dissolution properties of the tablets is clearly illustrated in the data presented in the Examples where Tablet compositions B and F with SNAC and semaglutide in different granules (as in the claims) show SNAC is released faster than semaglutide during the initial 20 minutes of dissolution (see Examples 2 and 6 and Tables 4 and 8) whereas Tablet compositions C, D and E with SNAC and semaglutide together (as in the prior art) show that SNAC is released more slowly than semaglutide after the first 5-10 minutes of dissolution (see Examples 3-5 and Tables 5-7).

Moreover, as noted previously, the difference in the dissolution rates results in differences in bioavailability between the Tablets with different granules (see Example 7 and Table 9).

To read limitations out of the claims as the Office has done ignores what Applicants have stated is their invention in the specification and claims as well as the data presented in the Examples. Applicant respectfully directs the Office's attention to MPEP § 2143 wherein it is stated the Examiner must clearly articulate why **each feature** is taught or is obvious in light of the prior art (emphasis added). The missing elements: (**first type of granules comprises a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and no GLP-1 peptide, and wherein said second type of granules comprises N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-heptadecanoylamino)butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl] [Aib8,Arg34]GLP-1(7-37) and no salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid**) are not necessarily present in the cited prior art documents. The fact that a certain result or characteristic

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

> may occur or be present in the prior art is not sufficient to establish the inherency of that result or characteristic (MPEP § 2112). The Office has not identified any prior art references disclosing or suggesting the elements noted above, but merely asserted in a conclusory manner that those limitations would have been obvious or could have been predicted while failing to address why one of ordinary skill in the art would choose the specific elements claimed.
>
> What Applicants claim (a composition containing the active agent (GLP-1 peptide) and the delivery agent (salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid) in different granules), and the differences in dissolution rates and bioavailability that flow from such a composition, is neither taught nor suggested by the combination of Khan and Sauerberg, who at best teach a composition in which GLP-1 and the delivery agent are mixed together in the tablet.
>
> Applicants respectfully request reconsideration and withdrawal of the rejections of claims numbered 1, 2, 5, 6 and 18-35 under 35 U.S.C. §103(a).

(*Id.* at APOSEM0030278-80).

43. In response to the double patenting rejection, Novo stated:

> (a) The Office has rejected claims numbered 1, 2, 5, 6 and 18-35 on the ground of non-statutory double patenting over claims numbered 1-14 of U.S. Patent No. 9,278,123.
>
> Applicants respectfully submit that until allowable subject matter is found, a complete determination of non-statutory double patenting cannot be made. Applicants submit that once allowable subject matter is found, Applicants may consider the filing of a terminal disclaimer(s).

(*Id.* at APOSEM0030280).

44. On March 9, 2018, the PTO rejected then-pending claims 1, 2, 5, 6, and 18-35. (*Id.* at APOSEM0030289).

45. Claims 1, 2, 5, 6 and 18-35 were rejected as obvious over the 497 publication and WO 471. (*Id.* at APOSEM0030291-98). The Examiner stated:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

Claims 1, 2, 5, 6 and 18-35 stand rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Khan, M., US 20050148497 in view of Sauerberg WO 2012/080471 (US 9,278,123), from Applicant's IDS. The references are relied upon for their full even if specific teachings are not addressed in full.

The instant invention is drawn to a pharmaceutical composition comprising a first type of granules and a second type of granules, wherein

(a) first type of granules comprises a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid (SNAC) and no GLP-1 peptide, therefore a granule of SNAC

wherein said second type of granules comprises

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

(b) GLP-1 peptide (semaglutide) and no salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, therefore a granule of semaglutide. Note N-(8-(2 hydroxybenzoyl)amino) caprylate is referred to as "SNAC" in the specification, and also known as sodium 8-(salicyloylamino) octanoate, and 8-[(2-hydroxybenzoyl)amino]-Octanoic acid from the STN search report included in previous office action.

The invention is drawn to a granule of SNAC and a granule of semaglutide.

Khan teaches GLP-1 peptides in the present of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, see page 24. Tablet form are also taught, see paragraph [0035]. Pharmaceutical salts are taught that they may be *optionally* employed in the invention, see [0034].

Sauerberg, P et al teaches N-(8-(2- hydroxybenzoyl)amino)caprylic acid and GLP-1 together as a composition, see Claim 1. The title of the patent is also relevant as it states : Solid compositions comprising a GLP-1 agonist and a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid. Sauerberg further teaches solid composition for oral administration comprising a GLP-1 agonist and a salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid, wherein a) the amount of said salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid is at least 0.6 mmol or at least 0.8 mmol. Improved rations are taught that have improved bioavailability. Sodium salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid is taught on page 12, readable on Claim 17, for example. Further, Sauerberg teaches relative amounts readable on Claim 5 as well as the specific peptide of Claim 1, known as semaglutide. Sauerberg teaches the covalent

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

attachment of fatty acids or fatty diacids, see page 21 under forms of composition starting on page 19 as well as Claim 10. All of the excipients, fillers, binders, etc… of the new claims are taught on page 12-15 of the WO document, those of povidone, microcrystalline cellulose, and magnesium stearate. The ranges taught are nearly identical to those claimed, see page 11 for SMAC and pages 13-14 for the filler, binders, delivery agents, lubricants, etc… Sauerberg also speaks to granulation, see column 12 of the PgPub at line 20.

Most importantly, Sauerberg teaches: *The present invention relates to solid compositions of a GLP-1 agonist and salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid. Surprisingly, the present inventors have found that solid compositions comprising certain amounts of a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, such as SNAC, are optimal for oral administration of GLP-1 agonists. Accordingly, the compositions provide improved exposure and/or bioavailability of the GLP-1 agonist.* In order for the salt form to be known as improved, the non-salt form must be known to the skilled artisan, since that would be the control.

It would have been obvious to one of ordinary skill in the art to use either that salt forms of SNAC or the acid form as taught by Khan or Sauerberg. One would have been motivated to use either one as they have both been shown to be an effective co-agent for administration. Applicant's specification is already supportive of this from the rather broad statement on page one that SNAC has previously been shown to improve the bioavailability of orally administered peptides, see page 1 of the PG Pub. One would have had a reasonable expectation of success in using SNAC in either salt form or acid

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

form, as both have been shown to be effective in providing oral availability of GLP-1. Recall that Khan teaches salt form as optimal. Given that either one is a functional equivalent, one is also motivated to use both in combination as set forth in *In re Kerkhoven*, 205 USPQ 1069 (CCPA 1980), "It is *prima facie* obvious to combine two compositions each of which is taught by prior art to be useful for same purpose in order to form third composition that is to be used for very same purpose; the idea of combining them flows logically from their having been individually taught in prior art." This is especially true since the acid forms are still likely to have a salt form and vice versa simply through impurities and equilibrium.

Note that Claims 2 and 5 are claims to results that are the effective outcome of resulting product of Claim 1 and logically flow as properties of the molecule from the assay.

It would have been obvious to one skilled in the art at the time of invention to determine all operable and optimum components of the SNAC ratios as well as their amounts in the claimed invention because these component are an art-recognized result-effective variables that are routinely determined and optimized in the medicinal and pharmaceutical arts. Further, the weight of the tablet, Claim 27, is not patentable as it is still the same composition.

Generally, differences in concentration or temperature will not support the patentability of subject matter encompassed by the prior art unless there is evidence indicating such concentration or temperature is critical. "[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." In reAller, 220 F.2d 454, 456, 105 USPQ 233, 235 (CCPA 1955) (Claimed process which was performed at a temperature

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

between 40°C and 80°C and an acid concentration between 25% and 70% was held to be prima facie obvious over a reference process which differed from the claims only in that the reference process was performed at a temperature of 100°C and an acid concentration of 10%.); see also Peterson, 315 F.3d at 1330, 65 USPQ2d at 1382 ("The normal desire of scientists or artisans to improve upon what is already generally known provides the motivation to determine where in a disclosed set of percentage ranges is the optimum combination of percentages."); In reHoeschele, 406 F.2d 1403, 160 USPQ 809 (CCPA 1969) (Claimed elastomeric polyurethanes which fell within the broad scope of the references were held to be unpatentable thereover because, among other reasons, there was no evidence of the criticality of the claimed ranges of molecular weight or molar proportions.). For more recent cases applying this principle, see Merck & Co. Inc.v.Biocraft Lab. Inc., 874 F.2d 804, 10 USPQ2d 1843 (Fed. Cir.), cert. denied, 493 U.S. 975 (1989); In reKulling, 897 F.2d 1147, 14 USPQ2d 1056 (Fed. Cir. 1990); and In re Geisler, 116 F.3d 1465, 43 USPQ2d 1362 (Fed. Cir. 1997); Smith v. Nichols, 88 U.S. 112, 118-19 (1874) (a change in form, proportions, or degree "will not sustain a patent"); In re Williams, 36 F.2d 436, 438 (CCPA 1929) ("It is a settled principle of law that a mere carrying forward of an original patented conception involving only change of form, proportions, or degree, or the substitution of equivalents doing the same thing as the original invention, by substantially the same means, is not such an invention as will sustain a patent, even though the changes of the kind may produce better results than prior inventions."). See also KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 416 (2007) (identifying "the need for caution in granting a patent based on the combination of elements found in the prior art.").

In the instant case, ranges of Claims 23 and 32, for example, are of overlapping scope from the teaching of the WO document, see pages 12-15.

Further, the Supreme Court in *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S. Ct. 1727, 82 USPQ2d 1385, 1395-97 (2007) identified a number of rationales to support a conclusion of obviousness which are consistent with the proper "functional approach" to the determination of obviousness as laid down in *Graham*. The key to supporting any rejection under 35 U.S.C. 103 is the clear articulation of the reason(s) why the claimed invention would have been obvious. The Supreme Court in

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

*KSR* noted that the analysis supporting a rejection under 35 U.S.C. 103 should be made explicit. Exemplary rationales that may support a conclusion of obviousness include:

(A) Combining prior art elements according to known methods to yield predictable results;
(B) Simple substitution of one known element for another to obtain predictable results;
(C) Use of known technique to improve similar devices (methods, or products) in the same way;
(D) Applying a known technique to a known device (method, or product) ready for improvement to yield predictable results;
(E) "Obvious to try" – choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success;
(F) Known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations are predictable to one of ordinary skill in the art;
(G) Some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention.

Note that the list of rationales provided is **not** intended to be an all-inclusive list, nor do they need to all be present to make a case for obviousness. Other rationales to support a conclusion of obviousness may be relied upon by Office personnel based upon the findings of the prior art.

In the instant case, (A) above has been presented to demonstrate combining of prior art teachings to arrive at the instantly claimed invention. Further consideration shows that the combination for (A) also embraces (B). (C)-(G) follow with the claimed invention as SNAC is already known to be used with GLP-1, and many other variants of SNAC are taught in the references above.

In conclusion, a reference is good not only for what it teaches by direct anticipation but also for what one of ordinary skill in the art might reasonably infer from the teachings. (In re Opprecht 12 USPQ 2d 1235, 1236 (Fed Cir. 1989); In re Bode 193

[redacted]



USPQ 12 (CCPA) 1976). In light of the foregoing discussion, the subject matter defined by the instant claims would have been obvious within the meaning of 35 USC 103(a). From the teachings of the references, it is apparent that one of ordinary skill in the art would have had a reasonable expectation of success in producing the claimed invention. Therefore, the invention as a whole was *prima facie* obvious to one of ordinary skill in the art at the time the invention was made, as evidenced by the references, especially in the absence of evidence to the contrary.

***Applicant's Arguments***

Applicant's arguments are found on page 8-10 of the remarks filed 10/24/2017

***Response to Applicants Arguments***

Applicant's arguments have been carefully considered but are not deemed persuasive to overcome the rejection.

Applicants have stated on page 9 that "the Examiner must clearly articulate why each feature is taught or is obvious in light of the prior art (emphasis added). The missing element being the newly amended claim that was not present in the previous office action. Further, Applicants are stating their invention is a GLP-1 granule and a SNAC granule combined together." The Examiner has looked to the definition of granule, and as argued in the previous office action, a granule is simply an amount of the composition. Merriam-Webster defines granule as a small particle; especially : one of numerous particles forming a larger unit, see https://www.merriam-

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

webster.com/dictionary/granule. Thus, the invention is drawn to small particles of GLP-1 and SNAC in combination. Given that the salt for had advantages (unexpected result), it is unclear what unexpected advantage will be without it. As stated in the office action mailed 02/02/2017, "Applicants Claims are to the mixing of two ingredients, SNAC and a GLP-1 compound called semaglutide. The amendment merely incorporate a species in a dependent claim into the dependent claim. The previous rejection is still valid. Looking to how Applicants are making the composition, they are taking two substances and mixing them. Sauerberg speaks to granulation and combining granulated components, see preparation of composition. It appears that one is mixing two substances by the claims and the specification."

Lastly, since Applicants have amended the claims, it would be impossible for the previous office action to address what was not present as asserted on page 10. Thus, the teachings of Khan, M., and Sauerberg appear to render the instant invention obvious over the prior art."

(*Id.*).

46. Claims 1, 2, 5, 6 and 18-35 were rejected in the ground of nonstatutory double patenting as being unpatentable over claims 1-14 of U.S. Patent No. 9,278,123. (*Id.* at APOSEM0030299-300). The Examiner stated:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

Claims 1, 2, 5, 6 and 18-35 are rejected on the ground of nonstatutory double patenting as being unpatentable over Claims 1-14 of U.S. Patent No. 9,278,123 in view of Khan, M., US 20050148497. Although the claims at issue are not identical, they are not patentably distinct from each other because the '123 patent is drawn to a composition of semaglutide and SNAC. Looking to the specification, granulation is taught as well as all of the excipients, fillers, binders, etc… of the new claims are taught on page 12-15 of the WO document, those of povidone, microcrystalline cellulose, and magnesium stearate. The ranges taught are nearly identical to those claimed, see page 11 for SMAC and pages 13-14 for the filler, binders, delivery agents, lubricants, etc… Further, the salt forms of SNAC is known to be optional from Khan. Therefore, the invention is obvious over the teaching of the '123 patent.

***Applicant's Arguments***

Applicant's arguments are found on pages 10 of the remarks filed 05/02/2017.

***Response to Applicants Arguments***

Applicant's arguments have been carefully considered but are not deemed persuasive to overcome the rejection.

Applicant's state: "Applicants respectfully submit that until allowable subject matter is found, a complete determination of non-statutory double patenting cannot be made. Applicants submit that once allowable subject matter is found, Applicants may consider the filing of a terminal disclaimer(s)." The rejection is maintained.

(*Id.*).

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

47. Claims 23-26 were rejected as being indefinite. (*Id.* at APOSEM0030300. The Examiner stated:

> Claim 23-26 are rejected under 35 U.S.C. 112(b) or 35 U.S.C. 112 (pre-AIA), second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which the inventor or a joint inventor, or for pre-AIA the applicant regards as the invention.
>
> Claim 23 claims a salt of SNAC, The SNAC of Claim 1 is not the SNAC form.

(*Id.*).

48. On June 8, 2018, Novo stated:

> Claims numbered 1, 2, 5, 6, 9-14, 16, and 18-27 are pending and at issue; claims numbered 9-14 and 16 are withdrawn from consideration. The Office has rejected claims numbered 1, 2, 5, 6 and 18-27.
>
> By the present Amendment/Response claim number 1 is amended, claim number 27 is cancelled, and new claims numbered 36-37 are added. Accordingly, claims numbered 1, 2, 5, 6, 9-14, 16, and 18-26 and 36-37 are pending and at issue. No new matter is believed presented, and all pending claims are believed allowable.

(*Id.* at APOSEM0030316).

49. Claim 1 was amended as follows:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

> 1. (**Currently Amended**) A pharmaceutical composition **comprising: a solid dosage form** comprising a first type of granules and a second type of granules, wherein said first type of granules comprises a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and no GLP-1 peptide, and wherein said second type of granules comprises N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-heptadecanoylamino)butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl][Aib8,Arg34]GLP-1(7-37) and no salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid.

(*Id.* at APOSEM0030312). New claims 36 and 37 are below:

> 36. (**New**) A pharmaceutical composition according to claim 1 wherein the solid dosage form is selected from the group consisting of tablet, capsule and sachet.
>
> 37. (**New**) A pharmaceutical composition according to claim 36, wherein said composition is in the form of a tablet, wherein the weight of said tablet is in the range of 150 mg to 1000 mg.

(*Id.* at APOSEM0030316).

50. Novo attempted to distinguish the 497 publication and WO 471, including as follows:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

The Office **has read key limitations out of the claims** in maintaining this rejection (first type of granule, second type of granule, no GLP-1 in the first granule and no N-(8-(2-hydroxybenzoyl)amino)caprylic acid in the second granule). Further, the Office's reading of the claims ignores the first paragraph of the description of the invention:

> *The present inventors have surprisingly found that the dissolution properties of tablets manufactured from the same composition (i.e. same type and the same amounts excipients and delivery agent)* ***was determined by the design of the granules from which the tablets were formed*** *(emphasis added).*

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

The impact of the design of the granules on dissolution properties of the tablets is clearly illustrated in the data presented in the Examples where Tablet compositions B and F with SNAC and semaglutide in different granules (as in the claims) show SNAC is released faster than semaglutide during the initial 20 minutes of dissolution (see Examples 2 and 6 and Tables 4 and 8) whereas Tablet compositions C, D and E with SNAC and semaglutide together (as in the prior art) show that SNAC is released more slowly than semaglutide after the first 5-10 minutes of dissolution (see Examples 3-5 and Tables 5-7).

Moreover, as noted previously, the difference in the dissolution rates results in differences in bioavailability between the Tablets with different granules (see Example 7 and Table 9).

To read limitations out of the claims as the Office has done ignores what Applicants have stated is their invention in the specification and claims as well as the data presented in the Examples. Applicant respectfully directs the Office's attention to MPEP § 2143 wherein it is stated the Examiner must clearly articulate why **each feature** is taught or is obvious in light of the prior art (emphasis added). The missing elements: (first type of granules comprises a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and no GLP-1 peptide, and wherein said second type of granules comprises N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-heptadecanoylamino)butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl][Aib8,Arg34]GLP-1(7-37) and no salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid) are not necessarily present in the cited prior art documents. The fact that a certain result or characteristic may occur or be present in the prior art is not sufficient to establish the inherency of that result or characteristic (MPEP § 2112). The Office has not identified any prior art references disclosing or suggesting the elements noted above, but merely asserted in a conclusory manner that those limitations would have been obvious or could have been predicted while failing to address why one of ordinary skill in the art would choose the specific elements claimed.

What Applicants claim (a pharmaceutical composition solid dosage form containing the active agent (N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-heptadecanoylamino)butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl]

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

> [Aib8,Arg34]GLP-1(7-37)) and the delivery agent (salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid) in different granules), and the differences in dissolution rates and bioavailability that flow from such a composition, is neither taught nor suggested by the combination of Khan and Sauerberg, who at best teach a composition in which GLP-1 and the delivery agent are mixed together in the tablet.
>
> Applicants respectfully request reconsideration and withdrawal of the rejections of claims numbered 1, 2, 5, 6 and 18-35 under 35 U.S.C. §103(a).

(*Id.* at APOSEM0030317-20).

51. Novo also stated:

> Applicants further note that "granule" is a term understood by those having ordinary skill in the relevant art (pharmaceutical formulation) as being directed to a dosage form in its own right composed of small particles gathered into a large mass (see specification as filed page 1, lines 17-18); granulation may be defined as a size enlargement process which converts small particles into physically stronger and larger agglomerates, which are known as granules. *Remington: The Science and Practice of Pharmacy* (19th Ed. 1995), a seminal work in the pharmaceutical field, devotes an entire chapter to oral solid dosage forms/granulation methods.

(*Id.* at APOSEM0030318).

52. In response to the double patenting rejection, Novo stated:

> (a) The Office has rejected claims numbered 1, 2, 5, 6 and 18-35 on the ground of non-statutory double patenting over claims numbered 1-14 of U.S. Patent No. 9,278,123.
>
> Applicants respectfully submit that until allowable subject matter is found, a complete determination of non-statutory double patenting cannot be made. Applicants submit that once allowable subject matter is found, Applicants may consider the filing of a terminal disclaimer(s).

[redacted]



(*Id.* at APOSEM0030320).

53. On September 14, 2018, the PTO rejected then-pending claims 1, 2, 5, 18-26, and 36-37. (*Id.* at APOSEM0030336).

54. Claims 1, 2, 5, 18-26, and 36-37 were rejected as obvious over the 497 publication and WO 471. (*Id.* at APOSEM0030337-45). The Examiner stated:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

Claims 1, 2, 5, 18-26, 36 and 37 stand rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Khan, M., US 20050148497 in view of Sauerberg WO 2012/080471 (US 9,278,123), from Applicant's IDS. The references are relied upon for their full even if specific teachings are not addressed in full.

The instant invention is drawn to a pharmaceutical composition comprising a solid dosage form comprising first type of granules and a second type of granules, wherein

(a) first type of granules comprises a salt of N-(8-(2- hydroxybenzoyl)amino)caprylic acid (SNAC) and no GLP-1 peptide, therefore a granule of SNAC

wherein said second type of granules comprises

(b) GLP-1 peptide (semaglutide) and no salt of N-(8-(2- hydroxybenzoyl)amino)caprylic acid, therefore a granule of semaglutide. Note N-(8-(2 hydroxybenzoyl)amino) caprylate is referred to as "SNAC" in the specification, and also known as sodium 8-(salicyloylamino) octanoate, and 8-[(2-hydroxybenzoyl)amino]- Octanoic acid from the STN search report included in previous office action.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

The invention is drawn to a granule of SNAC and a granule of semaglutide.

Khan teaches GLP-1 peptides in the present of N-(8-(2- hydroxybenzoyl)amino)caprylic acid, see page 24. Tablet form are also taught, see paragraph [0035]. Pharmaceutical salts are taught that they may be *optionally* employed in the invention, see [0034].

Sauerberg, P et al teaches N-(8-(2- hydroxybenzoyl)amino)caprylic acid and GLP-1 together as a composition, see Claim 1. The title of the patent is also relevant as it states: Solid compositions comprising a GLP-1 agonist and a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid. Sauerberg further teaches solid composition for oral administration comprising a GLP-1 agonist and a salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid, wherein a) the amount of said salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid is at least 0.6 mmol or at least 0.8 mmol. Improved rations are taught that have improved bioavailability. Sodium salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid is taught on page 12, readable on Claim 17, for example. Further, Sauerberg teaches relative amounts readable on Claim 5 as well as the specific peptide of Claim 1, known as semaglutide. Sauerberg teaches the covalent attachment of fatty acids or fatty diacids, see page 21 under forms of composition starting on page 19 as well as Claim 10. All of the excipients, fillers, binders, etc… of the new claims are taught on page 12-15 of the WO document, those of povidone, microcrystalline cellulose, and magnesium stearate. The ranges taught are nearly identical to those claimed, see page 11 for SMAC and pages 13-14 for the filler, binders, delivery agents, lubricants, etc… Sauerberg also speaks to granulation, see column 12 of the PgPub at line 20.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

Most importantly, Sauerberg teaches: *The present invention relates to solid compositions of a GLP-1 agonist and salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid. Surprisingly, the present inventors have found that solid compositions comprising certain amounts of a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, such as SNAC, are optimal for oral administration of GLP-1 agonists. Accordingly, the compositions provide improved exposure and/or bioavailability of the GLP-1 agonist*. In order for the salt form to be known as improved, the non-salt form must be known to the skilled artisan, since that would be the control.

It would have been obvious to one of ordinary skill in the art to use either that salt forms of SNAC or the acid form as taught by Khan or Sauerberg. One would have been motivated to use either one as they have both been shown to be an effective co-agent for administration. Applicant's specification is already supportive of this from the rather broad statement on page one that SNAC has previously been shown to improve the bioavailability of orally administered peptides, see page 1 of the PG Pub. One would have had a reasonable expectation of success in using SNAC in either salt form or acid form, as both have been shown to be effective in providing oral availability of GLP-1. Recall that Khan teaches salt form as optimal. Given that either one is a functional equivalent, one is also motivated to use both in combination as set forth in *In re Kerkhoven*, 205 USPQ 1069 (CCPA 1980), "It is *prima facie* obvious to combine two compositions each of which is taught by prior art to be useful for same purpose in order to form third composition that is to be used for very same purpose; the idea of combining them flows logically from their having been individually taught in prior art." This is especially true since the acid forms are still likely to have a salt form and vice versa simply through impurities and equilibrium.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

Note that Claims 2 and 5 are claims to results that are the effective outcome of resulting product of Claim 1 and logically flow as properties of the molecule from the assay.

It would have been obvious to one skilled in the art at the time of invention to determine all operable and optimum components of the SNAC ratios as well as their amounts in the claimed invention because these component are an art-recognized result-effective variables that are routinely determined and optimized in the medicinal and pharmaceutical arts. Further, the weight of the tablet, Claim 37, is not patentable as it is still the same composition.

Generally, differences in concentration or temperature will not support the patentability of subject matter encompassed by the prior art unless there is evidence indicating such concentration or temperature is critical. "[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." In reAller, 220 F.2d 454, 456, 105 USPQ 233, 235 (CCPA 1955) (Claimed process which was performed at a temperature between 40°C and 80°C and an acid concentration between 25% and 70% was held to be prima facie obvious over a reference process which differed from the claims only in that the reference process was performed at a temperature of 100°C and an acid concentration of 10%.); see also Peterson, 315 F.3d at 1330, 65 USPQ2d at 1382 ("The normal desire of scientists or artisans to improve upon what is already generally known provides the motivation to determine where in a disclosed set of percentage ranges is the optimum combination of percentages."); In reHoeschele, 406 F.2d 1403, 160 USPQ 809 (CCPA 1969) (Claimed elastomeric polyurethanes which fell within the broad scope of the references were held to be unpatentable thereover because, among other reasons, there was no evidence of the criticality of the claimed ranges of molecular weight or molar proportions.). For more recent cases applying this principle, see Merck & Co. Inc.v.Biocraft Lab. Inc., 874 F.2d 804, 10 USPQ2d 1843 (Fed. Cir.), cert. denied, 493 U.S. 975 (1989); In reKulling, 897 F.2d 1147, 14 USPQ2d 1056 (Fed. Cir. 1990); and In re Geisler, 116 F.3d 1465, 43 USPQ2d 1362 (Fed. Cir. 1997); Smith v. Nichols, 88 U.S. 112, 118-19 (1874) (a change in form, proportions, or degree "will not sustain a patent"); In re Williams, 36 F.2d 436, 438 (CCPA 1929) ("It is a settled principle of law that a mere carrying forward of an original patented conception involving only change of form, proportions, or degree, or the substitution of equivalents doing the same thing as the original invention, by substantially the same means, is not such an invention as will sustain a patent, even though the changes of the kind may produce better results than prior inventions."). See also KSR Int'l Co. v. Teleflex Inc., 550 U.S.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

398, 416 (2007) (identifying "the need for caution in granting a patent based on the combination of elements found in the prior art.").

In the instant case, ranges of Claim 23, for example, are of overlapping scope from the teaching of the WO document, see pages 12-15.

Further, the Supreme Court in *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S. Ct. 1727, 82 USPQ2d 1385, 1395-97 (2007) identified a number of rationales to support a conclusion of obviousness which are consistent with the proper "functional approach" to the determination of obviousness as laid down in *Graham*. The key to supporting any rejection under 35 U.S.C. 103 is the clear articulation of the reason(s) why the claimed invention would have been obvious. The Supreme Court in *KSR* noted that the analysis supporting a rejection under 35 U.S.C. 103 should be made explicit. Exemplary rationales that may support a conclusion of obviousness include:

(A) Combining prior art elements according to known methods to yield predictable results;
(B) Simple substitution of one known element for another to obtain predictable results;
(C) Use of known technique to improve similar devices (methods, or products) in the same way;
(D) Applying a known technique to a known device (method, or product) ready for improvement to yield predictable results;
(E) "Obvious to try" – choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success;
(F) Known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations are predictable to one of ordinary skill in the art;
(G) Some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

Note that the list of rationales provided is **not** intended to be an all-inclusive list, nor do they need to all be present to make a case for obviousness. Other rationales to support a conclusion of obviousness may be relied upon by Office personnel based upon the findings of the prior art.

In the instant case, (A) above has been presented to demonstrate combining of prior art teachings to arrive at the instantly claimed invention. Further consideration shows that the combination for (A) also embraces (B). (C)-(G) follow with the claimed invention as SNAC is already known to be used with GLP-1, and many other variants of SNAC are taught in the references above.

In conclusion, a reference is good not only for what it teaches by direct anticipation but also for what one of ordinary skill in the art might reasonably infer from the teachings. (In re Opprecht 12 USPQ 2d 1235, 1236 (Fed Cir. 1989); In re Bode 193 USPQ 12 (CCPA) 1976). In light of the foregoing discussion, the subject matter defined by the instant claims would have been obvious within the meaning of 35 USC 103(a). From the teachings of the references, it is apparent that one of ordinary skill in the art would have had a reasonable expectation of success in producing the claimed invention. Therefore, the invention as a whole was *prima facie* obvious to one of ordinary skill in the art at the time the invention was made, as evidenced by the references, especially in the absence of evidence to the contrary.

***Applicant's Arguments***

Applicant's arguments are found on page 8-10 of the remarks filed 06/08/2018

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

***Response to Applicants Arguments***

Applicant's arguments have been carefully considered but are not deemed persuasive to overcome the rejection.

Regarding Applicants comments on the Sauerberg reference not qualifying, Applicants should look to 706.02(b)(2) for the proper manner in which to overcome the rejection. Note that all applicable dates are relevant and must be overcome for each date, i.e., 102(a), 102(b), and 102(3). As such, Applicants have not overcome the 103 rejection. The inventive entity is different between the instant Applications.

Applicants again argue the term granule, which was already taken as a solid, see page 9. Further, Applicants are quite right that the design of the granules is important. Applicants are claiming granules in a very broad sense. From the claims, one can see that there are other components that are to be present, such as those of the New Claims 36 and 37. Granules is abroad generic term, and there appears to be other components, not just a solid granule of the SNAC and GLP-1. Size of the granule, the type of salt, other components as claimed come together to provide the properties Applicants desire, not the broad naming of components. Looking to the Examples, Example 7 appears to be what Applicants might view as an unexpected result, but as compared to the other examples, it is the unique combination of components at specific concentrations that provide this property. Generic components at generic amounts cannot provide the unexpected result, and this is born out by looking to the results in the Examples. Thus, if Applicants to want to assert an unexpected result, specificity that provides that unexpected result must be claimed, not generalities. SNAC and GLP are

[redacted]



> known to be used together, thus there must be a unique formulation that provides this result – what salt, what amount, what granule size, etc ...

(*Id.*).

55. Claims 1, 2, 5, 18-26, and 36-37 were rejected in the ground of nonstatutory double patenting as being unpatentable over claims 1-14 of U.S. Patent No. 9,278,123. (*Id.* at APOSEM0030345-46). The Examiner stated:

> Claims 1, 2, 5, 18-26, 36 and 37 are rejected on the ground of nonstatutory double patenting as being unpatentable over Claims 1-14 of U.S. Patent No. 9,278,123 in view of Khan, M., US 20050148497. Although the claims at issue are not identical, they are not patentably distinct from each other because the '123 patent is drawn to a composition of semaglutide and SNAC. Looking to the specification, granulation is taught as well as all of the excipients, fillers,

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

binders, etc… of the new claims are taught on page 12-15 of the WO document, those of povidone, microcrystalline cellulose, and magnesium stearate. The ranges taught are nearly identical to those claimed, see page 11 for SMAC and pages 13-14 for the filler, binders, delivery agents, lubricants, etc… Further, the salt forms of SNAC is known to be optional from Khan. Therefore, the invention is obvious over the teaching of the '123 patent.

***Applicant's Arguments***

Applicant's arguments are found on pages 11 of the remarks filed 06/08/2018.

***Response to Applicants Arguments***

Applicant's arguments have been carefully considered but are not deemed persuasive to overcome the rejection.

Applicant's state: "Applicants respectfully submit that until allowable subject matter is found, a complete determination of non-statutory double patenting cannot be made. Applicants submit that once allowable subject matter is found, Applicants may consider the filing of a terminal disclaimer(s)." The rejection is maintained.

(*Id.*).

56. On December 7, 2018, Novo stated:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

Claims 1 through 45 are pending in this application. Of those, claims 1, 2, 23, 24, 25 and 26 are amended, claims 3-8, 15, 17-22, 27-37 are canceled, claims 9-14, 16 were previously withdrawn and claims 38-45 are new. Support for the amended and newly added claims can be found throughout the specification and claims as filed. Accordingly, no new mater is added.

For the reasons discussed below, Applicants respectfully traverse the Examiner's rejections and request that the Examine reconsider patentability of the pending claims.

(*Id.* at APOSEM0030432).

57. Claims 1, 2, 23, 24, 25 and 26 were amended as follows:

1. (currently amended) A solid dosage pharmaceutical composition comprising: ~~a solid dosage form comprising~~

(a) a first type of granules comprising at least 75% (w/w) sodium N-(8-(2-hydroxybenzoyl)amino)caprylic acid (SNAC), less than 10% (w/w) lubricant, optionally less than 20% filler ~~and a second type of granules, wherein said first type of granules comprises a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid~~ and no GLP-1 peptide;~~,~~

(b) ~~and wherein said~~ a second type of granules compris~~es~~ing 2 to 40% (w/w) of GLP-1 peptide, at least 15% (w/w) filler, less than 40% (w/w) binder and no SNAC; wherein:

the GLP-1 peptide is semaglutide having a formula of N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-heptadecanoylamino)butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl][Aib8,Arg34]GLP-1(7-37); and ~~no salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid~~

the composition is in a form of a tablet having a weight in the range of 150 mg to 1000 mg.

2. (currently amended) A pharmaceutical composition according to claim 1, wherein the release of said ~~salt of~~ sodium N-(8-(2-hydroxybenzoyl)amino)caprylic acid is ~~simultaneous with or~~ faster than the release of said GLP-1 peptide in the first 20 minutes of dissolution as determined by dissolution testing using Assay (I) carried out at pH 2.5.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

23. (currently amended) ~~A~~ The pharmaceutical composition according to claim ~~22~~ 1, wherein said composition comprises at least 60 % (w/w) of ~~a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid~~ SNAC, less than 10 % (w/w) binder, 5-40 % (w/w) filler, and less than 10 % (w/w) lubricant.

24. (currently amended) ~~A~~ The solid dosage pharmaceutical composition according to claim ~~23~~1, wherein said binder is povidone.

25. (currently amended) ~~A~~ The solid dosage pharmaceutical composition according to claim ~~23~~1, wherein said filler is microcrystalline cellulose.

26. (currently amended) ~~A~~ The solid dosage pharmaceutical composition according to claim ~~23~~ 1 wherein said lubricant is magnesium stearate.

(*Id.* at APOSEM0030427, APOSEM0030429-30). Newly added claims 38-45 read as follows:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

38. (new) The solid dosage pharmaceutical composition of claim 1, the weight of the tablet is in the range of 300 mg to 600 mg.

39. (new) The solid dosage pharmaceutical composition of claim 1, wherein the weight of the tablet is in the range of 350 mg to 450 mg.

40. (new) A solid dosage pharmaceutical composition comprising:

(a) a first type of granule comprising at least 75% (w/w) sodium N-(8-(2-hydroxybenzoyl)amino)caprylic acid (SNAC) and no GLP-1 peptide;

(b) a second type of granule comprising 2 to 40% (w/w) of GLP-1 peptide and no SNAC, wherein the GLP-1 peptide is semaglutide having a formula of N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-heptadecanoylamino)butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl][Aib8,Arg34]GLP-1(7-37).

41. (new) The solid dosage pharmaceutical composition of claim 40, wherein the first granule further comprises less than 10% (w/w) lubricant and optionally less than 20% filler, and the second granule further comprises at least 15% (w/w) filler and less than 40% (w/w) binder.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

> 42. (new) The solid dosage pharmaceutical composition of claim 41, wherein the filler is microcrystalline cellulose, the lubricant is magnesium stearate and the binder is povidone.
>
> 43. (new) The solid dosage pharmaceutical composition of claim 40, wherein the composition is in the form of a tablet having a weight in a range of 150 mg to 1000 mg.
>
> 44. (new) The solid dosage pharmaceutical composition of claim 43, the weight of the tablet is in the range of 300 mg to 600 mg.
>
> 45. (new) The pharmaceutical composition of claim 44, wherein the weight of the tablet is in the range of 350 mg to 450 mg.

(*Id.* at APOSEM0030430-31).

58. Novo provided the following summary of the August 2, 2018 interview with the Examiner:

> Initially, Applicants wish to thank Examiner Heard for the courtesies extended during a brief telephonic discussion on August 2, 2018 with the undersigned. The undersigned and the Examiner discussed the chemical structure for the GLP-1 compound having a formula of N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-heptadecanoylamino)butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl][Aib8,Arg34]GLP-1(7-37) (also referred as semaglutide in the specification as filed) recited in claim 1 and claims dependent therefrom. Specifically, the Examiner had called the Applicants to inquire about the chemical structure of the compound in order to conduct the necessary search. The undersigned agreed to forward the drawn out structure of the recited GLP-1 compound to the Examiner via electronic mail. The undersigned also explained that the claims are not directed to the GLP-1 compound, but rather to a pharmaceutical composition comprising, *inter alia*, a first type of

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

> granules comprising salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid (e.g., SNAC) and no GLP-1 peptide, and a second type of granules comprising a GLP-1 peptide but no salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid. The undersigned directed the Examiner's attention to Example 1, Table 3 and Example 7, Table 9 of the specification as filed to review at least the bioavailability data in Table 9 for compositions where GLP-1 and SNAC are mixed together to form a tablet (Compositions C, D, and E) compared to compositions where GLP-1 and SNAC are in two different granules (Compositions B and F). The undersigned and Examiner Heard agreed to schedule a follow-up interview to discuss data in the specification if necessary. No additional agreements were reached.

(*Id.* at APOSEM0030432-33).

59. Novo attempted to distinguish the 497 publication and WO 471, including as follows:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

The Examiner continues to reject claims 1, 2, 5, 18-26, 36 and 37 under 35 U.S.C. § 103(a) as allegedly unpatentable over Khan (US 2005/0148497) in view of Sauerberg *et al.* (WO 2012/080471 (US 9,278,123); previously cited). Applicants respectfully traverse.

Claim 1 as amended recites a solid form pharmaceutical composition comprising, *inter alia*, (a) a first type of granules comprising at least 75% (w/w) sodium N-(8-(2-hydroxybenzoyl)amino)caprylic acid (SNAC), less than 10% (w/w) lubricant, optionally less than 20% filler, and no GLP-1; (b) a second type of granules comprising 2 to 40% (w/w) of GLP-1 peptide, at least 15% (w/w) filler, less than 40% (w/w) binder and no SNAC; wherein: the GLP-1 peptide is semaglutide, and the composition is in the form of a tablet having a weight in a range of 150 mg to 1000 mg. Applicants note that amended claim 1 also incorporates the features of now canceled claim 6 which Examiner did not reject as obvious over Khan in view of Sauerberg *et al.*

According to Applicants' specification (see published version of the US Patent Application, US 2015/0072926 (the '926 Pub.)), the inventors have surprisingly discovered that dissolution properties of a solid dosage form composition (e.g., tablet) having the same type and amounts of excipients/delivery agents are "***determined by the <u>design of the granules</u> from which the tablets were formed***" (see the '926 Pub. at 1, para. [0011] (emphasis added).). The inventors further explain that the dissolution properties of a solid composition (collected as data *in vitro*), which is ***determined by the <u>design of the granules forming the tablet</u>***, had a surprising and marked effect on

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

the bioavailability of the GLP-1 peptide (*in vivo* data). (*See id.* para. [0012].) The inventors also detail the importance of bioavailability of a solid dosage form ultimately administered to a subject:

> Generally, the term "bioavailability" as used herein refers to the fraction of an administered dose of an active pharmaceutical ingredient (API) and/or active moieties, such as a GLP-1 peptide as defined herein, which reaches the systemic circulation un-changed or in another active form. By definition, when an API and/or active moieties are administered intravenously, its bioavailability is 100%. However, ***when it is administered via other routes (such as orally), its bioavailability decreases (due to incomplete absorption and/or first-pass metabolism). Knowledge about bioavailability is important when calculating dosages for non-intravenous routes of administration***.

(The '926 Pub. at page 1, para. [0013] (emphasis added).)

Applicants' data in the specification as filed demonstrate the correlation between ***<u>design of the granules</u>*** for a given solid dosage composition (e.g., tablet), dissolution profile of the GLP-1 peptide (collected as data *in vitro*), and ultimate bioavailability of the GLP-1 peptide (*in vivo*) post administration of the composition to a subject. Applicants direct the Examiner's attention to Example 1, Table 3 of the '926 Publication showing, *inter alia*, the ***<u>design</u>*** of tablet Compositions B through F. Specifically, Compositions B and F are designed with a first type of granules comprising, among other excipient(s), SNAC, and a second type of granules comprising, among other excipient(s), the GLP-1 peptide semaglutide recited in claim 1[1]. In contrast, Compositions C, D and E are designed as a simple mixture made up of one type of granules (i.e., not a two-granule system) carrying both SNAC with GLP-1 (semaglutide) as well as other excipients. The inventors have surprisingly discovered that the design of tablets with two different granule types (Compositions B and F) alter the dissolution properties of the GLP-1 peptide (measured *in vitro*) and ultimately result is greater bioavailability *in vivo* compared to tablets designed as a simple mixture of granules carrying both SNAC and GLP-1 (Compositions C, D, and E).

The dissolution profiles based on tablet design of Compositions B and F, recited in claim 1 and claims dependent therefrom are shown Example 2, Table 4 (page 18) and Example 6, Table 8 (page 20) for Compositions B and F, respectively. For Composition B, data in Table 4 show that

[1] Please note that Table 3 also shows compositions G and H which have a first type of granules comprising, among other excipients, SNAC and a second type of granules comprising, among other excipients, Compound A which is also a GLP-1 compound not discussed here.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

"SNAC is released faster than semaglutide during the initial 20 min[utes] of dissolution". (The '926 Pub. at 18, para. [0181].) For Composition F, data in Table 8 show that "SNAC is released faster than semaglutide during the initial 20 to 30 min[utes] of dissolution". (*Id.* at 20, para. [0185].) In contrast, the dissolution profiles of tablet Compositions C, D and E which are designed with SNAC and semaglutide together in simple mixture show that SNAC is released more slowly than semaglutide after the first 5-10 minutes of dissolution (see *id.* at 18-20, Examples 3-5 and Tables 5-7).

The faster release of SNAC provides an optimal environment for the absorption of the GLP-1 *in vivo* thereby increasing the bioavailability of the GLP-1 peptide as shown in Example 7, Table 9. Specifically, data in Table 9 demonstrate that bioavailablity of tablet Compositions B and F as recited in claims 1, 40 and claims dependent therefrom are higher (0.7% and 1.0%, respectively) compared to bioavailability of tablet Compositions C, D and E designed with one granule type (0.5%, 0.3% and 0.4%, respectively). As discussed above, the inventors have surprisingly discovered that the ***design of the granules*** as a two-granule system forming a solid composition determines the dissolution properties of the composition resulting in higher bioavailability for the GLP-1 peptide. This, the art of record does not teach or suggest.

In contrast, Khan is directed generally to formulations and methods comprising GLP-1 compounds and delivery agents for oral administration. (*See, e.g.*, Khan Abstract, para. [0008].) Khan does not teach or suggest, and the Examiner does not argue to the contrary, a solid dosage composition made of two different granules types, one carrying SNAC and the other carrying GLP-1 peptide. There is nothing in Khan that would motivate a person having ordinary skill in the art (PHOSITA) to design a solid dosage pharmaceutical composition with two different granules with reasonable expectation of success.

The secondary reference Sauerberg *et al.* does not cure the deficiencies of Khan. As discussed below, Applicants submit that Sauerberg *et al.* is not prior art to the instant application. Assuming, *arguendo*, that it is prior art (which it is not), the compositions of Sauerberg *et al.* are designed by mixing SNAC and semaglutide together in the same granules. In other words, the tablet compositions disclosed in Sauerberg *et al.* are similar to tablet Compositions C, D and E (see the '926 Pub. at 16, Table 3) which are designed by mixing SNAC and semaglutide together, have a

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

different dissolution profile and result in lower bioavailability compared to Compositions B and F (two-granule system) designed according to claims 1, 40 and claims dependent therefrom. Glancing at Sauerberg *et al.*, PHOSITA would not be motivated to make a solid dosage pharmaceutical composition designed with two granule types, where the active ingredient (e.g., semaglutide) and the absorption enhancer (e.g., SNAC) are in two separate granule types forming the tablet and that such composition would have improved dissolution properties and increased bioavailability. The Examiner does not argue to the contrary.

Regarding Sauerberg *et al.*, the Examiner continues to maintain that this reference qualifies as prior art because it has a priority date of "December 16, 2010 and December 20, 2010" (*see, e.g.*, Office Action dated July 24, 2017 at 8.) Applicants disagree and maintain that, as previously argued (see Applicants' Response filed May 2, 2017), Sauerberg *et al.* disqualifies as prior art.

Specifically, the instant application has a PCT filing date of March 15, 2013 and, therefore, should be examined under pre-AIA provisions. The earliest effective priority date of the instant application (the '926 Pub.) is March 22, 2012. Under pre-AIA, Sauerberg *et al.*'s international application the Examiner cites as prior art (WO 2012/080471) was published on June 21, 2012, which is after the earliest effective priory date (i.e., March 22, 2012) of the instant application. Sauerberg *et al.*'s US patent 9,278,123 issued on March 8, 2016 and published as US publication 2013-0345134 on December 26, 2013, both of which are also after the earliest effective priority date (March 22, 2012) of the instant application.

Because the present claims find support in, and are entitled to, the March 22, 2012 EP priority filing, the Sauerberg *et al.* international publication (WO) is not available as prior art. Sauerberg *et al.* US patent is only available as prior art under 35 U.S.C. § 103 via pre-AIA 35 U.S.C. § 102(e). And because the present application should be examined under the pre-AIA provisions, Applicants hereby remove the Sauerberg *et al.* US patent 9,278,123 as prior art under 35 U.S.C § 103(c) by stating that the subject matter of US patent 9,278,123 and the presently claimed invention were, at the time the presently claimed invention was made, owned by the same person or subject to an obligation of assignment to the same person as evidenced by the assignment for US patent 9,278,123 at Reel/Frame 030952/0031 and the assignment for the present application at Reel/Frame 034438/0552.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

> Accordingly, the present rejection is now based only on the Khan that merely discloses GLP-1 peptides in the presence of N-(8-(2-hydroxybenzoyl)amino)caprylic acid. Applicants respectfully submit that the present claims are non-obvious over the cited art and respectfully request that the Examiner withdraw rejections under 35 U.S.C. § 103(a) based on Khan.

(*Id.* at APOSEM0030433-37).

60. In response to the double patenting rejection, Novo stated:

> The Examiner continues to provisionally reject claims 1, 2, 5, 18-26, 36 and 37 on the grounds of nonstatutory obviousness-type double patenting as being unpatentable over claims 1-14 of copending U.S. Patent No. 9,278,123 in view of Khan, M., (US 20050148497; previously cited). Applicants respectfully traverse. The Examiner has based the obviousness-type double patenting rejection on the assertion that Applicants' claims recited two ingredients, SNAC and semaglutide, that are mixed together in one granule. As discussed in detail above, this is incorrect.
>
> The composition recited in claim 1 and claims dependent therefrom are to a pharmaceutical composition designed with two separate granule types (one with SNAC and the other with GLP-1 peptide). Unlike Sauerberg *et al.*, where the SNAC and semaglutide are mixed together in one granule. The inventors of the instant application have surprisingly discovered that a composition recited in claim 1 and claims dependent therefrom resulted in improved dissolution properties of the composition and increased bioavailability for the GLP-1 peptide as shown in Examples 1-2, 6-7 and Tables 3-4, 8-9. The existence of the two types of granules enables the independent release of the components of each granule type. By comparison, in the compositions of Sauerberg *et al.*, the SNAC and semaglutide are mixed together.
>
> Applicants submit that the differences in dissolution rates and bioavailability that flow from the claimed compositions are neither taught nor suggested by the claims of Sauerberg *et al.* which are directed to a composition where the SNAC and semaglutide are mixed together. Accordingly, Applicants respectfully request that the Examiner withdraw the obviousness-type double patenting rejection.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

(*Id.* at APOSEM0030437).

61. On March 22, 2019, the PTO rejected then-pending claims 1-2, 23-26 and 38-45. (*Id.* at APOSEM0030449).

62. The Examiner provided the following summary of an interview with Novo:

> **Interview Summary**
>
> Applicants provided the structure requested, and identified it is more common name, semaglutide in the discussion. The introduction to the chemical name in the Claims submitted 8/15/2016 the compound N-epsilon26-[2-(2-{2-(2-(2-(2-r(S)-4-carboxy-4-(17-carboxy-heptadecanoylamino) butarylamino]ethoxylethoxy}acetylamino]ethoxvlethoxy)acetyl1 [Aib8.Arg34]GLP-1(7-37). These are cumbersome to deal with, and when Applicant can be their
>
> own lexicographer, complicates the search, even to the point that well known and used chemical software cannot solve for the structure from the name. However, the Examiner is well informed that the claims are drawn to a composition of GLP and SNAC.

(*Id.* at APOSEM0030450-51).

63. Claims 40-45 were rejected as obvious over the 497 publication and WO 471. (*Id.* at APOSEM0030452-60). The Examiner stated:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

**Claims 40-45** are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Khan, M., US 20050148497 in view of Sauerberg WO 2012/080471 (US 9,278,123), from Applicant's IDS. The references are relied upon for their full even if specific teachings are not addressed in full.

The instant invention is drawn to a pharmaceutical composition comprising a solid dosage form comprising first type of granules and a second type of granules, wherein

(a) first type of granules comprises a salt of N-(8-(2- hydroxybenzoyl)amino)caprylic acid (SNAC) and no GLP-1 peptide, therefore a granule of SNAC

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

wherein said second type of granules comprises

(b) GLP-1 peptide (semaglutide) and no salt of N-(8-(2- hydroxybenzoyl)amino)caprylic acid, therefore a granule of semaglutide. Note N-(8-(2 hydroxybenzoyl)amino) caprylate is referred to as "SNAC" in the specification, and also known as sodium 8-(salicyloylamino) octanoate, and 8-[(2-hydroxybenzoyl)amino]- Octanoic acid from the STN search report included in previous office action.

The invention is drawn to a granule of SNAC and a granule of semaglutide.

Khan teaches GLP-1 peptides in the present of N-(8-(2- hydroxybenzoyl)amino)caprylic acid, see page 24. Tablet form are also taught, see paragraph [0035]. Pharmaceutical salts are taught that they may be ***optionally*** employed in the invention, see [0034].

Sauerberg, P et al teaches N-(8-(2- hydroxybenzoyl)amino)caprylic acid and GLP-1 together as a composition, see Claim 1. The title of the patent is also relevant as it states: Solid compositions comprising a GLP-1 agonist and a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid. Sauerberg further teaches solid composition for oral administration comprising a GLP-1 agonist and a salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid, wherein a) the amount of said salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid is at least 0.6 mmol or at least 0.8 mmol. Improved rations are taught that have improved bioavailability. Sodium salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid is taught on page 12, readable on Claim 17, for example. Further, Sauerberg teaches relative amounts readable on Claim 5 as well as the specific peptide of Claim 1, known as semaglutide. Sauerberg teaches the covalent attachment of fatty acids or

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

fatty diacids, see page 21 under forms of composition starting on page 19 as well as Claim 10. All of the excipients, fillers, binders, etc... of the new claims are taught on page 12-15 of the WO document, those of povidone, microcrystalline cellulose, and magnesium stearate. The ranges taught are nearly identical to those claimed, see page 11 for SMAC and pages 13-14 for the filler, binders, delivery agents, lubricants, etc... Sauerberg also speaks to granulation, see column 12 of the PgPub at line 20.

Most importantly, Sauerberg teaches: *The present invention relates to solid compositions of a GLP-1 agonist and salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid. Surprisingly, the present inventors have found that solid compositions comprising certain amounts of a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, such as SNAC, are optimal for oral administration of GLP-1 agonists. Accordingly, the compositions provide improved exposure and/or bioavailability of the GLP-1 agonist*. In order for the salt form to be known as improved, the non-salt form must be known to the skilled artisan, since that would be the control.

It would have been obvious to one of ordinary skill in the art to use either that salt forms of SNAC or the acid form as taught by Khan or Sauerberg. One would have been motivated to use either one as they have both been shown to be an effective co-agent for administration. Applicant's specification is already supportive of this from the rather broad statement on page one that SNAC has previously been shown to improve the bioavailability of orally administered peptides, see page 1 of the PG Pub. One would have had a reasonable expectation of success in using SNAC in either salt form or acid form, as both have been shown

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

to be effective in providing oral availability of GLP-1. Recall that Khan teaches salt form as optimal. Given that either one is a functional equivalent, one is also motivated to use both in combination as set forth in *In re Kerkhoven*, 205 USPQ 1069 (CCPA 1980), "It is *prima facie* obvious to combine two compositions each of which is taught by prior art to be useful for same purpose in order to form third composition that is to be used for very same purpose; the idea of combining them flows logically from their having been individually taught in prior art." This is especially true since the acid forms are still likely to have a salt form and vice versa simply through impurities and equilibrium.

It would have been obvious to one skilled in the art at the time of invention to determine all operable and optimum components of the SNAC ratios as well as their amounts in the claimed invention because these component are an art-recognized result-effective variables that are routinely determined and optimized in the medicinal and pharmaceutical arts. Further, the weight of the tablet, Claims 43-45, is not patentable as it is still the same composition. Weight may inform if the final composition is claimed and described by amounts in w/w against a final weight.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

Generally, differences in concentration or temperature will not support the patentability of subject matter encompassed by the prior art unless there is evidence indicating such concentration or temperature is critical. "[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." In reAller, 220 F.2d 454, 456, 105 USPQ 233, 235 (CCPA 1955) (Claimed process which was performed at a temperature between 40°C and 80°C and an acid concentration between 25% and 70% was held to be prima facie obvious over a reference process which differed from the claims only in that the reference process was performed at a temperature of 100°C and an acid concentration of 10%.); see also Peterson, 315 F.3d at 1330, 65 USPQ2d at 1382 ("The normal desire of scientists or artisans to improve upon what is already generally known provides the motivation to determine where in a disclosed set of

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

percentage ranges is the optimum combination of percentages."); In reHoeschele, 406 F.2d 1403, 160 USPQ 809 (CCPA 1969) (Claimed elastomeric polyurethanes which fell within the broad scope of the references were held to be unpatentable thereover because, among other reasons, there was no evidence of the criticality of the claimed ranges of molecular weight or molar proportions.). For more recent cases applying this principle, see Merck & Co. Inc.v.Biocraft Lab. Inc., 874 F.2d 804, 10 USPQ2d 1843 (Fed. Cir.), cert. denied, 493 U.S. 975 (1989); In reKulling, 897 F.2d 1147, 14 USPQ2d 1056 (Fed. Cir. 1990); and In re Geisler, 116 F.3d 1465, 43 USPQ2d 1362 (Fed. Cir. 1997); Smith v. Nichols, 88 U.S. 112, 118-19 (1874) (a change in form, proportions, or degree "will not sustain a patent"); In re Williams, 36 F.2d 436, 438 (CCPA 1929) ("It is a settled principle of law that a mere carrying forward of an original patented conception involving only change of form, proportions, or degree, or the substitution of equivalents doing the same thing as the original invention, by substantially the same means, is not such an invention as will sustain a patent, even though the changes of the kind may produce better results than prior inventions."). See also KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 416 (2007) (identifying "the need for caution in granting a patent based on the combination of elements found in the prior art.").

In the instant case, ranges of Claim 23, for example, are of overlapping scope from the teaching of the WO document, see pages 12-15.

Further, the Supreme Court in *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S. Ct. 1727, 82 USPQ2d 1385, 1395-97 (2007) identified a number of rationales to support a conclusion of obviousness which are consistent with the proper "functional approach" to the determination of obviousness as laid down in *Graham*. The key to supporting any rejection under 35 U.S.C. 103 is the clear articulation of the reason(s) why the claimed invention would have been obvious. The Supreme Court in *KSR* noted that the analysis supporting a rejection under 35 U.S.C. 103 should be made explicit. Exemplary rationales that may support a conclusion of obviousness include:

(A) Combining prior art elements according to known methods to yield predictable results;

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

(B) Simple substitution of one known element for another to obtain predictable results;
(C) Use of known technique to improve similar devices (methods, or products) in the same way;
(D) Applying a known technique to a known device (method, or product) ready for improvement to yield predictable results;
(E) "Obvious to try" – choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success;
(F) Known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations are predictable to one of ordinary skill in the art;
(G) Some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention.

Note that the list of rationales provided is **not** intended to be an all-inclusive list, nor do they need to all be present to make a case for obviousness. Other rationales to support a conclusion of obviousness may be relied upon by Office personnel based upon the findings of the prior art.

In the instant case, (A) above has been presented to demonstrate combining of prior art teachings to arrive at the instantly claimed invention. Further consideration shows that the combination for (A) also embraces (B). (C)-(G) follow with the claimed invention as SNAC is already known to be used with GLP-1, and many other variants of SNAC are taught in the references above.

In conclusion, a reference is good not only for what it teaches by direct anticipation but also for what one of ordinary skill in the art might reasonably infer from the teachings. (In re Opprecht 12 USPQ 2d 1235, 1236 (Fed Cir. 1989); In re Bode 193 USPQ 12 (CCPA) 1976). In light of the foregoing discussion, the subject matter defined by the instant claims would have been obvious within the meaning of 35 USC 103(a). From the teachings of the references, it is

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

apparent that one of ordinary skill in the art would have had a reasonable expectation of success in producing the claimed invention. Therefore, the invention as a whole was *prima facie* obvious to one of ordinary skill in the art at the time the invention was made, as evidenced by the references, especially in the absence of evidence to the contrary.

***Applicant's Arguments***

Applicant's arguments are found on page 8-12 of the remarks filed 12/07/2018.

***Response to Applicants Arguments***

Applicant's arguments have been carefully considered but are not deemed persuasive to overcome the rejection.

Applicants want to assert a surprising result, and better dissolution and (assumed) absorption profiles have been demonstrated in the specification. However, unexpected results and surprising results are specific to final product made (ingredients and final amounts/percentages). Generic references to binders, excipients, lubricants, etc … have not shown the unexpected result, but specific examples and their ratios. One need look no further than the data in the specification which demonstrates that Tablet D, E and F do not function the same, and pH is even an issue. Thus, GLP-1 with SNAC and the additives claimed in genus form (binder, for example), with no speciation and final amounts relative to active ingredients cannot be said to possess the unexpected or surprising result. Note too that granule is not informative in many ways. First, what size? The word size does not even exist in the specification for each of granules which are then apparently combined. Thus, the Examiner is seeing Claim 40 is simply

[redacted]



> small particles of GLP-1 and SNAC in combination. Claim 1, however, is helpful for seeing the two granules as distinct compositions that are then combined to give the final outcome. However, they Claim 1 is still so generic it is hard to see how such an unexpected result can come about with such a generic claiming of ingredients when the specification shows otherwise. It is hoped that this will help Applicants carve out compositions specifically in Claim 1 and 40 to arrive at a patent. While GLP-1 (semaglutide) with SNAC is known in the art, combined as separate granule composition is not known in the prior art applied above.

(*Id.*).

64. Claims 1-2, 23-26, 38, and 39 were rejected for failing to meet the written description requirement. (*Id.* at APOSEM0030451-52). The Examiner stated:

> **Claims 1, 2, 23,-26, 38 & 39** are rejected under 35 U.S.C. 112(a) or 35 U.S.C. 112 (pre-AIA), first paragraph, as failing to comply with the written description requirement. The claim(s) contains subject matter which was not described in the specification in such a way as to reasonably convey to one skilled in the relevant art that the inventor or a joint inventor, or for pre-AIA the inventor(s), at the time the application was filed, had possession of the claimed invention. This is a **NEW MATTER** rejection.
>
> The response filed 12/07/2018 has introduced **NEW MATTER** into the claims. The newly added/amended Claim(s) 1 recites 2 to 40% (w/w) of GLP-1. **The response did not specifically and adequately point out where support for newly added/amended Claim(s) 1 could be**

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

**found in the originally filed disclosure.** Applicant merely stated that "support for the amended and newly added claims can be found throughout the specification and claims as filed. This places the amendments on a burdensome search for confirmation of support. The Examiner has not read the whole specification to search for support for every amendment combinations found in the new claims.

Although the PTO has the initial burden of presenting evidence or reasons why persons skilled in the art would not recognize in the disclosure a description of the invention defined by the claims, when filing an amendment an applicant should show support in the original disclosure for new or amended claims. See **MPEP 714.02** and **2163.06** ("Applicant should therefore specifically point out the support for any amendments made to the disclosure.").

The amended claims now recites limitations, which were not clearly disclosed in the specification as filed, and now change the scope of the instant disclosure as filed. Such limitations recited in newly added/amended Claims 1, which did not appear in the specification, as filed, introduce new concepts and violate the description requirement of the first paragraph of 35 U.S.C 112. Applicant is required to provide sufficient written support for the limitations recited in the present Claim 1 in the specification, or claims as-filed, or remove these limitations from the claims in response to this Office Action.

(*Id.*).

65. Claims 40-45 were rejected in the ground of nonstatutory double patenting as being unpatentable over claims 1-14 of U.S. Patent No. 9,278,123. (*Id.* at APOSEM0030461-62). The Examiner stated:

[redacted]



**Claims 40-45** are rejected on the ground of nonstatutory double patenting as being unpatentable over Claims 1-14 of U.S. Patent No. 9,278,123 in view of Khan, M., US 20050148497. Although the claims at issue are not identical, they are not patentably distinct from each other because the '123 patent is drawn to a composition of semaglutide and SNAC. Looking to the specification, granulation is taught as well as all of the excipients, fillers, binders, etc... of the new claims are taught on page 12-15 of the WO document, those of povidone, microcrystalline cellulose, and magnesium stearate. The ranges taught are nearly identical to those claimed, see page 11 for SMAC and pages 13-14 for the filler, binders, delivery agents, lubricants, etc... Further, the salt forms of SNAC is known to be optional from Khan. Therefore, the invention is obvious over the teaching of the '123 patent.

***Applicant's Arguments***

Applicant's arguments are found on pages 12 of the remarks filed 12/07/2018.

***Response to Applicants Arguments***

Applicant's arguments have been carefully considered but are not deemed persuasive to overcome the rejection.

Applicant's state: Applicants argue that the instant composition is different from that of the '123 patent. As argued above, Claim 40 is just an undefined compound of GLP-1 and SNAC described as a granule of yet to be determined size (amount). As with the 103, this is obvious and components are to be optimized. The rejection would likely be dropped if the Claims are

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

> amended to language like Clam 1, but with specific components and amounts commensurate with the unexpected result. The rejection is maintained.

(*Id.*).

66. On July 18, 2019, Novo stated:

> Claims 1-2, 9-14, 16, 23-26, and 38-45 were previously pending, with claims 9-14 and 16 withdrawn from consideration.
>
> With this response, claims 1-2, 9, 23-26, 38-40, and 42 are amended. Support for the claim amendments can be found throughout the specification and claims as originally filed, for example, at pages 8-9. In view of the amendment to claim 9, the claim is requested to be rejoined for consideration on the merits.
>
> Claims 41 and 43-45 are canceled.
>
> New claims 46-62 are added, with related support found throughout the specification and claims as originally filed, for example, at pages 5-9. Of particular note is the paragraph spanning pages 5-6, reciting that "the composition or granule comprises at least one…excipient," and that the excipient can be a number of different compounds, including filler, binder, and lubricant.
>
> Thus, the amendments do not introduce new matter and entry thereof is respectfully requested. Upon such entry, claims 1-2, 9, 23-26, 38-40, 42, and 46-63 will be pending and presented for consideration on the merits.

(*Id.* at APOSEM0030843).

67. Claims 1, 2, 9, 23-26, 38-40 and 42 were amended as follows:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

1. (Currently Amended) A solid dosage pharmaceutical composition comprising:

(a) a first type of granules comprising at least 75% (w/w) sodium N-(8-(2-hydroxybenzoyl)amino)caprylic acid (SNAC), lubricant, and no GLP-1 peptide, wherein the SNAC is at least 75% (w/w), and wherein the lubricant is less than 10% (w/w) lubricant, optionally less than 20% filler and no GLP-1 peptide;

(b) a second type of granules comprising GLP-1 peptide, filler, binder, and no SNAC, wherein the GLP-1 peptide is 2 to 40% (w/w) of GLP-1 peptide, wherein the filler is at least 15% (w/w) filler, and wherein the binder is less than 40% (w/w) binder and no SNAC; wherein:

the GLP-1 peptide is semaglutide, wherein the having a formula of semaglutide is N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-heptadecanoylamino)butyrylamino] ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl] [Aib8,Arg34]GLP-1(7-37); and

the composition is in a form of a tablet, wherein the having a weight of the tablet is in the range of 150 mg to 1000 mg.

2. (Currently Amended) The [[A]] pharmaceutical composition according to claim 1, wherein the release of said sodium N-(8-(2-hydroxybenzoyl)amino)caprylic acid is faster than the release of said GLP-1 peptide in the first 20 minutes of dissolution as determined by dissolution testing using Assay (I) carried out at pH 2.5.

9. (Currently Amended) The pharmaceutical composition according to claim 1, wherein the first type of granules further comprises filler, wherein the filler is less than 20% (w/w)

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

~~A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:~~

~~a) mixing a GLP-1 peptide with a filler and/or a binder;~~

~~b) dry granulation of the mixture of step a;~~

~~c) mixing the granules obtained in step b with a composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid; and~~

~~d) optionally adding further lubricant,~~

~~wherein the mixture of step a does not comprise a salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid~~.

23. (Currently Amended) The pharmaceutical composition according to claim 1 <u>or claim 9</u>, wherein <u>the</u> [[said]] composition comprises at least 60 % (w/w) of SNAC, less than 10 % (w/w) binder, 5-40 % (w/w) filler, and less than 10 % (w/w) lubricant.

24. (Currently Amended) The ~~solid dosage~~ pharmaceutical composition according to claim 1 <u>or claim 9</u>, wherein <u>the</u> [[said]] binder is povidone.

25. (Currently Amended) The solid dosage pharmaceutical composition according to claim 1 <u>or claim 9</u>, wherein <u>the</u> [[said]] filler is microcrystalline cellulose.

26. (Currently Amended) The solid dosage pharmaceutical composition according to claim 1 <u>or claim 9,</u> wherein <u>the</u> [[said]] lubricant is magnesium stearate.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

38. (Currently Amended) The ~~solid dosage~~ pharmaceutical composition according to [[of]] claim 1 or claim 9, wherein the weight of the tablet is in the range of 300 mg to 600 mg.

39. (Currently Amended) The solid dosage pharmaceutical composition according to [[of]] claim 1 or claim 9, wherein the weight of the tablet is in the range of 350 mg to 450 mg.

40. (Currently Amended) A solid dosage pharmaceutical composition comprising:

(a) a first type of granule comprising ~~at least 75% (w/w)~~ sodium N-(8-(2-hydroxybenzoyl)amino)caprylic acid (SNAC), lubricant, and no GLP-1 peptide, wherein the SNAC is at least 75% (w/w), and wherein the lubricant is less than 10% (w/w);

(b) a second type of granule comprising GLP-1 peptide, filler, binder, and no SNAC, wherein the GLP-1 peptide is 2 to 40% (w/w) ~~of GLP-1 peptide and no SNAC~~, the filler is at least 15% (w/w), and the binder is less than 40% (w/w);

wherein the GLP-1 peptide is semaglutide, and wherein the formula of semaglutide is ~~having a formula of~~ N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-heptadecanoylamino) butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl] [Aib8,Arg34]GLP-1(7-37).

42. (Currently Amended) The ~~solid dosage~~ pharmaceutical composition according to claim 40 ~~of claim 41~~, wherein the filler is microcrystalline cellulose, the lubricant is magnesium stearate, and the binder is povidone.

(*Id*. at APOSEM0030836-40). Newly added claims 46-62 read as follows:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

46. (New) The pharmaceutical composition according to claim 40, wherein the first type of granules further comprises filler, wherein the filler is less than 20% (w/w).

47. (New) The pharmaceutical composition according to claim 46, wherein the filler of the first type of granules is microcrystalline cellulose, wherein the filler of the second type of granules is microcrystalline cellulose, wherein the lubricant is magnesium stearate, and wherein the binder is povidone.

48. (New) The pharmaceutical composition according to claim 47, wherein the composition is in the form of a tablet having a weight in a range of 150 mg to 1000 mg.

49. (New) The pharmaceutical composition according to claim 48, wherein the weight of the tablet is in the range of 300 mg to 600 mg.

50. (New) The pharmaceutical composition according to claim 49, wherein the weight of the tablet is in the range of 350 mg to 450 mg.

51. (New) A solid dosage pharmaceutical composition comprising:

(a) a first type of granules consisting essentially of sodium N-(8-(2-hydroxybenzoyl)amino)caprylic acid (SNAC) and one or more excipients selected from the group consisting of a lubricant, a filler, and a binder, wherein the SNAC is at least 75% (w/w);

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

(b) a second type of granules consisting essentially of GLP-1 peptide and one or more excipients selected from the group consisting of a lubricant, a filler, and a binder, wherein the GLP-1 peptide is 2 to 40% (w/w);

wherein the GLP-1 peptide is semaglutide, and wherein the formula of semaglutide is N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-heptadecanoylamino)butyrylamino] ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl] [Aib8,Arg34]GLP-1(7-37).

52. (New) The pharmaceutical composition according to claim 51, wherein the composition is a tablet with a weight in the range of 150 mg to 1000 mg.

53. (New) The pharmaceutical composition according to claim 52, wherein the weight of the tablet is in the range of 300 mg to 600 mg.

54. (New) The pharmaceutical composition according to claim 53, wherein the weight of the tablet is in the range of 350 mg to 450 mg.

55. (New) The pharmaceutical composition according to claim 51, wherein (a) the first type of granules consists essentially of (SNAC) and the lubricant; and wherein (b) the second type of granules consists essentially of semaglutide, the filler, and the binder.

56. (New) The pharmaceutical composition according to claim 55, wherein the lubricant of the first type of granules is magnesium stearate, wherein the filler of the second type of granules is microcrystalline cellulose, and wherein the binder of the second type of granules is povidone.

57. (New) The pharmaceutical composition according to claim 51, wherein (a) the first type of granules consists essentially of (SNAC), the lubricant, and the filler; and wherein (b) the second type of granules consists essentially of semaglutide, the filler, and the binder.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

58. (New) The pharmaceutical composition according to claim 57, wherein the lubricant of the first type of granules is less than 10% (w/w), wherein the filler of the first type of granules is less than 20% (w/w), wherein the filler of the second type of granules is at least 15% (w/w), and wherein the binder of the second type of granules is less than 40% (w/w).

59. (New) The pharmaceutical composition according to claim 58, wherein the lubricant of the first type of granules is magnesium stearate, wherein the filler of the first type of granules is microcrystalline cellulose, wherein the filler of the second type of granules is microcrystalline cellulose, and wherein the binder of the second type of granules is povidone.

60. (New) The pharmaceutical composition according to claim 59, wherein the composition is a tablet with a weight in a range of 150 mg to 1000 mg.

61. (New) The pharmaceutical composition according to claim 60, wherein the weight of the tablet is in the range of 300 mg to 600 mg.

62. (New) The pharmaceutical composition according to claim 61, wherein the weight of the tablet is in the range of 350 mg to 450 mg.

(*Id.* at APOSEM0030840-42).

68. In response to the obviousness rejection Novo stated:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

> The Examiner continues to reject claims 40-45 under 35 U.S.C. 103(a) as allegedly unpatentable over Khan (US 2005/0148497) in view of Sauerberg (WO 2012/080471 (US 9,278,123)). Applicant respectfully traverses, particularly in view of the present claim amendments.
>
> The Office Action at page 12 states that "[w]hile GLP-1 (semaglutide) with SNAC is known in the art, combined as separate granule composition is not known in the prior art applied above." Accordingly, in view of this statement, and combined with the present amendments to independent claim 40, Applicant respectfully request that the prior art rejection be withdrawn.

(*Id.* at APOSEM0030844).

69. In response to the lack of written description requirement rejection, Novo stated:

> The Office Action rejects claims 1, 2, 23-26, and 38-39 under 35 USC 112, first paragraph as allegedly containing new matter in view of the phrase "2 to 40% (w/w)" GLP-1, to which the previous response did not specifically indicate where the specification describes this feature. Support for this feature is presented in the specification at page 8, line 33. Accordingly, the rejection should now be withdrawn.

(*Id.* at APOSEM0030843).

70. In response to the double patenting rejection Novo stated:

> The Office Action rejects claims 40-45 under the judicially-created doctrine of obviousness-type double patenting as allegedly obvious in view of US 9,278,123 in view of Khan. Without acquiescing to the merits of the rejection and merely to advance prosecution, and in view of Office Action's statement spanning pages 13-14 that "[t]he rejection would likely be dropped if the Claims are amended to language like Claim 1, but with specific components and amounts commensurate with the unexpected result," the claims have been amended as indicated above. Accordingly, Applicant respectfully requests that the rejection be withdrawn.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

(*Id.* at APOSEM0030844).

71. On November 15, 2019, the PTO rejected then-pending claims 1-2, 9, 23-26, 38-40, 42 and 46-62. (*Id.* at APOSEM0030857).

72. Claims 1, 2, 9, 23-26, 38-40, 42, and 46-62 were rejected as obvious over the 497 publication and WO 471. (*Id.* at APOSEM0030859-67). The Examiner stated:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

Claims 1, 2, 9, 23-26, 38-40, 42, and 46-62 are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Khan, M., US 20050148497 in view of Sauerberg WO 2012/080471 (US 9,278,123), from Applicant's IDS. The references are relied upon for their full even if specific teachings are not addressed in full.

The instant invention is drawn to a pharmaceutical composition comprising a solid dosage form comprising first type of granules and a second type of granules, wherein

(a) first type of granules comprises a salt of N-(8-(2- hydroxybenzoyl)amino)caprylic acid (SNAC) and no GLP-1 peptide, therefore a granule of SNAC

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

wherein said second type of granules comprises

(b) GLP-1 peptide (semaglutide) and no salt of N-(8-(2- hydroxybenzoyl)amino)caprylic acid, therefore a granule of semaglutide. Note N-(8-(2 hydroxybenzoyl)amino) caprylate is referred to as "SNAC" in the specification, and also known as sodium 8-(salicyloylamino) octanoate, and 8-[(2-hydroxybenzoyl)amino]- Octanoic acid from the STN search report included in previous office action.

The invention is drawn to a granule of SNAC and a granule of semaglutide which are then combined into a solid form.

Khan teaches GLP-1 peptides in the present of N-(8-(2- hydroxybenzoyl)amino)caprylic acid, see page 24. Tablet form are also taught, see paragraph [0035]. Pharmaceutical salts are taught that they may be *optionally* employed in the invention, see [0034].

Sauerberg, P et al teaches N-(8-(2- hydroxybenzoyl)amino)caprylic acid and GLP-1 together as a composition, see Claim 1. The title of the patent is also relevant as it states: Solid compositions comprising a GLP-1 agonist and a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid. Sauerberg further teaches solid composition for oral administration comprising a GLP-1 agonist and a salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid, wherein a) the amount of said salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid is at least 0.6 mmol or at least 0.8 mmol. Improved ratios are taught that have improved bioavailability. Sodium salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid is taught on page 12, readable on Claim 17, for example.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

Further, Sauerberg teaches relative amounts readable on Claim 5 as well as the specific peptide of Claim 1, known as semaglutide. Sauerberg teaches the covalent attachment of fatty acids or fatty diacids, see page 21 under forms of composition starting on page 19 as well as Claim 10. All of the excipients, fillers, binders, etc… of the new claims are taught on page 12-15 of the WO document, those of povidone, microcrystalline cellulose, and magnesium stearate. The ranges taught are nearly identical to those claimed, see page 11 for SMAC and pages 13-14 for the filler, binders, delivery agents, lubricants, etc… Sauerberg also speaks to granulation, see column 12 of the PgPub at line 20. Further, the reference also teaches the newly added filler, lubricant, and binder of Claims 42, for example.

Most importantly, Sauerberg teaches: *The present invention relates to solid compositions of a GLP-1 agonist and salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid. Surprisingly, the present inventors have found that solid compositions comprising certain amounts of a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, such as SNAC, are optimal for oral administration of GLP-1 agonists. Accordingly, the compositions provide improved exposure and/or bioavailability of the GLP-1 agonist*. In order for the salt form to be known as improved, the non-salt form must be known to the skilled artisan, since that would be the control.

It would have been obvious to one of ordinary skill in the art to use either that salt forms of SNAC or the acid form as taught by Khan or Sauerberg. One would have been motivated to use either one as they have both been shown to be an effective co-agent for administration. Applicant's specification is already supportive of this from the rather broad

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

statement on page one that SNAC has previously been shown to improve the bioavailability of orally administered peptides, see page 1 of the PG Pub. One would have had a reasonable expectation of success in using SNAC in either salt form or acid form, as both have been shown to be effective in providing oral availability of GLP-1. Recall that Khan teaches salt form as optimal. Given that either one is a functional equivalent, one is also motivated to use both in combination as set forth in *In re Kerkhoven*, 205 USPQ 1069 (CCPA 1980), "It is *prima facie* obvious to combine two compositions each of which is taught by prior art to be useful for same purpose in order to form third composition that is to be used for very same purpose; the idea of combining them flows logically from their having been individually taught in prior art." This is especially true since the acid forms are still likely to have a salt form and vice versa simply through impurities and equilibrium.

It would have been obvious to one skilled in the art at the time of invention to determine all operable and optimum components of the SNAC ratios as well as their amounts in the claimed invention because these component are an art-recognized result-effective variables that are routinely determined and optimized in the medicinal and pharmaceutical arts. Further, the weight of the tablet, Claims 43-45, is not patentable as it is still the same composition. Weight may inform if the final composition is claimed and described by amounts in w/w against a final weight.

Generally, differences in concentration or temperature will not support the patentability of subject matter encompassed by the prior art unless there is evidence indicating such concentration or temperature is critical. "[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." In reAller, 220 F.2d 454, 456, 105 USPQ 233, 235 (CCPA 1955)

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

(Claimed process which was performed at a temperature between 40°C and 80°C and an acid concentration between 25% and 70% was held to be prima facie obvious over a reference process which differed from the claims only in that the reference process was performed at a temperature of 100°C and an acid concentration of 10%.); see also Peterson, 315 F.3d at 1330, 65 USPQ2d at 1382 ("The normal desire of scientists or artisans to improve upon what is already generally known provides the motivation to determine where in a disclosed set of percentage ranges is the optimum combination of percentages."); In reHoeschele, 406 F.2d 1403, 160 USPQ 809 (CCPA 1969) (Claimed elastomeric polyurethanes which fell within the broad scope of the references were held to be unpatentable thereover because, among other reasons, there was no evidence of the criticality of the claimed ranges of molecular weight or molar proportions.). For more recent cases applying this principle, see Merck & Co. Inc.v.Biocraft Lab. Inc., 874 F.2d 804, 10 USPQ2d 1843 (Fed. Cir.), cert. denied, 493 U.S. 975 (1989); In reKulling, 897 F.2d 1147, 14 USPQ2d 1056 (Fed. Cir. 1990); and In re Geisler, 116 F.3d 1465, 43 USPQ2d 1362 (Fed. Cir. 1997); Smith v. Nichols, 88 U.S. 112, 118-19 (1874) (a change in form, proportions, or degree "will not sustain a patent"); In re Williams, 36 F.2d 436, 438 (CCPA 1929) ("It is a settled principle of law that a mere carrying forward of an original patented conception involving only change of form, proportions, or degree, or the substitution of equivalents doing the same thing as the original invention, by substantially the same means, is not such an invention as will sustain a patent, even though the changes of the kind may produce better results than prior inventions."). See also KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 416 (2007) (identifying "the need for caution in granting a patent based on the combination of elements found in the prior art.").

In the instant case, ranges of Claim 23, for example, are of overlapping scope from the teaching of the WO document, see pages 12-15.

Further, the Supreme Court in *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S. Ct. 1727, 82 USPQ2d 1385, 1395-97 (2007) identified a number of rationales to support a conclusion of obviousness which are consistent with the proper "functional approach" to the determination of obviousness as laid down in *Graham*. The key to supporting any rejection under 35 U.S.C. 103 is the clear articulation of the reason(s) why the claimed invention would have been obvious. The Supreme Court in *KSR* noted that the analysis supporting a rejection

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

under 35 U.S.C. 103 should be made explicit. Exemplary rationales that may support a conclusion of obviousness include:

(A) Combining prior art elements according to known methods to yield predictable results;
(B) Simple substitution of one known element for another to obtain predictable results;
(C) Use of known technique to improve similar devices (methods, or products) in the same way;
(D) Applying a known technique to a known device (method, or product) ready for improvement to yield predictable results;
(E) "Obvious to try" – choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success;
(F) Known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations are predictable to one of ordinary skill in the art;
(G) Some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention.

Note that the list of rationales provided is **not** intended to be an all-inclusive list, nor do they need to all be present to make a case for obviousness. Other rationales to support a conclusion of obviousness may be relied upon by Office personnel based upon the findings of the prior art.

In the instant case, (A) above has been presented to demonstrate combining of prior art teachings to arrive at the instantly claimed invention. Further consideration shows that the combination for (A) also embraces (B). (C)-(G) follow with the claimed invention as SNAC is already known to be used with GLP-1, and many other variants of SNAC are taught in the references above.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

In conclusion, a reference is good not only for what it teaches by direct anticipation but also for what one of ordinary skill in the art might reasonably infer from the teachings. (In re Opprecht 12 USPQ 2d 1235, 1236 (Fed Cir. 1989); In re Bode 193 USPQ 12 (CCPA) 1976). In light of the foregoing discussion, the subject matter defined by the instant claims would have been obvious within the meaning of 35 USC 103(a). From the teachings of the references, it is apparent that one of ordinary skill in the art would have had a reasonable expectation of success in producing the claimed invention. Therefore, the invention as a whole was *prima facie* obvious to one of ordinary skill in the art at the time the invention was made, as evidenced by the references, especially in the absence of evidence to the contrary.

***Applicant's Arguments***

Applicant's arguments are found on page 10 of the remarks filed 07/19/2019.

***Response to Applicants Arguments***

Applicant's arguments have been carefully considered but are not deemed persuasive to overcome the rejection.

The issue(s) are compositions of each granule, which can contain the same components. So, one takes the components that are shared between the two granules, and then, apparently compresses them together. It's just not clear how an unexpected result is supposed to occur when the same ingredients are found among the two "granules." Further, Applicants have bombarded the Office with a jumbo IDS, one that is 796 pages is length, and no explanation for

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

its relevance. The major components of the instant Application are known to be combined in the prior art. Unexpected results are claimed, but generic conditions remain.

Applicants want to assert a surprising result, and better dissolution and (assumed) absorption profiles have been demonstrated in the specification. However, unexpected results and surprising results are specific to final product made (ingredients and final amounts/percentages). Generic references to binders, excipients, lubricants, etc ... have not shown the unexpected result, but specific examples and their ratios. One need look no further than the data in the specification which demonstrates that Tablet D, E and F do not function the same, and pH is even an issue. Thus, GLP-1 with SNAC and the additives claimed in genus form (binder, for example), with no speciation and final amounts relative to active ingredients cannot be said to possess the unexpected or surprising result. Note too that granule is not informative in many ways. First, what size? The word size does not even exist in the specification for each of granules which are then apparently combined. Thus, the Examiner is seeing Claim 40 is simply small particles of GLP-1 and SNAC in combination. Claim 1, however, is helpful for seeing the two granules as distinct compositions that are then combined to give the final outcome. However, they Claim 1 is still so generic it is hard to see how such an unexpected result can come about with such a generic claiming of ingredients when the specification shows otherwise. It is hoped that this will help Applicants carve out compositions specifically in Claim 1 and 40 to arrive at a patent. While GLP-1 (semaglutide) with SNAC is known in the art, combined as separate granule composition is not known in the prior art applied above. However, once these "two" compositions are combined (compressed into a pill form?), it would

[redacted]



> appear to be no different than just mixing the ingredients outright and makings them into a solid form.

(*Id.*).

73. Claims 1, 2, 9, 23-26, 38-40, 42, and 46-62 were rejected in the ground of nonstatutory double patenting as being unpatentable over claims 1-14 of U.S. Patent No. 9,278,123. (*Id.* at APOSEM0030867-69). The Examiner stated:

> Claims 1, 2, 9, 23-26, 38-40, 42, and 46-62 are rejected on the ground of nonstatutory double patenting as being unpatentable over Claims 1-14 of U.S. Patent No. 9,278,123 in view of Khan, M., US 20050148497. Although the claims at issue are not identical, they are not patentably distinct from each other because the '123 patent is drawn to a composition of semaglutide and SNAC. Looking to the specification, granulation is taught as well as all of the

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

excipients, fillers, binders, etc... of the new claims are taught on page 12-15 of the WO document, those of povidone, microcrystalline cellulose, and magnesium stearate. The ranges taught are nearly identical to those claimed, see page 11 for SMAC and pages 13-14 for the filler, binders, delivery agents, lubricants, etc... Further, the salt forms of SNAC is known to be optional from Khan. Therefore, the invention is obvious over the teaching of the '123 patent.

***Applicant's Arguments***

Applicant's arguments are found on pages 10 of the remarks filed 07/19/2019.

***Response to Applicants Arguments***

Applicant's arguments have been carefully considered but are not deemed persuasive to overcome the rejection.

The Argument's for the ODP are not to specific components and ranges, but to generic ingredients and ranges. Such unexpected result is not deemed convincing as the two components of GLP and SNAC, from Applicant's arguments, will result in an unexpected result no matter the binder, lubricant, etc ... This is not convincing.

The examiner has looked to the specification (again), as requested in Applicant's remarks filed 12/07/2018 (page 8 of the remarks), and does not see unexpected results over what their simple combination would achieve. Example 7 for Tablet B and C differ only (%F) 0.7 and 0.5, and there is nothing to show statistical significance. Much of the data is pH dependent, see Table 7 and 8. The differences between granulation and non-granulation do not appear to

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

> be unexpected, statistically different, and differing in magnitude to an unexpected and superior to warrant a patent. The amounts in the claims do not appear to match what is seen in the specification, and claims, such as Claim 40, is generic to the fillers, binders, and lubricants, etc …. It is not clear from the specification how one can broaden out from what was reduced to practice and still have an unexpected result as the data in the specification is not supportive.
>
> The rejection is maintained.

(*Id.*).

74. On April 15, 2020, Novo stated:

> Claims 1-2, 9-14, 16, 23-26, 38-40, 42, and 46-62 were previously pending, with claims 10-14 and 16 withdrawn from consideration. With this response, no claims are added, amended, or canceled. Thus, claims 1-2, 9, 23-26, 38-40, 42, and 46-62 are presented for reconsideration on the merits.

(*Id.* at APOSEM0030945).

75. Novo provided the following summary of a January 2020 interview with the Examiner:

> Applicant appreciates the courtesy extended by Examiner Heard during the telephone call conducted in January 2020. During the call, the Examiner and Applicant's representative discussed the Sauerberg reference cited in the Office Action (WO 2012/080471 (US 9,278,123)) and the applicability of the reference as prior art.

(*Id.*).

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

76. In response to the obviousness rejection Novo stated:

The Office Action rejects claims 1-2, 9, 23-26, 38-40, 42, and 46-62 under pre-AIA 35 U.S.C. 103(a) as allegedly unpatentable over Khan (US 2005/0148497) in view of Sauerberg (WO 2012/080471 (US 9,278,123)). Applicant respectfully traverses.

Under pre-AIA 35 U.S.C. 103(c)(1), "[s]ubject matter developed by another person, which qualifies as prior art only under one or more of subsections (e), (f), and (g) of section 102, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the claimed invention was made, owned by the same person or subject to an obligation of assignment to the same person." Thus, where a reference is owned by a party and a claimed invention were "subject to an obligation of assignment" to the same party at the time the claimed invention was made, the reference is disqualified as prior art under pre-AIA 35 U.S.C. 103(c)(1).

Here, the present application is a national stage filing of PCT/EP2013/055362, filed on March 16, 2013, with priority claims to applications EP12160743.6 (filed on March 22, 2012), EP13153459.6 (filed on January 31, 2013), and US 61/748,840 (filed on January 4, 2013). The

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

> present application's priority claim to the EP applications were perfected under 35 U.S.C. 119(a)-(d) and these applications provide written description support for the instant claims.
>
> The Sauerberg reference has a publication date of June 21, 2012, which is less than one year prior to the present application's priority dates. Thus, because Sauerberg was cited in a prior art rejection under pre-AIA 35 U.S.C. 103(a), then Sauerberg is only available as a prior art reference under 35 U.S.C. 102(e).
>
> However, the present application and Sauerberg were, at the time the invention of the present application was made, subject to an obligation of assignment to Novo Nordisk A/S and owned by Novo Nordisk A/S, respectively. Thus, as indicated above under pre-AIA 35 U.S.C. 103(c)(1), this statement alone should be sufficient to disqualify Sauerberg from being used in a rejection under pre-AIA 35 U.S.C. 103(a) against the claims of the present application.
>
> Accordingly, Applicant respectfully states that Sauerberg is disqualified as a reference under 35 U.S.C. 102(e) and that the prior art rejection be withdrawn.

(*Id.* at APOSEM0030945-46).

77. In response to the double patenting rejection Novo stated:

> The Office Action rejects claims 1-2, 9, 23-26, 38-40, 42, and 46-62 under the judicially-created doctrine of obviousness-type double patenting as allegedly obvious in view of US 9,278,123 in view of Khan. Applicant respectfully traverses the rejection for at least the following reasons.
>
> As exemplified in independent claim 1, the present claims cover solid dosage pharmaceutical compositions comprising a ***first type of granules*** and a ***second type of granules***. The first type of granules contain no GLP-1 peptide and the second type of granules contain no sodium N-(8-(2-hydroxybenzoyl)amino)caprylic acid (SNAC).
>
> The claims of the '123 patent, however, do not recite a first type of granules or a second type of granules, let alone that the first type of granules contain no GLP-1 peptide and that the second type of granules contain no SNAC.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

To support the rejection, the Office Action cites the specification of the '123 patent, stating, "Looking to the specification, granulation is taught as well as all of the excipients, fillers, binders, etc…of the new claims are taught on page 12-15 of the WO document, those of povidone, microcrystalline cellulose, and magnesium stearate." Office Action at the paragraph spanning pages 11-12. However, like the claims, the specification of the '123 patent does not recite a first type of granules or a second type of granules, let alone that the first type of granules contains no GLP-1 peptide and that the second type of granules contain no SNAC.

Moreover, as explained below, although the specification can be relied up on in an obviousness-type double patenting rejection, such reliance is under very limited circumstances. The rationale provided by the Office Action for relying on the specification against the instant claims does not fall into such limited circumstances.

The MPEP at Section 804(II)(B)(2) ("Obviousness Analysis" under "Requirements Of A Double Patenting Rejection (Including Provisional Rejections)") states the following:

> A nonstatutory double patenting rejection, if not based on an anticipation rationale or an "unjustified timewise extension" rationale, is "analogous to [a failure to meet] the nonobviousness requirement of **35 U.S.C. 103**" except that the ***patent disclosure principally underlying the double patenting rejection is not considered prior art***. *In re Braithwaite*, 379 F.2d 594, 154 USPQ 29 (CCPA 1967) (emphasis added)…When considering whether the invention defined in a claim of an application would have been an ***obvious variation*** of the invention defined in the claim of a patent or copending application, ***the disclosure of the patent may not be used as prior art***. *General Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1279, 23 USPQ2d 1839, 1846 (Fed. Cir. 1992).

Thus, in general, the specification of the patent cannot be relied upon as "prior art" in the context of a nonstatutory obviousness-type double patenting rejection.

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

The MPEP goes on to note a limited exception where the "specification can be used as a dictionary to learn the meaning of a term in the claim." *Id.*, citing *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1299, 53 USPQ2d 1065, 1067 (Fed. Cir. 1999)("[W]ords in patent claims are given their ordinary meaning in the usage of the field of the invention, unless the text of the patent makes clear that a word was used with a special meaning."). The MPEP also states that "those portions of the specification which provide support for the reference claims may also be examined and considered when addressing the issue of whether a claim in the application defines an obvious variation of an invention claimed in the reference patent or application (***as distinguished from*** an obvious variation of the subject matter disclosed in the reference patent or application)." *Id.*, citing *In re Vogel*, 422 F.2d 438, 441-42, 164 USPQ 619, 622 (CCPA 1970) (emphasis added).

Here, the Office Action is not relying on the '123 specification as a dictionary to learn the meaning of a term in the claim. Nor is the Office Action relying on the '123 specification to determine whether the instant claims are an obvious variation of the claimed invention in the '123 patent. Indeed, the foregoing excerpt from the Office Action in the paragraph spanning pages 11-12 discusses the '123 patent in the context of what "the specification…taught" in relation to the claims of the present application. As indicated in the foregoing excerpt from the MPEP citing *In re Vogel*, such an analysis is not proper.

Notwithstanding the foregoing, even in view of the proper analysis in *In re Vogel*, the specification of the '123 patent does not indicate that the claimed invention in the claims of the '123 patent covers an obvious variant that would support the nonstatutory obviousness-type double patenting advanced by the Office Action. Indeed, Applicant reiterates that the '123 patent does not recite a first type of granules or a second type of granules, let alone that the first type of granules contain no GLP-1 peptide and that the second type of granules contain no SNAC.

Khan does not provide a curative disclosure. Indeed, the Office Action cites Khan merely for different salt forms of SNAC.

Accordingly, in view of the foregoing, Applicant respectfully requests that the nonstatutory obviousness-type double patenting rejection be withdrawn.

[redacted]



(*Id.* at APOSEM0030946-48).

78. On July 13, 2020, the PTO allowed claims 1-2, 9, 23-26, 38-40, 42 and 46-62. (*Id.* at APOSEM0037447).

79. In the reasons for allowance the PTO stated:

> The following is an examiner's statement of reasons for allowance: the instant invention is drawn to a two part granular composition as in Claim 1. The prior art teaches them together, but not as separate granules whereby the SNAC release and the semaglutide (Novo) release can be separately controlled. The closest prior art is that applied, and/or US 9,278,123.

(*Id.* at APOSEM0037448).

80. On July 29, 2020, Novo submitted an Information Disclosure Statement with additional prior art. (*Id.* at APOSEM0037624).

81. On August 27, 2020, the PTO allowed claims 1-2, 9, 23-26, 38-40, 42 and 46-62. (*Id.*).

82. In the reasons for allowance the PTO stated:

> The following is an examiner's statement of reasons for allowance: the reasons for allowance still stands. No new art presented in the IDS submitted 07/29/2020 negates the previous allowance made 07/13/2020.

(*Id.*).

83. On October 19, 2020, Novo submitted a request for continued examination with additional prior art references. (*Id.* at APOSEM0037792).

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

84. On November 12, 2020, the PTO allowed claims 1-2, 9, 23-26, 38-40, 42 and 46-62. (*Id.*).

85. In the reasons for allowance the PTO stated:

> The following is an examiner's statement of reasons for allowance: Applicants have submitted an IDS for consideration. The instant Application is allowed as before and for reasons of record.

(*Id.*).

86. On December 18, 2020, Novo submitted a request for continued examination with additional prior art references. (*Id.* at APOSEM0037947).

87. On January 7, 2021, the PTO allowed claims 1-2, 9, 23-26, 38-40, 42 and 46-62. (*Id.* at APOSEM0037948).

88. In the reasons for allowance the PTO stated:

[redacted]

**Appendix G—120 Prosecution History**
March 6, 2025

> The following is an examiner's statement of reasons for allowance: Applicants have submitted and IDS with reference teaching semaglutide in combination with SNAC, to which the references were carefully read. The prior art teaches this combination as a whole, i.e., a single composition where the whole formulation is at the molecular level for each and every ingredient, completely blended. However, the prior art does not teach the formulation of *granules* claimed in Claim 1. This is not taught or suggested, nor is the amounts in each granule for each component taught in the prior art. Even if a composition with contained all of the components were found in a single composition, there is nothing in the prior art to suggest their separation into granules of different entities and amounts claimed. Note that in Claim 1, (a) contains a lubricant but (b) does not. (b) contains a filler and a binder, but (a) does not. There is nothing that inform the skilled artesian to separate these components out into separate granules to be pressed into a final composition (tablet).

(*Id.* at APOSEM0037947).

89. On March 3, 2021, the 120 patent issued. (*Id.* at APOSEM0037975).

***