# Exhibit 12

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

1. The earliest application leading to the 501 patent, EP743, was filed on March 22, 2012. EP743 included the following claims:

1. A pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the release of said salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is simultaneous with or faster than the release of said GLP-1 peptide as determined by dissolution testing using Assay (I).

2. A pharmaceutical composition according to any one of the preceding claims, wherein the dissolved amount of the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid peaks within the first 30 minutes as determined by dissolution testing using Assay (I) at pH 2.5.

3. A pharmaceutical composition according to claim 2, wherein the dissolved amount of the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid peaks within 31 minutes, such as within 32, 33, 34, 35, 36, 37, 38, 39, 40, 45, 50, 55, or 60 minutes as determined by dissolution testing using Assay (I) at pH 2.5.

4. A pharmaceutical composition according to any one of the preceding claims, wherein said dissolution testing using Assay (I) is carried out at any one of pH 1.0-8.0, such as pH 1.0, 2.5, or 6.8.

5. A pharmaceutical composition comprising a first type and a second type of granules, wherein said first type of granules comprises a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and said second type of granules comprises a GLP-1 peptide.

6. A pharmaceutical composition according to any one of the preceding claims, wherein the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is SNAC.

7. A pharmaceutical composition according to any one of the preceding claims, wherein the GLP-1 peptide comprises an albumin binding moiety.

8. A pharmaceutical composition according to any one of the preceding claims, wherein the GLP-1 peptide is N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-heptadecanoylamino) butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl][Aib8,Arg34]GLP-1(7-37).

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

9. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a GLP-1 peptide with a filler and/or a binder;
b) dry granulation of the mixture of step a;
c) mixing the granules obtained in step b with a composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid; and
d) optionally adding further lubricant.

10. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid with a lubricant and/or a filler;
b) dry granulation of the mixture of step a;
c) mixing the granules obtained in step b with a composition comprising a GLP-1 peptide; and
d) optionally adding further lubricant.

11. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a GLP-1 peptide with a filler and/or a binder;
b) dry granulation of the mixture of step a;
c) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, optionally a lubricant and/or a filler;
d) dry granulation of the mixture of step c;
e) mixing the granules obtained in step b with the granules obtained in step d; and
f) optionally adding further lubricant.

12. A pharmaceutical composition obtained by the process as defined in any one of claims 9-11.

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

13. A process of producing a granule comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, wherein the process comprises the steps:

a) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid (such as SNAC) with a lubricant and/or a filler; and

b) dry granulation of the mixture of step a.

14. A granule obtained by the process as defined in claim 13.

15. A composition as defined in any one of claims 1-8 or 12 or a granule as defined in claim 14 for use in medicine, such as for treatment of diabetes or obesity, wherein said composition is administered orally.

(501 PH at APOSEM0038157-59).

2. The next application, EP459, was filed on January 31, 2013. EP459 included the following claims:

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

1. A pharmaceutical composition comprising a first type of granules and a second type of granules, wherein said first type of granules comprises a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and no GLP-1 peptide, and wherein said second type of granules comprises a GLP-1 peptide and no salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid.

2. A pharmaceutical composition according to any one of the preceding claims, wherein the release of said salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is simultaneous with or faster than the release of said GLP-1 peptide as determined by dissolution testing using Assay (I) and wherein said release is optionally determined within 30 minutes of said dissolution testing.

3. A pharmaceutical composition according to any one of the preceding claims, wherein the dissolved amount of the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid peaks within the first 60 minutes, such as within 55, 50, 45, 40, 39, 38, 37, 36, 35, 34, 33, 32, 31, or 30 minutes, as determined by dissolution testing using Assay (I) at pH 2.5.

. A pharmaceutical composition according to any one of the preceding claims, wherein said dissolution testing using Assay (I) is carried out at any one of pH 1.0-8.0, such as pH 1.0, 2.5, or 6.8.

5. A pharmaceutical composition according to any one of the preceding claims, wherein said first type of granules and said second type of granules comprises at least 50 % (w/w) of said composition.

6. A pharmaceutical composition according to any one of the preceding claims, wherein the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is SNAC.

7. A pharmaceutical composition according to any one of the preceding claims, wherein the GLP-1 peptide comprises an albumin binding moiety.

8. A pharmaceutical composition according to any one of the preceding claims, wherein the GLP-1 peptide is N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

heptadecanoylamino) butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl] [Aib8,Arg34]GLP-1(7-37) or N-epsilon26-{2-[2-(2-{2-[2-(2-{(S)-4-carboxy-4-[10-(4-carboxyphenoxy) decanoylamino]butyrylamino}ethoxy)ethoxy] acetylamino}ethoxy) ethoxy]acetyl}, N-epsilon37-{2-[2-(2-{2-[2-(2-{(S)-4-carboxy-4-[10-(4-carboxy-phenoxy) decanoylamino] butyrylamino}ethoxy)ethoxy]acetylamino}ethoxy) ethoxy]acetyl}-[Aib8,Arg34,Lys37]GLP-1(7-37)-OH.

9. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a GLP-1 peptide with a filler and/or a binder;
b) dry granulation of the mixture of step a;
c) mixing the granules obtained in step b with a composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid; and
d) optionally adding further lubricant,

wherein the mixture of step a does not comprise a salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid.

10. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid with a lubricant and/or a filler;
b) dry granulation of the mixture of step a;
c) mixing the granules obtained in step b with a composition comprising a GLP-1 peptide; and
d) optionally adding further lubricant

wherein the mixture of step a does not comprise a GLP-1 peptide.

11. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a GLP-1 peptide with a filler and/or a binder;
b) dry granulation of the mixture of step a;

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

> c) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, optionally a lubricant and/or a filler;
>
> d) dry granulation of the mixture of step c;
>
> e) mixing the granules obtained in step b with the granules obtained in step d; and
>
> f) optionally adding further lubricant,
>
> wherein the mixture of step a does not comprise a salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid and wherein the mixture of step c does not comprise a GLP-1 peptide.
>
> 12. A pharmaceutical composition obtained by the process as defined in any one of claims 9-11.
>
> 13. A process of producing a granule comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, wherein the process comprises the steps:
>
> a) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid (such as SNAC) with a lubricant and/or a filler; and
>
> b) dry granulation of the mixture of step a,
>
> wherein the mixture of step a does not comprise a GLP-1 peptide.
>
> 14. A granule obtained by the process as defined in claim 13.
>
> 15. A composition as defined in any one of claims 1-8 or 12 or a granule as defined in claim 14 for use in medicine, such as for treatment of diabetes or obesity, wherein said composition is administered orally.

(*Id.* at APOSEM0038216-18).

3. The next application, the 840 provisional, was filed on January 4, 2013. The 840 provisional included the following claims:

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

1. A pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the release of said salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is simultaneous with or faster than the release of said GLP-1 peptide as determined by dissolution testing using Assay (I).

2. A pharmaceutical composition according to the preceding aspect, wherein the dissolved amount of the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid peaks within the first 30 minutes as determined by dissolution testing using Assay (I) at pH 2.5.

3. A pharmaceutical composition according to aspect 2, wherein the dissolved amount of the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid peaks within 31 minutes, such as within 32, 33, 34, 35, 36, 37, 38, 39, 40, 45, 50, 55, or 60 minutes as determined by dissolution testing using Assay (I) at pH 2.5.

4. A pharmaceutical composition according to any one of the preceding aspects, wherein said dissolution testing using Assay (I) is carried out at any one of pH 1.0-8.0, such as pH 1.0, 2.5, or 6.8.

5. A pharmaceutical composition comprising a first type and a second type of granules, wherein said first type of granules comprises a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and said second type of granules comprises a GLP-1 peptide.

6. A pharmaceutical composition according to any one of the preceding aspects, wherein the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is SNAC.

7. A pharmaceutical composition according to any one of the preceding aspects, wherein the GLP-1 peptide comprises an albumin binding moiety.

8. A pharmaceutical composition according to any one of the preceding aspects, wherein the GLP-1 peptide is N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-heptadecanoylamino) butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl] [Aib8,Arg34]GLP-1(7-37).

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

9. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a GLP-1 peptide with a filler and/or a binder;
b) dry granulation of the mixture of step a;
c) mixing the granules obtained in step b with a composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid; and
d) optionally adding further lubricant.

10. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid with a lubricant and/or a filler;
b) dry granulation of the mixture of step a;
c) mixing the granules obtained in step b with a composition comprising a GLP-1 peptide; and
d) optionally adding further lubricant.

11. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a GLP-1 peptide with a filler and/or a binder;
b) dry granulation of the mixture of step a;
c) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, optionally a lubricant and/or a filler;
d) dry granulation of the mixture of step c;
e) mixing the granules obtained in step b with the granules obtained in step d; and
f) optionally adding further lubricant.

12. A pharmaceutical composition obtained by the process as defined in any one of aspects 9-11.

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

13. A process of producing a granule comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, wherein the process comprises the steps:

a) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid (such as SNAC) with a lubricant and/or a filler; and

b) dry granulation of the mixture of step a.

14. A granule obtained by the process as defined in aspect 13.

15. A composition as defined in any one of aspects 1-8 or 12 or a granule as defined in aspect 14 for use in medicine, such as for treatment of diabetes or obesity, wherein said composition is administered orally.

(*Id.* at APOSEM0028374-76).

4. The next application, PCT/EP2013/055362, was filed on March 15, 2013, and published as the 694 publication on September 26, 2013. The 694 publication included the following claims:

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

1. A pharmaceutical composition comprising a first type of granules and a second type of granules, wherein said first type of granules comprises a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and no GLP-1 peptide, and wherein said second type of granules comprises a GLP-1 peptide and no salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid.

2. A pharmaceutical composition according to any one of the preceding claims, wherein the release of said salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is simultaneous with or faster than the release of said GLP-1 peptide as determined by dissolution testing using Assay (I) and wherein said release is optionally determined within 30 minutes of said dissolution testing.

3. A pharmaceutical composition according to any one of the preceding claims, wherein the dissolved amount of the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid peaks within the first 60 minutes, such as within 55, 50, 45, 40, 39, 38, 37, 36, 35, 34, 33, 32, 31, or 30 minutes, as determined by dissolution testing using Assay (I) at pH 2.5.

4. A pharmaceutical composition according to any one of the preceding claims, wherein said dissolution testing using Assay (I) is carried out at any one of pH 1.0-8.0, such as pH 1.0, 2.5, or 6.8.

5. A pharmaceutical composition according to any one of the preceding claims, wherein said first type of granules and said second type of granules comprises at least 50 % (w/w) of said composition.

6. A pharmaceutical composition according to any one of the preceding claims, wherein the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is SNAC.

7. A pharmaceutical composition according to any one of the preceding claims, wherein the GLP-1 peptide comprises an albumin binding moiety.

8. A pharmaceutical composition according to any one of the preceding claims, wherein the GLP-1 peptide is N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

heptadecanoylamino) butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl] [Aib8,Arg34]GLP-1(7-37) or N-epsilon26-{2-[2-(2-{2-[2-(2-{(S)-4-carboxy-4-[10-(4-carboxyphenoxy) decanoylamino]butyrylamino}ethoxy)ethoxy] acetylamino}ethoxy) ethoxy]acetyl}, N-epsilon37-{2-[2-(2-{2-[2-(2-{(S)-4-carboxy-4-[10-(4-carboxy-phenoxy) decanoylamino] butyrylamino}ethoxy)ethoxy]acetylamino}ethoxy) ethoxy]acetyl}-[Aib8,Arg34,Lys37]GLP-1(7-37)-OH.

9. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a GLP-1 peptide with a filler and/or a binder;
b) dry granulation of the mixture of step a;
c) mixing the granules obtained in step b with a composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid; and
d) optionally adding further lubricant,

wherein the mixture of step a does not comprise a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid.

10. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid with a lubricant and/or a filler;
b) dry granulation of the mixture of step a;
c) mixing the granules obtained in step b with a composition comprising a GLP-1 peptide; and
d) optionally adding further lubricant

wherein the mixture of step a does not comprise a GLP-1 peptide.

11. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a GLP-1 peptide with a filler and/or a binder;
b) dry granulation of the mixture of step a;

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

c) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, optionally a lubricant and/or a filler;
d) dry granulation of the mixture of step c;
e) mixing the granules obtained in step b with the granules obtained in step d; and
f) optionally adding further lubricant,

wherein the mixture of step a does not comprise a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and wherein the mixture of step c does not comprise a GLP-1 peptide.

12. A pharmaceutical composition obtained by the process as defined in any one of claims 9-11.

13. A process of producing a granule comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, wherein the process comprises the steps:
a) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid (such as SNAC) with a lubricant and/or a filler; and
b) dry granulation of the mixture of step a,

wherein the mixture of step a does not comprise a GLP-1 peptide.

14. A granule obtained by the process as defined in claim 13.

15. A composition as defined in any one of claims 1-8 or 12 or a granule as defined in claim 14 for use in medicine, such as for treatment of diabetes or obesity, wherein said composition is administered orally.

(*Id.* at APOSEM0028537-39).

5. The next application, the 589 application, was filed as a national stage application of PCT 362 on September 19, 2014.

6. The 589 application issued as the 120 patent. (*See generally* 120 PH).

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

7. The last application, the 363 application, was filed as a continuation of the 589 application on January 25, 2021. The 363 application included the following claims:

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

1. A pharmaceutical composition comprising a first type of granules and a second type of granules, wherein said first type of granules comprises a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and no GLP-1 peptide, and wherein said second type of granules comprises a GLP-1 peptide and no salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid.

2. A pharmaceutical composition according to claim 1, wherein the release of said salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is simultaneous with or faster than the release of said GLP-1 peptide as determined by dissolution testing using Assay (I) and wherein said release is optionally determined within 30 minutes of said dissolution testing.

3. A pharmaceutical composition according to claim 2, wherein the dissolved amount of the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid peaks within the first 60 minutes, as determined by dissolution testing using Assay (I) at pH 2.5.

4. A pharmaceutical composition according to claim 3, wherein said dissolution testing using Assay (I) is carried out at any one of pH 1.0-8.0.

5. A pharmaceutical composition according to claim 1, wherein said first type of granules and said second type of granules comprises at least 50 % (w/w) of said composition.

6. A pharmaceutical composition according to claim 1, wherein the salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid is SNAC.

7. A pharmaceutical composition according to claim 1, wherein the GLP-1 peptide comprises an albumin binding moiety.

8. A pharmaceutical composition according to claim 1, wherein the GLP-1 peptide is N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-heptadecanoylamino)

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl] [Aib8,Arg34]GLP-1(7-37) or N-epsilon26-{2-[2-(2-{2-[2-(2-{(S)-4-carboxy-4-[10-(4-carboxyphenoxy) decanoylamino]butyrylamino}ethoxy)ethoxy] acetylamino}ethoxy) ethoxy]acetyl}, N-epsilon37-{2-[2-(2-{2-[2-(2-{(S)-4-carboxy-4-[10-(4-carboxy-phenoxy) decanoylamino] butyrylamino}ethoxy)ethoxy]acetylamino}ethoxy) ethoxy]acetyl}-[Aib8,Arg34,Lys37]GLP-1(7-37)-OH.

9. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a GLP-1 peptide with a filler and/or a binder;
b) dry granulation of the mixture of step a;
c) mixing the granules obtained in step b with a composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid; and
d) optionally adding further lubricant,

wherein the mixture of step a does not comprise a salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid.

10. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

a) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid with a lubricant and/or a filler;
b) dry granulation of the mixture of step a;
c) mixing the granules obtained in step b with a composition comprising a GLP-1 peptide; and
d) optionally adding further lubricant

wherein the mixture of step a does not comprise a GLP-1 peptide.

11. A process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and a GLP-1 peptide, wherein the process comprises the steps:

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

a) mixing a GLP-1 peptide with a filler and/or a binder;

b) dry granulation of the mixture of step a;

c) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, optionally a lubricant and/or a filler;

d) dry granulation of the mixture of step c;

e) mixing the granules obtained in step b with the granules obtained in step d; and

f) optionally adding further lubricant,

wherein the mixture of step a does not comprise a salt of N-(8-(2-hydroxybenzoyl)amino) caprylic acid and wherein the mixture of step c does not comprise a GLP-1 peptide.

12. A pharmaceutical composition obtained by the process as defined in claim 9.

13. A process of producing a granule comprising a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid, wherein the process comprises the steps:

a) mixing a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid (such as SNAC) with a lubricant and/or a filler; and

b) dry granulation of the mixture of step a,

wherein the mixture of step a does not comprise a GLP-1 peptide.

14. A granule obtained by the process as defined in claim 13.

15. A method for treating diabetes or obesity in a subject in need of such treatment, said method comprising orally administering to said subject a therapeutically effective amount of the pharmaceutical composition of claim 1.

(501 PH at APOSEM0038104-06).

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

8. On June 3, 2021, the 363 application published as U.S. Patent Publication No. 2021/0162012. (*Id.* at APOSEM0038226).

9. On January 6, 2022, the PTO issued an Office Action stating:

> **Disposition of Claims***
> 5) ☑ Claim(s) 1-15 is/are pending in the application.
> 5a) Of the above claim(s) _____ is/are withdrawn from consideration.
> 6) ☐ Claim(s) _____ is/are allowed.
> 7) ☐ Claim(s) _____ is/are rejected.
> 8) ☐ Claim(s) _____ is/are objected to.
> 9) ☑ Claim(s) 1-15 are subject to restriction and/or election requirement

(*Id.* at APOSEM0038370-71).

10. The Examiner issued an election/restriction requirement. The Examiner stated:

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

***Election/Restrictions***

Restriction to one of the following inventions is required under **35 U.S.C. 121**:

I. Claim(s) 1-8 is/are drawn to a pharmaceutical composition, classified in A61K 38/26, for K example.

II. Claim(s) 9 is/are drawn to a process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hy droxy benzoyl)amino)caprylic acid and a GLP-1 peptide, classified in A61K 2300/00, for example.

III. Claim(s) 10 is/are drawn to a process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hy droxy benzoyl)amino)caprylic acid and a GLP-1 peptide, classified in A61K 2300/00, for example, whereby the final product is different from Group III.

IV. Claim(s) 11 is/are drawn to a process of producing a pharmaceutical composition comprising a salt of N-(8-(2-hy droxy benzoyl)amino)caprylic acid and a GLP-1 peptide, classified in A61K 2300/00, for example, whereby the final product is different from Group III or IV.

V. Claim(s) 12 is/are drawn to a composition, product by process, of Group 9 classified in A61K 38/26, for example.

VI. Claim(s) 13 is/are drawn to process of making a composition that does not contain GLP-1, classified in A61P 3/00, for example.

[redacted]



VII. Claim(s) 14 is/are drawn to a product of Group VI, classified in A61K 9/2077, for example.

VIII. Claim(s) 15 is/are drawn to a method of treatment, classified in A61P 3/00, for example.

Due to the complex nature of the claims, no request for an oral election is being made, see **MPEP 812.01**.

**The inventions are distinct, each from the other for the following reasons:**

**Inventions I, V, and VII are drawn to different products**. Inventions are unrelated if it can be shown that they are not disclosed as capable of use together and they have different modes of operation, different functions, or different effects **(MPEP § 806.04, MPEP § 808.01)**.

In the instant case the products are structurally and functionally distinct. For example, the product of Group V has different components within the different granules.

**Inventions V and VII are related as process of making and product made**. The inventions are distinct if either or both of the following can be shown:

**(1)** that the process as claimed can be used to make another and materially different product, **or**

**(2)** that the product as claimed can be made by another and materially different process **(MPEP § 806.05(f))**.

In the instant case the process use some common components, but the order of addition results in a different composition outcome for the final product.

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

**Inventions I and VIII are related as product and process of use**. The inventions can be shown to be distinct if either or both of the following can be shown:

**(1)** the process for using the product as claimed can be practiced with another materially different product **or**

**(2)** the product as claimed can be used in a materially different process of using that product. See **MPEP § 806.05(h)**.

In the instant case diabetes can be treated with other composition, such as insulin.

**Inventions (II, III, IV, and VI) and VIII are unrelated.** Inventions are unrelated if it can be shown that they are not disclosed as capable of use together and they have different designs, modes of operation, and effects (**MPEP § 802.01** and **§ 806.06**).

In the instant case, the different inventions, as evidenced by the claims themselves, are directed to different inventions which are not connected in design, operation, or effect. These methods are independent since they are not disclosed as capable of use together, they have different modes of operation, they have different functions, and they have different effects. One would not have to practice the various methods at the same time to practice just one method alone.

For example, the method of making a product have different effects and outcomes.

**Restriction for examination purposes as indicated is proper because all these inventions listed in this action are independent or distinct for the reasons given above and there would be a serious search and examination burden if restriction were not required because one or more of the following reasons apply**:

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

**(a)** the inventions have acquired a separate status in the art in view of their different classification;
**(b)** the inventions have acquired a separate status in the art due to their recognized divergent subject matter;
**(c)** the inventions require a different field of search (for example, searching different classes/subclasses or electronic resources, or employing different search queries);
**(d)** the prior art applicable to one invention would not likely be applicable to another invention;
**(e)** the inventions are likely to raise different non-prior art issues under 35 U.S.C. 101 and/or 35 U.S.C. 112, first paragraph.

In the instant case, the search burden encompasses one or more of **(a)-(c)**. For example:

**(a)** is generally useless for complex molecules, or complex Markush groups that must be searched by chemical databases. The search for a product would not necessarily find its method of synthesis or method of using the compound. A compound can be made in a number of ways, and the search to arrive at a single reference that teaches all the embodiments and limitations is unrealistic, requiring a number of search strings and databases. Further, methods are divergent in subject matter, requiring different search strings and databases. Lastly, single reference hits that embrace all of what Applicants are claiming are rather infrequent, and for obviousness type rejections, the search results require substantial reading and refinement of the search terms as the prior art is uncovered. Thus, **(c)** and **(d)** are very relevant to multiple and/or divergent inventions despite the presumption of overlap in subject matter between different inventions, and presents a burden to the Examiner.

**(e)** is also relevant as issues of written description, enablement, and indefiniteness, even new matter, are often found in the initial claims. This adds to the already burdensome search of divergent inventions.

**Applicant is advised that the reply to this requirement to be complete <u>must</u> include**

**(i) an election of a invention to be examined** even though the requirement may be traversed (**37 CFR 1.143**) **and**

**(ii) identification of the claims encompassing the elected invention**.

The election of an invention may be made with or without traverse. To reserve a right to petition, the election must be made with traverse. If the reply does not distinctly and specifically point out supposed errors in the restriction requirement, the election shall be treated as an election without traverse. Traversal must be presented at the time of election in order to be considered timely. Failure to timely traverse the requirement will result in the loss

[redacted]



of right to petition under **37 CFR 1.144**. If claims are added after the election, applicant must indicate which of these claims are readable on the elected invention.

If claims are added after the election, applicant must indicate which of these claims are readable upon the elected invention.

Should applicant traverse on the ground that the inventions are not patentably distinct, applicant should submit evidence or identify such evidence now of record showing the inventions to be obvious variants or clearly admit on the record that this is the case. In either instance, if the examiner finds one of the inventions unpatentable over the prior art, the evidence or admission may be used in a rejection under 35 U.S.C. 103(a) of the other invention.

**Regardless of which group is elected, a further election of species is required.**

This application contains claims directed to patentably distinct species. The species are independent or distinct because the species are not obvious variants of each other based on the current record.

Applicant is required under **35 U.S.C. 121** to elect a single disclosed species, or a single grouping of patentably indistinct species, for prosecution on the merits to which the claims shall be restricted if no generic claim is finally held to be allowable. Therefore, there is a search and/or examination burden for the patentably distinct species as set forth in the reason(s) above.

Applicant is advised that the reply to this requirement to be complete **must** include:

**(i) an election of a species** or a grouping of patentably indistinct species to be examined even though the requirement may be traversed (**37 CFR 1.143**) and

**(ii) identification of the claims encompassing the elected species** or grouping of patentably indistinct species, including any claims subsequently added.

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

An argument that a claim is allowable or that all claims are generic is considered nonresponsive unless accompanied by an election.

If Applicants elects a group that has options or generic components, then the following species must be elected: the optional component if desired in the claim, and the component specified. For example, an optional lubricant. What specific lubricant is to be added.

**Election of Species Practice**

The prior art search, however, will not be extended unnecessarily to cover all nonelected species. Should applicant, in response to this rejection of the Markush-type claim, overcome the rejection, as by amending the Markush-type claim to exclude the species anticipated or rendered obvious by the prior art, the amended Markush-type claim will be reexamined. The examination will be extended to the extent necessary to determine patentability of the Markush-type claim. In the event prior art is found during the reexamination that anticipates or renders obvious the amended Markush-type claim, the claim will be rejected and the action can be made final unless the examiner introduces a new ground of rejection that is neither necessitated by applicant's amendment of the claims nor based on information submitted in an information disclosure statement filed during the period set forth in **37 CFR 1.97(c)** with the fee set forth in **37 CFR 1.17(p)**. See **MPEP § 706.07(a)**. Amendments submitted after the final rejection further restricting the scope of the claim may be denied entry if they do not comply with the requirements of **37 CFR 1.116**. See **MPEP § 714.13**.

The election may be made **with** or **without traverse**. To preserve a right to petition, the election must be made with traverse. If the reply does not distinctly and specifically point out supposed errors in the election of species requirement, the election shall be treated as an election without traverse. Traversal must be presented at the time of election in order to be considered timely. Failure to timely traverse the requirement will result in the loss of right to petition under **37 CFR 1.144**. If claims are added after the election, applicant must indicate which of these claims are readable on the elected species or grouping of patentably indistinct species.

Should applicant traverse on the ground that the species, or groupings of patentably indistinct species from which election is required, are not patentably distinct, applicant should submit evidence or identify such evidence now of record showing them to be obvious variants or clearly admit on the record that this is the case. In either instance, if the examiner finds one

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

of the species unpatentable over the prior art, the evidence or admission may be used in a rejection under 35 U.S.C. 103(a) of the other species.

Upon the allowance of a generic claim, applicant will be entitled to consideration of claims to additional species which depend from or otherwise require all the limitations of an allowable generic claim as provided by **37 CFR 1.141**.

**Rejoinder of Process Claims**

The examiner has required restriction between product and process claims. Where applicant elects claims directed to the product, and a product claim is subsequently found allowable, withdrawn process claims that depend from or otherwise include all the limitations of the allowable product claim will be rejoined in accordance with the provisions of **MPEP § 821.04**. **Process claims that depend from or otherwise include all the limitations of the patentable product** will be entered as a matter of right if the amendment is presented prior to final rejection or allowance, whichever is earlier. Amendments submitted after final rejection are governed by **37 CFR 1.116**; amendments submitted after allowance are governed by **37 CFR 1.312**.

In the event of rejoinder, the requirement for restriction between the product claims and the rejoined process claims will be withdrawn, and the rejoined process claims will be fully examined for patentability in accordance with **37 CFR 1.104**.

Thus, to be allowable, the rejoined claims must meet all criteria for patentability including the requirements of 35 U.S.C. 101, 102, 103, and 112. Until an elected product claim is found allowable, an otherwise proper restriction requirement between product claims and process claims may be maintained. **Withdrawn process claims that are not commensurate in scope with an allowed product claim will not be rejoined**. See "Guidance on Treatment of Product and Process Claims in light of In re Ochiai, In re Brouwer and 35 U.S.C. § 103(b)," 1184 O.G. 86 (March 26, 1996). Additionally, in order to retain the right to rejoinder in accordance with the above policy, Applicant is advised that the process claims should be amended during prosecution either to maintain dependency on the product claims or to otherwise include the limitations of the product claims. **Failure to do so may result in a loss of the right to rejoinder.** Further, note that the prohibition against double patenting rejections of **35 U.S.C. 121** does not apply where the restriction requirement is withdrawn by the examiner before the patent issues. See **MPEP § 804.01**.

With the response to this Election/Restriction requirement, a listing of co-pending applications relevant to the instantly claimed invention is **requested, but not required**.

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

(*Id.* at APOSEM0038372-78).

11. On April 13, 2022, Novo canceled then-pending claims 1-15 and added new claims 16-41:

> Listing of the Claims:
>
> 1. – 15. (Canceled)
>
> 16. (New) A solid dosage pharmaceutical composition comprising (1) semaglutide and (2) a granule;
> wherein the granule comprises a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid (salt of NAC), a lubricant, and no semaglutide;
> wherein the salt of NAC is at least 75% (w/w) of the granule; and
> wherein the lubricant is less than 10% (w/w) of the granule.
>
> 17. (New) The composition according to claim 16, wherein the salt of NAC is sodium N-(8-(2-hydroxybenzoyl)amino)caprylic acid (SNAC).
>
> 18. (New) The composition according to claim 16, wherein the salt of NAC is 80-86% (w/w) of the granule.
>
> 19. (New) The composition according to claim 18, wherein the salt of NAC is sodium N-(8-(2-hydroxybenzoyl)amino)caprylic acid (SNAC).
>
> 20. (New) The composition according to claim 16, wherein the lubricant is magnesium stearate.
>
> 21. (New) The composition according to claim 16, wherein the lubricant is 1-3% (w/w) of the granule.

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

22. (New) The composition according to claim 21, wherein the lubricant is magnesium stearate.

23. (New) The composition according to claim 16, wherein the granule further comprises a filler.

24. (New) The composition according to claim 23, wherein the filler is microcrystalline cellulose.

25. (New) The composition according to claim 23, wherein the microcrystalline cellulose is 10-20% (w/w) of the granule.

26. (New) The composition according to claim 23, wherein the microcrystalline cellulose is less than 20% (w/w) of the granule.

27. (New) The composition according to claim 26, wherein the microcrystalline cellulose is 14-17% (w/w) of the granule.

28. (New) The composition according to claim 16, wherein the weight of the composition is in the range of 150 mg to 1000 mg.

29. (New) The composition according to claim 28, wherein the weight of the composition is in the range of 300 mg to 600 mg.

30. (New) The composition according to claim 29, wherein the weight of the composition is in the range of 350 mg to 450 g.

31. (New) The composition according to claim 16, wherein the salt of NAC is sodium N-(8-(2-hydroxybenzoyl)amino)caprylic acid (SNAC), and wherein the lubricant is magnesium stearate.

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

32. (New) The composition according to claim 31, wherein the salt of NAC is 80-86% (w/w) of the granule, and wherein the lubricant is 1-3% (w/w) of the granule.

33. (New) The composition according to claim 32, wherein the granule further comprises a filler, wherein the filler is microcrystalline cellulose, and wherein the microcrystalline cellulose is 10-20% (w/w) of the granule.

34. (New) The composition according to claim 33, wherein the microcrystalline cellulose is 14-17% (w/w) of the granule.

35. (New) The composition according to claim 32, wherein the granule further comprises a filler, wherein the filler is microcrystalline cellulose, and wherein the microcrystalline cellulose is less than 20% (w/w) of the granule.

36. (New) The composition according to claim 16, wherein the composition comprises at least 60% (w/w) of the salt of NAC.

37. (New) The composition according to claim 36, wherein the salt of NAC is sodium N-(8-(2-hydroxybenzoyl)amino)caprylic acid (SNAC).

38. (New) The composition according to claim 36, wherein the composition comprises at least 70% (w/w) of the salt of NAC.

39. (New) The composition according to claim 38, wherein the salt of NAC is sodium N-(8-(2-hydroxybenzoyl)amino)caprylic acid (SNAC).

40. (New) The composition according to claim 31, wherein the composition comprises at least 60% (w/w) of the SNAC.

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

> 41. (New) The composition according to claim 40, wherein the composition comprises at least 70% (w/w) of the SNAC.

(*Id.* at APOSEM0043546-50).

12. Novo requested that the election/restriction requirement be withdrawn in light of the claim amendments:

> **REMARKS**
>
> Summary of the Claims
>
> Claims 1-15 were previously presented and are now canceled.
>
> Claims 16-41 are newly added, with related support throughout the specification and claims as originally filed, such as, for example, at pages 8-9. Thus, the new claims do not add new matter and entry thereof is warranted. Upon such entry, claims 16-41 will be pending and presented for consideration on the merits.
>
> Restriction Requirement
>
> The Office Action issued a restriction requirement for claims 1-15. Applicant respectfully requests that this requirement be withdrawn in view of the cancellation of claims 1-15.

(*Id.* at APOSEM0043551).

13. On July 19, 2022, the PTO rejected then-pending claims 16-41. (*Id.* at APOSEM0043657-58).

14. Claims 16-41 were rejected as obvious over Khan in view of Sauerberg. The Examiner stated:

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

Claims 16-41 are rejected under 35 U.S.C. 103 as being unpatentable over Khan, M., US 20050148497 in view of Sauerberg, WO 2012080471 (from Applicants IDS as well as the prosecution history for 14/386,589).

The instant invention is drawn to a two-component composition of Claim 16, comprised of two granules, each containing different ingredients and medicaments.

Khan teaches a variety of GLP-1 peptides in the presence of N-8-(2-hydroxybenzoyl)amino)caprylic acid, also known as SNAC. Tablet forms are also taught, see paragraph [0035].

The difference between what is taught by the prior art and that instantly claimed is that while Khan teaches the two major components of a GLP and SNAC molecules, Khan does not teach the components of fillers, lubricants, etc ….

Sauerberg teaches SNAC and GLP-1 together as a composition. Sauerberg further teaches solid composition for oral administration comprising a GLP-1 agonist and a salt of SNAC. Further, all of the excipients, fillers, binders, etc … of Claims 20, 22-27, and 31-35 are

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

found on pages 12-15 of the WO document. The ranges taught are nearly identical to those claimed, see page 11 for SNAC and pages 13-14 for the fillers, binders, delivery agents, and lubricants, etc ....

It would have been obvious to one of ordinary skill in the art to combine the teachings of Khan and Sauerberg to arrive at the instant composition. One would have been motivated to combine the ingredients from the two references to arrive at medicinal composition for an oral composition for glucose regulation. One would have had a reasonable expectation of success in making the instant composition as the components are known in the formulation of the instant composition.

The strongest rationale for combining references is a recognition, expressly or impliedly in the prior art or drawn from a convincing line of reasoning based on established scientific principles or legal precedent, that some advantage or expected beneficial result would have been produced by their combination. In re Sernaker, 702 F.2d 989, 994-95, 217 USPQ 1, 5-6 (Fed. Cir. 1983). In the instant case, the two references clearly teach the individual components for the formulation of the instant pharmaceutical compositions of Claims 16-41, leading one to create a medicinal composition for oral blood glucose regulation.

It would have been obvious to one skilled in the art at the time of invention to determine all operable and optimum components of the composition in the claimed in the claimed invention because these component are an art-recognized result-effective variable that

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

is routinely determined and optimized in the medicinal and pharmaceutical arts. Generally, differences in concentration or temperature will not support the patentability of subject matter encompassed by the prior art unless there is evidence indicating such concentration or temperature is critical. "[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." In reAller, 220 F.2d 454, 456, 105 USPQ 233, 235 (CCPA 1955). Further, Smith v. Nichols, 88 U.S. 112, 118-19 (1874) (a change in form, proportions, or degree "will not sustain a patent"); In re Williams, 36 F.2d 436, 438 (CCPA 1929) ("It is a settled principle of law that a mere carrying forward of an original patented conception involving only change of form, proportions, or degree, or the substitution of equivalents doing the same thing as the original invention, by substantially the same means, is not such an invention as will sustain a patent, even though the changes of the kind may produce better results than prior inventions."). In the instant case, one requires specific amounts for dosing which is not instantly known but determined. Further, having more of a specific component is wasteful, and maybe toxic. As stated in the preamble, "[o]ne of ordinary skill in the art is held in accountable not only for specific teachings of references, but also for inferences which those skilled in the art may reasonably be expected to draw. In re Hoeschele, 160 USPQ 809, 811 (CCPA 1969)." "Further, [o]ne of ordinary skill in the art is motivated by economics to depart from the prior art to reduce costs consistent with desired product properties. In re Clinton, 188 USPQ 365, 367 (CCPA 1976); In re Thompson, 192 USPQ 275, 277 (CCPA 1976)."

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

The Supreme Court in *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S. Ct. 1727, 82 USPQ2d 1385, 1395-97 (2007) identified a number of rationales to support a conclusion of obviousness which are consistent with the proper "functional approach" to the determination of obviousness as laid down in *Graham*. The key to supporting any rejection under 35 U.S.C. 103 is the clear articulation of the reason(s) why the claimed invention would have been obvious. The Supreme Court in *KSR* noted that the analysis supporting a rejection under 35 U.S.C. 103 should be made explicit. Exemplary rationales that may support a conclusion of obviousness include:

(A) Combining prior art elements according to known methods to yield predictable results;
(B) Simple substitution of one known element for another to obtain predictable results;
(C) Use of known technique to improve similar devices (methods, or products) in the same way;
(D) Applying a known technique to a known device (method, or product) ready for improvement to yield predictable results;
(E) "Obvious to try" – choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success;
(F) Known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations are predictable to one of ordinary skill in the art;
(G) Some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention.

Note that the list of rationales provided is **not** intended to be an all-inclusive list, nor do they need to all be present to make a case for obviousness. Other rationales to support a conclusion of obviousness may be relied upon by Office personnel based upon the findings of the prior art.

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

> In the instant case, (A) above has been presented to demonstrate combining of prior art teachings to arrive at the instantly claimed invention. Further consideration shows that the combination for (A) also embraces (B), as well as (C), (D), (F) and (G).
>
> In conclusion, a reference is good not only for what it teaches by direct anticipation but also for what one of ordinary skill in the art might reasonably infer from the teachings. (In re Opprecht 12 USPQ 2d 1235, 1236 (Fed Cir. 1989); In re Bode 193 USPQ 12 (CCPA) 1976). In light of the foregoing discussion, the subject matter defined by the instant claims would have been obvious within the meaning of 35 USC 103(a). From the teachings of the references, it is apparent that one of ordinary skill in the art would have had a reasonable expectation of success in producing the claimed invention. Therefore, the invention as a whole was *prima facie* obvious to one of ordinary skill in the art at the time the invention was made, as evidenced by the references, especially in the absence of evidence to the contrary.

(*Id.* at APOSEM0043660-64).

15. Claims 16-41 were rejected for nonstatutory double patenting. The Examiner stated:

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

> Claims 16-41 are rejected on the ground of nonstatutory double patenting as being unpatentable over Claims 1-28 of U.S. Patent No. 10,933,120 and Claims 1-18 of U.S. Patent No. 9,278,123. Although the claims at issue are not identical, they are not patentably distinct from each other because the '120 and '123 patents teach the instant invention. For example, the '120 teaches the same invention with the same components with overlapping ranges and forms of granules. Further the '123 patent teaches the main components of the instant Claim 1, but considering the comprising language of the claims, and using the specification as dictionary, one finds the same fillers, binders, etc... to be used in the invention.
>
> It would have been obvious to make the instant composition from the teachings of the '120 and '123 patents, arriving at pharmaceutical composition instantly claimed. One would be motivated to make the compounds due to their medicinal value, and have reasonable expectation of success in the final product(s) possessing the desired end goal. Therefore, the invention is obvious over the two patents.

(*Id.* at APOSEM0043666).

16. On October 14, 2022, Novo responded to the Examiner's rejections, without amending any of then-pending claims 16-41:

> **REMARKS**
>
> Summary of the claims
>
> Claims 16-41 were previously pending. With this response, no claims are added, amended, or canceled. Thus, claims 16-41 are presented for reconsideration on the merits.

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

(*Id.* at APOSEM0043763-67).

17. In response to the obviousness rejection, Novo argued:

> Rejection under 35 U.S.C. 103(a)
>
> The Office Action rejects claims 16-41 under pre-AIA 35 U.S.C. 103(a) as allegedly unpatentable over Khan (US 2005/0148497) in view of Sauerberg (WO 2012/080471 (US 9,278,123)). Applicant respectfully traverses.
>
> Under pre-AIA 35 U.S.C. 103(c)(1), "[s]ubject matter developed by another person, which qualifies as prior art only under one or more of subsections (e), (f), and (g) of section 102, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the claimed invention was made, owned by the same person or subject to an obligation of assignment to the same person." Thus, where a reference is owned by a party and a claimed invention were "subject to an obligation of assignment" to the same party at the time the claimed invention was made, the reference is disqualified as prior art under pre-AIA 35 U.S.C. 103(c)(1).
>
> Here, the present application is continuation of US 14,386,589, which is a national stage filing of PCT/EP2013/055362, filed on March 15, 2013, with priority claims to applications EP12160743.6 (filed on March 22, 2012), EP13153459.6 (filed on January 31, 2013), and US 61/748,840 (filed on January 4, 2013). The present application's priority claim to the EP applications were perfected under 35 U.S.C. 119(a)-(d) and these applications provide written description support for the instant claims.
>
> The Sauerberg reference has a publication date of June 21, 2012, which is less than one year prior to the present application's priority dates. Thus, because Sauerberg was cited in a prior art rejection under pre-AIA 35 U.S.C. 103(a), then Sauerberg is only available as a prior art reference under 35 U.S.C. 102(e).

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

> However, the present application and Sauerberg were, at the time the invention of the present application was made, subject to an obligation of assignment to Novo Nordisk A/S and owned by Novo Nordisk A/S, respectively. Thus, as indicated above under pre-AIA 35 U.S.C. 103(c)(1), this statement alone should be sufficient to disqualify Sauerberg from being used in a rejection under pre-AIA 35 U.S.C. 103(a) against the claims of the present application.
>
> Accordingly, Applicant respectfully states that Sauerberg is disqualified as a reference under 35 U.S.C. 102(e) and that the prior art rejection be withdrawn.

(*Id.* at APOSEM0043767-68).

18. In response to the nonstatutory double patenting rejection, Novo argued:

> <u>Double Patenting Rejection</u>
>
> The Office Action rejects claims 16-41 under the judicially-created doctrine of obviousness-type double patenting as allegedly unpatentable over claims 1-28 of US 10,933,120 and claims 1-18 of US 9,278,123. With respect to the '120 patent, Applicant respectfully requests that the rejection be held in abeyance, particularly because the present claims have not been deemed allowable.
>
> With respect to the '123 patent, Applicant respectfully traverses the rejection inasmuch as it can be applied to the claims. As exemplified in independent claim 1, the present claims cover solid dosage pharmaceutical compositions comprising semaglutide and a granule, in which the granule contains no semaglutide. The <u>claims</u> of the '123 patent, however, do not recite a granule, let alone that the granule contains no semaglutide. Accordingly, Applicant respectfully requests that the rejection be withdrawn.

(*Id.* at APOSEM0043768).

19. On November 10, 2022, the PTO rejected then-pending claims 16-41. (*Id.* at APOSEM0043770-71).

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

20. Claims 16-41 were rejected for nonstatutory double patenting. The Examiner stated:

> Claims 16-41 stand rejected on the ground of nonstatutory double patenting as being unpatentable over Claims 1-28 of U.S. Patent No. 10,933,120 and Claims 1-18 of U.S. Patent No. 9,278,123. Although the claims at issue are not identical, they are not patentably distinct from each other because the '120 and '123 patents teach the instant invention. For example, the '120 teaches the same invention with the same components with overlapping ranges and forms of granules. Further the '123 patent teaches the main components of the instant Claim 1, but considering the comprising language of the claims, and using the specification as dictionary, one finds the same fillers, binders, etc... to be used in the invention.
>
> It would have been obvious to make the instant composition from the teachings of the '120 and '123 patents, arriving at pharmaceutical composition instantly claimed. One would be motivated to make the compounds due to their medicinal value, and have reasonable

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

expectation of success in the final product(s) possessing the desired end goal. Therefore, the invention is obvious over the two patents.

***Applicant's Arguments***

Applicant's arguments are found on page 6 of the remarks filed 10/14/2022. Applicants have argued: (1) *With respect to the "120 patent, Applicant respectfully requests that the rejection be held in abeyance, particularly because the present claims have not been deemed allowable*. (2) *With respect to the "123 patent, Applicant respectfully traverses the rejection inasmuch as it can be applied to the claims. As exemplified in independent claim 1, the present claims cover solid dosage pharmaceutical compositions comprising semaglutide and a granule, in which the granule contains no semaglutide. The claims of the '123 patent, however, do not recite a granule, let alone that the granule contains no semaglutide. Accordingly, Applicant respectfully requests that the rejection be withdrawn*.

***Response to Applicants Arguments***

Applicant's arguments have been carefully considered but are not deemed persuasive to overcome the rejection. Regarding both arguments, the composition contains the same ingredients that can be optimized for the purpose of treating diseases related to those treatable with GLP-1 peptides and compositions. Regardless of the granule, the same final formulation is found in the final product, and through that solid form, delivers the same therapeutic components. Therefore, the invention is remains obvious over the '120 and '123 patents.

[redacted]



(*Id.* at APOSEM0043773-74).

21. On April 6, 2023, Novo filed a Request for Continued Examination. (*Id.* at APOSEM0043779-80).

22. In the RCE, Novo responded to the Examiner's rejections, without amending any of then-pending claims 16-41:

> **REMARKS**
>
> Summary of the claims
>
> Claims 16-41 were previously pending. With this response, no claims are added, amended, or canceled. Thus, claims 16-41 are presented for reconsideration on the merits.

(*Id.* at APOSEM0043797).

23. In response to the nonstatutory double patenting rejection, Novo argued:

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

Double Patenting Rejection

The Office Action rejects claims 16-41 under the judicially-created doctrine of obviousness-type double patenting as allegedly unpatentable over claims 1-28 of US 10,933,120 and claims 1-18 of US 9,278,123. With respect to the '120 patent, Applicant hereby concurrently files a terminal disclaimer. Thus, Applicant respectfully requests that the obviousness-type double patenting rejection over US 10,933,120 be withdrawn.

With respect to the '123 patent, Applicant respectfully traverses the rejection inasmuch as it can be applied to the claims. As exemplified in independent claim 1, the present claims cover solid dosage pharmaceutical compositions comprising semaglutide and a granule, in which the granule contains no semaglutide. The claims of the '123 patent, however, do not recite a granule, let alone that the granule contains no semaglutide.

In comparing the present application to the '123 patent, the Office Action states at page 5 that "[r]egardless of the granule, the same final formulation is found in the final product, and through that solid form, delivers the same therapeutic components." However, this statement does not address how the present claims are obvious over the claims of the '123 patent, which is the objective criteria for determining obviousness-type double patenting. Indeed, Applicant reiterates that the claims of the '123 patent do not recite a granule. Moreover, the Office Action has not provided any rationale why such a feature (in particular, that such granule contains no semaglutide) would have been obvious in view of the '123 patent. Accordingly, Applicant respectfully requests that the rejection be withdrawn.

(*Id.*).

24. On April 6, 2023, Novo filed a terminal disclaimer:

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

| | |
|---|---|
| Electronic Petition Request | **TERMINAL DISCLAIMER TO OBVIATE A DOUBLE PATENTING REJECTION OVER A "PRIOR" PATENT** |
| Application Number | 17157363 |
| Filing Date | 25-Jan-2021 |
| First Named Inventor | Thomas Vilhelmsen |
| Attorney Docket Number | 8481US02 |
| Title of Invention | COMPOSITIONS OF GLP-1 PEPTIDES AND PREPARATION THEREOF |

☒ Filing of terminal disclaimer does not obviate requirement for response under 37 CFR 1.111 to outstanding Office Action

☒ This electronic Terminal Disclaimer is not being used for a Joint Research Agreement.

| Owner | Percent Interest |
|---|---|
| Novo Nordisk A/S | 100% |

The owner(s) with percent interest listed above in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application which would extend beyond the expiration date of the full statutory term of prior patent number(s)

10933120

as the term of said prior patent is presently shortened by any terminal disclaimer. The owner hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and the prior patent are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns.

In making the above disclaimer, the owner does not disclaim the terminal part of the term of any patent granted on the instant application that would extend to the expiration date of the full statutory term of the prior patent, "as the term of said prior patent is presently shortened by any terminal disclaimer," in the event that said prior patent later:
- expires for failure to pay a maintenance fee;
- is held unenforceable;
- is found invalid by a court of competent jurisdiction;
- is statutorily disclaimed in whole or terminally disclaimed under 37 CFR 1.321;
- has all claims canceled by a reexamination certificate;
- is reissued; or
- is in any manner terminated prior to the expiration of its full statutory term as presently shortened by any terminal disclaimer.

(*Id.* at APOSEM0043797, 43799-800).

[redacted]

**Appendix H—501 Prosecution History**
March 6, 2025

25. On July 10, 2023, the PTO allowed claims 16-41. (*Id.* at APOSEM0043817-23).

26. In response to Novo's arguments, the PTO stated:

> ***Response to Arguments***
>
> Applicant's arguments, see page 5 in the remarks, filed 04/06/2023, with respect to the ODP over US 9,278, 123 have been fully considered and are persuasive. The ODP has been withdrawn. Applicants have filed a terminal disclaimer regarding US PAT 10,933,120.

(*Id.* at APOSEM0043822).

27. On September 19, 2023, the 501 patent issued. (*Id.* at APOSEM0043829).