# Exhibit 17

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

NOVO NORDISK INC. and
NOVO NORDISK A/S,
Plaintiffs,

CASE NO.
24-cv-09729-RMB-AMD

-against-

APOTEX INC.,

Defendant.

***HIGHLY CONFIDENTIAL***
***OUTSIDE COUNSEL ONLY***

VIDEO-RECORDED DEPOSITION OF
PATRICK SINKO, PhD

Groombridge, Wu, Baughman & Stone, LLP
565 Fifth Avenue, Suite 2900
New York, NY 10017

10/16/2025
9:02 a.m. (EDT)

REPORTED BY: MONIQUE CABRERA
JOB NO. 171661

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036

of us, under 13 MPa, RC granules, in the upper left of that image, there is a very large granule, agreed?
MS. BAREL: Objection.
A. Sorry. You're talking about in 13 MPa?
BY MR. JAROS:
Q. 13 MPa, yes.
A. Yes, I -- I see that.
Q. And compared to the very large granule in the upper left, there are much smaller granules in the bottom of that image, correct?
MS. BAREL: Objection.
A. Yes. And as I mentioned, you know, I -- I can't tell you if it's a wider particle size distribution, meaning from -- there's many more -- it's less homogeneous, let's say. It's more heterogeneous, meaning a wider distribution.
I -- I can't tell that based on one snapshot, but what you just said is true in this one picture.
BY MR. JAROS:



Q. Would a POSA consider the large granule in the upper left to be a different type of granule to the small granules at the bottom?
MS. BAREL: Objection.
A. You know, possibly. It depends on how the composition has been -- how it's been designed, how it's to function. So in some cases, it may, and in some cases, it may not. It just depends, ultimately, on how they, you know, put those particles together. They may or may not behave the same.
So would you consider them one or two types or three types? Maybe. It just depends on if -- if they took that into consideration when they were designing them.
BY MR. JAROS:
Q. Earlier, you mentioned that you'd probably want a little more data before you published those images.
Can you go back one page and look again at figure 5?
A. Sure.



Q. Did you understand figure 5 to refer to the D10, D50 and D90 of the particles in those images and different pressures?
And I say that because the pressure numbers correlate.
A. Yeah. Well, so the general rule of publishing is that a -- a figure should stand alone with its caption. And this caption doesn't say much, right?
So I could dig through it. It looks like it's looking at three formulations. Without going through everything, it's probably the same three. It would make sense.
Q. Okay. If we assume -- and let's just clear up the record. With respect to figure 5, there are three data points along the bottom axis at about 4 and 5 and 13.
Do you see that?
A. Yes. But what you see is it says D10, D50, D90, right? But it's not saying which of these. So the -- the pressure -- no, I see it. I see it, yes. I see the 4, 5, and 13.



Q. Excellent. So if we assume that figure 5 describes the granules presented in figure 6, would that change your testimony you made on these images earlier?
A. So what it's telling you, if you just, let's say, focus first on the D50, it's telling you that, I think as I mentioned, it looks like there's a wider distribution of sizes in the 13 MPa group.
And it looks like for the 4 and 5, they're closer together, and visually speaking from this one snapshot, it looks like it's quite consistent with that.
Q. With that in mind, in your opinion, would a POSA consider any of the three images of granules in figure 6 to show two types of granules?
MS. BAREL: Objection.
A. So if these granules are from that table -- which I'm assuming they are -- compositionally, they may be one type of granule. But based on the other factor of size, you know,

Page 94

on average, because it's always a range, they could be two different types granules based on size. But compositionally, it's probably considered one type of granule, based on composition.
BY MR. JAROS:
Q. What would a POSA consider to be the physical properties of a granule?
MS. BAREL: Objection.
A. Well, there are a variety of ways of looking at it. You know, would the granule stay intact? So you want to see if the -- if the granules are -- stay together.
You want to see -- typically, you can look at porosity of granules because one of the reasons that you bring primary powders together is they're -- primary powders tend to be harder, and therefore, a granule, you introduce porosity so that there is some kind of elasticity during the compression cycle, for example. It just helps in things like that.
BY MR. JAROS:

Page 95

Q. Would a POSA consider size, shape, density, and friability to be physical properties of a granule?
MS. BAREL: Objection.
A. Sure. I mean, I -- I think I just mentioned some of those. I mentioned, you know, like, if it's not staying together -- if they're not staying together, that kind of falls in to friability, where parts of it come off.
I mentioned density and porosity. I mentioned size. So, yeah, they're all, I mean, things that a POSA would consider.
BY MR. JAROS:
Q. So going back to figure 6 in DX 1-16, is size alone -- the difference in sizes of these granules sufficient for a POSA to conclude there are two types of granules?
MS. BAREL: Objection.
A. In general, if these -- there's no -- I don't see other data here, or at least yet. I have to read the rest of this. But if the different size populations -- because they're

Page 96

populations -- if they behave differently with respect to disintegration, dissolution, then they could be considered two distinct populations or for whatever it may be.
If they don't behave differently, then just based on size and assuming the same composition, then a person of skill may not.
BY MR. JAROS:
Q. Now, the same question with respect to kind: Looking at figure 6, Exhibit 1-16, the RC granule images, would a POSA see two different kinds of granules in any of those images?
MS. BAREL: Objection.
A. My answer is the same. You can't tell compositionally from this type of images. So you can't tell that.
But from the perspective of different kinds being, you know, different sizes, you could, but it's based on performance. There's not enough data here to make that conclusion either, based on, you know, this paper. I think it had a different objective.

Page 97

BY MR. JAROS:
Q. Let's go to the next row down. You see it's labeled "Tablet Cross Section"?
A. Yes, I see that.
Q. Starting with the left cross section image, do you see granules according to your proposed construction?
MS. BAREL: Objection.
A. I would say -- yeah, I would say suggestive. I just don't see how they actually did the cross sections.
BY MR. JAROS:
Q. Meaning whether it's broken or cut?
A. Yeah. But I think it's -- I mean, it's -- yes, it's most likely showing some sort of granule.
Q. And how are you identifying -- we can broaden it -- for efficiency, broaden it to all three images in the tablet cross section row.
Do you see granules in all three of those images, according to your proposed instruction?

Page 114

left. Do you have that?
MS. BAREL: Do you mean claim 1?
MR. JAROS: Yes.
A. Claim 10?
BY MR. JAROS:
Q. Claim 1. I'm sorry. In the upper left. Do you have claim 1 in the upper left for the '503 patent?
A. Yes.
Q. Do you understand the technical scope of claim 1 of the '503 patent?
A. Yes, I do.
Q. According to your proposed constructions, is there any limit on the amount of semaglutide in the first type of granule?
MS. BAREL: Objection.
A. Well, it's -- it's silent to the amount of semaglutide in the first type of granule, so is there a limit? I think at that point, you start getting into, you know, practical considerations, but it's silent to it. So I don't know how the math works, and I did not

Page 115

do that math, but...
BY MR. JAROS:
Q. In part A of claim of 1 of the '503 patent, you see there's a sub A referring to the first type of granules?
A. Yes.
Q. And then the phrase "less than 10 percent of a lubricant."
Do you see that?
A. Yes, I do.
Q. Does less than 10 percent of a lubricant include no lubricant?
MS. BAREL: Objection.
A. I think the way a POSA would understand it is that there has to be some lubricant, so I don't think you would include no lubricant. Theoretically, it would include no, but I don't think it's not the way a POSA would understand it.
BY MR. JAROS:
Q. So let's turn to the second type of granules in part B of that claim.

Page 116

According to your proposed construction, is there any limit on the amount of SNAC in the second type of granules?
A. Well, once again, it's silent to SNAC being in the granule, but I guess, of course, it could be because of the comprising term, and I don't know how to determine that limit based on the information that I have here.
Q. And that subpart of the claim, there was the phrase "less than 40 percent of a binder."
Do you see that?
A. Yes, I do.
Q. The same question I had earlier: Does less than 40 percent of a binder include no binder?
MS. BAREL: Objection.
A. And once again, I mean theoretically, yes, but I think person of skill seeing the word "granules" would think that you have some sort binder in there. So theoretically, may be zero, but there has to be

Page 117

some binder in there.
BY MR. JAROS:
Q. Could be as little as 1 percent in the binder?
MS. BAREL: Objection.
A. Well, it's difficult to say. If -- if the 1 percent binder lets it maintain itself as a granule, sure.
BY MR. JAROS:
Q. With respect to part A, could the lubricant be as little as 1 percent of the first type of granules?
MS. BAREL: Objection.
A. So theoretically, yes, but much like poisons or other things, it's -- it all depends on the dose, right? So, you know, is the lubricant a lubricant? If it's in that formulation to have lubricant properties and it doesn't function that way, then it's not enough. But so could it be any amount, less than 10? It could be. But if you want to make -- successfully make that first type of granules, it

Page 122

allowable, correct?
MS. BAREL: Objection.
A. So -- so you just made a whole bunch of assumptions. So you're saying that you have 15 percent -- so by the way, in my report, I still don't do that math. But you're saying -- so you're saying, on this hypothetical, assume 15 percent filler, assuming how much binder?
BY MR. JAROS:
Q. Let me try and simplify it.
A. Okay.
Q. You hadn't done the math.
A. Okay.
Q. So, again, focusing on Part B, the second type of granules of claim 1 of the '503 patent.
A. Sure.
Q. The only thing required is some amount of semaglutide. We agreed that it's not specified, correct?
A. That is correct.
Q. According to your testimony earlier,

Page 123

some amount of binder is required, but the lower limit is not specified, correct?
A. That is correct.
Q. So please assume 1 percent semaglutide and 1 percent binder.
A. Assuming 1 percent semaglutide and 1 percent binder, that is 2 percent. Okay.
Q. And then assume 15 percent filler. Based on the mathematics, the second type of granules could include 75 percent SNAC, correct?
MS. BAREL: Objection.
A. It could include -- I mean, under your hypothetical, given those limitations, I'm not sure if you should make a granule that way, but you could. It would be, yeah, up to 83 percent, right? 100 minus 17.
BY MR. JAROS:
Q. I agree. That's 83 percent SNAC, correct?
A. Yeah, I -- I guess so. Like I said, I literally have not done that math. So -- but it -- but given the hypothetical and -- and the

Page 124

parameters that you told me to assume, you know, you just subtract from 100 percent, and that's the math.
Q. Okay. So setting aside hypotheticals, we can just look at the claim language. Claim 1 part B of the '503 patent only requires some unidentified amount of semaglutide, 15 percent of a filler, and something less than 40 percent of a binder, agreed?
A. Yeah, I agree.
Q. Using those actual numbers, the claim part B allows at least 75 percent SNAC, agreed?
A. If the only other thing you're adding to the granules is SNAC and assuming all of those other numbers are -- would make a -- the granule, then the answer would be, yes, just mathematically.
Q. I have the same question with respect to part A of claim 1 of the '503 patent.
According to your proposed constructions, the first type of granule could

Page 125

contain 10 percent semaglutide and 75 percent SNAC, correct?
MS. BAREL: Objection.
A. Can you repeat that, please?
BY MR. JAROS:
Q. Sure.
A. Doing math on the fly is not a great idea, so.
Q. Sure. Let -- let's do it together because I think the numbers here are relatively simple. So this is not a hypothetical here. Looking at the claim language, claim 1(a) refers to a first type of granules.
Do you see that?
A. Yes, I do.
Q. That first type of granules must have at least 75 percent SNAC, agreed?
A. Agreed.
Q. And then less than 10 percent of a lubricant, we know from claim 3, that could be as little as 1 percent, correct?
A. Well, I wouldn't be looking at