Rebekah Conroy
STONE CONROY LLC
25 A Hanover Road, Suite 301
Florham Park, NJ 07932
(973) 400-4181
rconroy@stoneconroy.com

*Attorneys for Defendant Apotex Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NOVO NORDISK INC. and<br>NOVO NORDISK A/S,<br><br>　　　　　　*Plaintiffs*,<br><br>　　v.<br><br>APOTEX INC.,<br><br>　　　　　　*Defendant*. | Civil Action No. 24-9729-RMB-AMD<br><br>██████████████████████<br>██████████████████████<br>████████████████ |

## APOTEX'S OPENING CLAIM CONSTRUCTION BRIEF

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................... 1

II.   BACKGROUND ............................................................................................. 4

    A.    Claims ................................................................................................ 4

    B.    Written Description............................................................................ 6

    C.    Prosecution History...........................................................................11

III.  LEGAL STANDARDS.................................................................................. 13

IV.   APOTEX'S POSITIONS AND PROPOSED CONSTRUCTIONS............................... 15

    A.    The Two Types of Granules Phrases ................................................ 15

        1.    Meaning Conferred by the Claims............................................ 15

        2.    Meaning Conferred by the Written Description........................ 17

        3.    Meaning Supported by the Prosecution History ...................... 21

    B.    923 Preamble ................................................................................... 25

        1.    There is No Need for Construction............................................ 25

        2.    Novo's Position is Not a Proposed Construction...................... 26

V.    CONCLUSION.............................................................................................. 27

## TABLE OF AUTHORITIES

### Cases

*Aptalis Pharmatech, Inc. v. Apotex Inc.*,
  718 F. App'x 965 (Fed. Cir. 2018) ............................................................................... 14

*Azurity Pharm., Inc. v. Alkem Labs. Ltd.*,
  No. 22-cv-143-KMW-EAP (D.N.J. Aug. 30, 2023) ..................................................... 15

*Corcept Therapeutics, Inc. v. Teva Pharms. USA, Inc.*,
  No. 18-3632 (SDW) (LDW), 2020 WL 3425302 (D.N.J. June 23, 2020) ...................... 25

*Curia IP Holdings, LLC v. Salix Pharms., Ltd.*,
  No. 21-19293, 2024 WL 4039583 (D.N.J. Sept. 4, 2024) ............................................ 21

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
  192 F.3d 973 (Fed. Cir. 1999) ...................................................................................... 14

*Fenner Invs., Ltd. v. Cellco P'ship*,
  778 F.3d 1320 (Fed. Cir. 2015) ..................................................................................... 14

*Hakim v. Cannon Avent Group, PLC*,
  479 F.3d 1313 (Fed. Cir. 2007) .................................................................................... 23

*Heuft Systemtechnik GMBH v. Industrial Dynamics Co., Ltd.*,
  282 Fed. App'x 836 (Fed. Cir. 2008) ........................................................................... 23

*In re Ciprodex*,
  No. 15-cv-5756 (PGS) (DEA), 2017 WL 2784410 (D.N.J. June 27, 2017) ................... 25

*Intel Corp. v. Qualcomm Inc.*,
  21 F.4th 801 (Fed. Cir. 2021) ....................................................................................... 17

*Intel Corp. v. VIA Techs., Inc.*,
  319 F.3d 1357 (Fed. Cir. 2003) .................................................................................... 15

*Jang v. Boston Sci. Corp.*,
  532 F.3d 1330 (Fed. Cir. 2008) .................................................................................... 26

*Jazz Pharms., Inc. v. Amneal Pharms., LLC*,
  No. CV130391ESJAD, 2017 WL 5128748 (D.N.J. Nov. 6, 2017) ................................ 26

*K-2 Corp. v. Salomon S.A.*,
  191 F.3d 1356 (Fed. Cir. 1999) .................................................................................... 14

*Kaken Pharm. Co. v. Iancu*,
  952 F.3d 1346 (Fed. Cir. 2020) .................................................................................... 17

*Magēmā Tech. LLC v. Phillips 66 et al.*,
    153 F.4th 1248 (Fed. Cir. 2025) .................................................................... 13

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996) ...................................................................................... 13

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) ........................................................................ 13

*Microlinc, LLC v. Intel Corp.*,
    No. 2:07-cv-488, 2013 WL 2471551 (E.D. Tex. June 7, 2013) .................... 26

*Neville v. Found. Constructors, Inc.*,
    972 F.3d 1350 (Fed. Cir. 2020) .................................................................... 20

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003) .................................................................... 22

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ................................................... 13, 15, 25, 26

*Regents of the Univ. of California v. Eli Lilly & Co.*,
    119 F.3d 1559 (Fed. Cir. 1997).....................................................................11

*Rheox, Inc. v. Entact, Inc.*,
    276 F.3d 1319 (Fed. Cir. 2002) .................................................................... 14

*Sequoia Tech., LLC v. Dell, Inc.*,
    66 F.4th 1317 (Fed. Cir. 2023) .................................................................... 17

*SimpleAir, Inc. v. Google LLC*,
    884 F.3d 1160 (Fed. Cir. 2018)............................................................... 14, 23

*Spectrum Int'l, Inc. v. Sterilite Corp.*,
    164 F.3d 1372 (Fed. Cir. 1998) .................................................................... 14

*Supernus Pharms., Inc. v. TWI Pharms., Inc.*,
    265 F. Supp. 3d 490 (D.N.J. 2017)............................................................... 26

*Taction Tech., Inc. v. Apple Inc.*,
    No. 2023-2349, 2025 WL 2336950 (Fed. Cir. Aug. 13, 2025) .................... 23

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831 (2015) .................................................................................... 13

*Tris Pharma, Inc. v. Teva Pharms. USA, Inc.*,
    No. 20-05212, 2021 WL 3879153 (D.N.J. Aug. 25, 2021)........................... 20

iii

*U.S. Surgical Corp. v. Ethicon, Inc.*,
  103 F.3d 1554 (Fed. Cir. 1997) ....................................................................................... 25

*Upaid Systems, Ltd. v. Card Concepts*, Inc.,
  No. 17-8150, 2020 WL 1955156 (N.D. Il. 2020)..................................................................... 24

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*,
  520 U.S. 17 (1997) .............................................................................................................11

**Note**:  Emphasis has been added unless indicated otherwise.

## TABLE OF ABREVIATIONS

| Abbreviation | Description |
| --- | --- |
| 120 Patent | U.S. Patent No. 10,933,120 |
| 123 Patent | U.S. Patent No. 9,278,123 |
| 501 Patent | U.S. Patent No. 11,759,501 |
| 502 Patent | U.S. Patent No. 11,759,502 |
| 503 Patent | U.S. Patent No. 11,759,503 |
| 923 Patent | U.S. Patent No. 10,278,923 |
| Apotex | Defendant Apotex Inc. |
| GLP-1 | glucagon-like peptide-1 |
| Novo | Plaintiffs Novo Nordisk Inc. and Novo Nordisk A/S |
| POSA | Person of ordinary skill in the art |
| SNAC | sodium N-(8-(2-hydroxybenzoyl)amino )caprylate |
| US 497 (Khan) | U.S. Patent Application No. 2005/0148497 |
| WO 471 (Sauerberg) | WO 2012/080471 |

## I.    INTRODUCTION

This case is about the patents covering Novo's RYBELSUS® product.  RYBELSUS contains "semaglutide," which was initially marketed as an injection for diabetes called OZEMPIC®, and is now also marketed as an injection (WEGOVY®) and a tablet (RYBELSUS) for obesity and weight loss.  Novo's pricing and patenting of its portfolio of semaglutide products has attracted scrutiny from the U.S. government and media.

For example, according to the Inflation Reduction Act of 2022, the government intends to negotiate the $14.4 billion cost of Novo's semaglutide products, which exceeds the total cost of the next five most expensive drugs covered by Medicare:

| Drug Name | Commonly Treated Conditions* | Total Part D Gross Covered Prescription Drug Costs from November 2023-October 2024 | Number of Medicare Part D Enrollees Who Used the Drug from November 2023 - October 2024 |
|---|---|---|---|
| Ozempic; Rybelsus; Wegovy | Type 2 diabetes; Type 2 diabetes and cardiovascular disease; Obesity/overweight and cardiovascular disease | $14,426,566,000 | 2,287,000 |
| Trelegy Ellipta | Asthma; Chronic obstructive pulmonary disease | $5,138,107,000 | 1,252,000 |
| Xtandi | Prostate cancer | $3,159,055,000 | 35,000 |
| Pomalyst | Kaposi sarcoma; Multiple myeloma | $2,069,147,000 | 14,000 |
| Ibrance | Breast cancer | $1,984,624,000 | 16,000 |
| Ofev | Idiopathic pulmonary fibrosis | $1,961,060,000 | 24,000 |

Novo's patenting of its semaglutide products also led to media reports such as "**Overpatented, Overpriced: A Data Brief on Medicare-Negotiated Drugs . . . Ozempic, Rybelsus and Wegovy**."  (https://www.i-mak.org/overpatented/).  In that report, the author describes the "patent thicket" that Novo has constructed around semaglutide "since the filing of the main compound patents in 2006 . . . consistently over a period of 17 years."  (*Id.*).  Apotex submits this opening claim construction brief to confirm the scope of the second of three families of formulation patents listed by Novo as covering RYBELSUS, for the reasons explained below.

According to Novo, its RYBELSUS tablet products are covered by three families of formulation patents. For the purpose of this claim construction proceeding, only the first and second families of formulation patents are at issue. Novo's first family of patents cover a mixture of the active ingredient (semaglutide) with an absorption enhancer called "SNAC" in "granules" that are used to make a tablet. In simple terms, pharmaceutical "granules" are agglomerates of various ingredients,[1] often for compression into a tablet, as illustrated below:



Novo's second family of formulation patents cover "two types of granules"—a "first type" of granule containing the absorption enhancer (SNAC), and a "second type" of granule containing semaglutide. According to Novo, separating those ingredients into two types of granules was an improvement compared to the single type of granule described in its first family of patents, including as illustrated by Novo in the lower right hand corner of the image below, where the

---

[1] The parties have agreed to a more precise construction of the "granule" claim term. (*See* Dkt. 81-1 at 4).

claimed "first type" of granule is orange (SNAC), and the claimed "second type" of granule is blue (semaglutide):



Despite the clear and obvious distinction between Novo's first and second families of formulation patents (single granule versus "two types of granules"), Novo obscurely contends that Apotex's █████████████████████████████████ During claim construction discovery, Apotex discovered that Novo is interpreting at least one of its two types of granules patents to allow the *same ingredients* in the *same amounts* in both types of granules—*i.e.*, Novo's interpretation leads to an absurd result where "two types of granules" merge into the single granule formulation claimed in Novo's first family of patents, contrary to all of the intrinsic evidence, including the Novo's stated purpose for "two types" of granules.

For that reason, Apotex proposes that the Court construe the "first type of granule" and "second type of granule" phrases according to the intrinsic evidence, as summarized in Table 1 below. In contrast, Novo's proposed constructions neither clarify nor explain what the claims cover, but instead appear to be intended to allow Novo to maintain its vague contention that a

████████████████████████████████████████

██████████████████

**Table 1: Representative Proposed Constructions**

| Claim Term | Apotex Construction | Novo Construction |
|---|---|---|
| "first type of granule" | "granule designed to be a homogenous mixture with SNAC at least substantially free of semaglutide" | "a first kind of granules" |
| "second type of granule" | "granule designed to be a homogenous mixture with semaglutide at least substantially free of SNAC" | "a second kind of granules" |

\*       \*       \*

Novo also disputes the plain language of the 923 patent preamble. While Novo agrees that the preamble is limiting, Novo disputes the plain and ordinary meaning of its plain language. Apotex maintains that no construction is required—the meaning is plain and ordinary: "a method for treating diabetes and/or obesity in a subject in need of such treatment." Novo, in contrast, proposes that the Court complicate and elaborate that plain language, for no apparent reason.

## II.    BACKGROUND

### A.    Claims

The disputed granule phrases appear in the asserted claims of the 120, 501, 502 and 503 patents. Representative claims appear below—the first type of granules are highlighted in blue, and the second type of granules are highlighted in orange:

4

## 120 Patent

1. A solid dosage pharmaceutical composition comprising:

(a) a first type of granules comprising sodium N-(8-(2-hydroxybenzoyl)amino)caprylic acid (SNAC), lubricant, and no GLP-1 peptide, wherein the SNAC is at least 75% (w/w), and wherein the lubricant is less than 10% (w/w);

(b) a second type of granules comprising GLP-1 peptide, filler, binder, and no SNAC, wherein the GLP-1 peptide is 2 to 40% (w/w), wherein the filler is at least 15% (w/w), and wherein the binder is less than 40% (w/w); wherein:

the GLP-1 peptide is semaglutide, wherein the formula of semaglutide is N-epsilon26-[2-(2-{2-[2-(2-{2-[(S)-4-carboxy-4-(17-carboxy-heptadecanoylamino)butyrylamino]ethoxy}ethoxy)acetylamino]ethoxy}ethoxy)acetyl] [Aib8,Arg34]GLP-1(7-37); and

the composition is a tablet, wherein the weight of the tablet is in the range of 150 mg to 1000 mg.

## 501 Patent

1. A solid dosage pharmaceutical composition comprising (1) semaglutide and (2) a granule;

wherein the granule comprises a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid (salt of NAC), a lubricant, and no semaglutide;

wherein the salt of NAC is at least 75% (w/w) of the granule; and

wherein the lubricant is less than 10% (w/w) of the granule.

## 502 Patent

1. A solid dosage pharmaceutical composition comprising (1) a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid (salt of NAC) and (2) a granule;

wherein the granule comprises semaglutide, a binder, a filler, and no salt of NAC;

wherein the filler is at least 15% (w/w) of the granule; and

wherein the binder is less than 40% (w/w) of the granule.

5

**503 Patent**

1. A solid dosage pharmaceutical composition comprising:

(a) a first type of granules comprising at least 75% (w/w) of sodium N-(8-(2-hydroxybenzoyl)amino)caprylic acid (SNAC) and less than 10% (w/w) of a lubricant; and

(b) a second type of granules comprising semaglutide, at least 15% (w/w) of a filler, and less than 40% (w/w) of a binder.

(Ex. 10).[2]

## B.    Written Description

The patents shown above are members of the same family (the 501, 502, and 503 patents are continuations of the 120 patent), and share a common written description. The Abstract states:

(57)                          **ABSTRACT**

The invention relates to pharmaceutical compositions comprising a first type of granules and a second type of granules, wherein said first type of granules comprises a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and no GLP-1 peptide, and wherein said second type of granules comprises a GLP-1 peptide and no salt of N-(8-(2-hydroxybenzoyl) amino)caprylic acid, as well as the intermediate granules, processes for the preparation of the granules and compositions, and use thereof in medicine.

(Ex. 4, 503 patent). The "Background" explains the challenges with prior art formulations and the alleged "improvements" of the claimed invention to overcome those challenges:

---

[2] Exhibit Nos. 1-16 are attached to the Wythers Declaration, dated September 19, 2025, filed November 7, 2025. Exhibit Nos. 17-18 are attached to the Supplemental Wythers Declaration, dated and filed November 7, 2025.

> ### BACKGROUND
>
> One of the main challenges in oral delivery of proteins and peptides is the inability of these compounds to be readily transported across the membranes of the gastrointestinal tract. The delivery agent SNAC has previously been shown to improve the bioavailability of orally administered peptides. The present invention relates to further improvements of the bioavailability by oral administration of compositions of such peptides, in particular of GLP-1 peptides.

(*Id.* at 1:35).  The "Summary" includes the following description of "granule" and "granules":

> ### SUMMARY
>
> In one embodiment the invention relates to a pharmaceutical composition comprising a first type and a second type of granules, wherein said first type of granules comprises a salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid and no GLP-1 peptide, and wherein said second type of granules comprises a GLP-1 peptide and no salt of N-(8-(2-hydroxybenzoyl)amino)caprylic acid. In some embodiments the term "granule" refers to small particles gathered into a large mass.

(*Id.* at 1:46).

The "Description" includes the following statements about design of granules, dissolution properties and bioavailability:

> ### DESCRIPTION
>
> The present inventors surprisingly found that the dissolution properties of tablets manufactured from the same composition (i.e. same type and the same amounts of excipients and delivery agent) was determined by the design of the granules from which the tablets were formed.
>
> Furthermore, the present inventors found that the dissolution behaviour surprisingly had a marked effect on the bioavailability of GLP-1 peptide from the composition, such as the tablet. Thus, the present inventors have shown that the

7

> bioavailability of solid tablets manufactured from various granule designs can be predicted from in vitro data, i.e. dissolution data. In one embodiment this invention provides compositions, granules and methods for their preparation with improved bioavailability of the GLP-1 peptide.

(*Id.* at 2:56).

The Examples also disclose descriptions of granules and processes to make granules. Example 1, "Preparation of Tablet Compositions Comprising GLP-1 and SNAC," describes two types of granules and includes Table 2:

TABLE 2

Composition of the tablet compositions

| Component | Amount (mg/tablet) | Function |
|---|---|---|
| Semaglutide or Compound A | 10 | Active ingredient |
| SNAC | 300 | Delivery agent |
| Microcrystalline cellulose (Avicel PH 101) | 80 | Filler |
| Povidone K 90 (Kollidon 90F) | 8 | Binder |
| Magnesium stearate | 9.7 | Lubricant |
| Total amount | 407.7 | |

Tablet compositions were prepared by mixing the components listed in Table 2 in different ways. The tablet compositions consisted of a first type of granules, in some cases a second type of granules, as well as extragranular ingredients mixed with the first type of granules and, if present, the second type of granules. Preparation of granules by roller compaction and preparation of tablets from the tablet compositions were as described in the section General Methods of Preparation. The design of the tablet compositions is shown in Table 3.

(*Id.* at 30:28). Example 1 also includes Table 3:

8

TABLE 3

Design of tablet compositions (the amount of each
component in mg/tablet is shown in brackets)

| Tablet composition | Composition of first type of granules (mg/tablet) | Composition of second type of granules (mg/tablet) | Extragranular ingredients (mg/tablet) |
|---|---|---|---|
| B | SNAC (300), magnesium stearate (7.7) | semaglutide (10), microcrystalline cellulose (80), povidone (8) | magnesium stearate (2) |
| C | SNAC (300), semaglutide (10), magnesium stearate (7.7) | — | microcrystalline cellulose (80), povidone (8), magnesium stearate (2) |

TABLE 3-continued

Design of tablet compositions (the amount of each
component in mg/tablet is shown in brackets)

| Tablet composition | Composition of first type of granules (mg/tablet) | Composition of second type of granules (mg/tablet) | Extragranular ingredients (mg/tablet) |
|---|---|---|---|
| D | SNAC (300), semaglutide (10), povidone (8), magnesium stearate (7.7) | — | microcrystalline cellulose (80), magnesium stearate (2) |
| E | SNAC (300), semaglutide (10), microcrystalline cellulose (80), povidone (8), magnesium stearate (7.7) | — | magnesium stearate (2) |
| F | SNAC (300), microcrystalline cellulose (57), magnesium stearate (7.7) | semaglutide (10), microcrystalline cellulose (23), povidone (8) | magnesium stearate (2) |
| G | SNAC (300), magnesium stearate (7.7) | Compound A (10), microcrystalline cellulose (80), povidone (8) | magnesium stearate (2) |
| H | SNAC (300), microcrystalline cellulose (57), magnesium stearate (7.7) | Compound A (10), microcrystalline cellulose (23), povidone (8) | magnesium stearate (2) |

9

(*Id.* at 30:51).  Compositions B, F, G and H in Table 3 are made from "two types of granules." (*Id.*).  The description of the preparation of those four separate granule compositions is consistent with the description of Tablet Composition B:

> Tablet Composition B
>
> Magnesium stearate for the first granule fraction was passed through a 355 μm sieve. Magnesium stearate was manually mixed with SNAC in a stainless steel bowl in corresponding volumes. Two cycles of geometric dilution was applied by mixing for around 60 s until the blend was visually homogenous. The remaining quantity of SNAC was transferred to a blender and was pre-mixed for 2 min at 25 rpm. The SNAC and magnesium stearate pre-mix was added to the blender and mixing was performed for 20 min at 25 rpm. The blend was roller compacted. The granules were sieved through a 180 μm mesh.
>
> Semaglutide, microcrystalline cellulose and povidone for the second granule fraction were weighed directly into a stainless steel bowl in the order of decreasing amounts and mixed manually for at least 3 min until visually homogenous before transferring the pre-mix to a 1000 mL Duma bottle. The Duma bottle was closed with a lid and tumbled manually in a Turbula-like movement for 1 min. The blend was roller compacted.
>
> The two types of granules were added to a blending container in order of decreasing content and mixed for 5 minutes at 32 rpm. Extragranular magnesium stearate was mixed with the granule blend by manual mixing using volume-doubling followed by 30 s mixing in the Turbula mixer at 32 rpm. Tablets were prepared from this composition.

(*Id.* at 31:34).  The Table 3 compositions also include three single granule tablet compositions: Compositions C, D and E.  (*Id.* at 32:24).  The ingredients in those compositions were also mixed until "visually homogenous."  (*Id.*).

Example 7 compares the bioavailability of Tablet Compositions B through F in Table 9:

Bioavailability of GLP-1 from tablet compositions B-F was determined in dogs according to Assay (II) described herein. The results are shown in Table 9.

TABLE 9

Bioavailability of GLP-1 in dogs from tablet compositions B-F

| Tablet composition | Bioavailability of GLP-1 in dogs (% F) |
|---|---|
| B | 0.7 |
| C | 0.5 |
| D | 0.3 |
| E | 0.4 |
| F | 1.0 |

The results show that tablet composition F provided a bioavailability of 1.0%. The results show that tablet composition B provided a bioavailability of 0.7%. The results show that tablet composition C provided a bioavailability of 0.5%. The results show that tablet composition E provided a bioavailability of 0.4%. The results show that tablet composition D provided a bioavailability of 0.3%.

(*Id.* at 39:28).

## C.     Prosecution History

During the prosecution of the 120 patent, the examiner issued multiple obviousness rejections citing WO 471 (Sauerberg)[3] and US 497 (Khan).  In response to those rejections, Novo distinguished prior art granules by clearly and repeatedly stating that the claimed invention requires separate granules of GLP-1 peptide (semaglutide) and SNAC, emphasizing the "design" of two types of separate GLP-1 and SNAC granules, in contrast to the prior art mixtures of SNAC

---

[3] During prosecution, Novo argued that WO 471 (Sauerberg) was not prior art, including in response to double patenting rejections based on the same reference. (*See, e.g.*, Ex. 11, 120 prosecution summary at 139).  In any event, "[i]n construing the claims in view of prosecution," the district court should accept the examiner's arguments and "may only explore 'the reason (right or wrong) for the objection and the manner in which" the applicant addressed it. *Regents of the Univ. of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1572 n.6 (Fed. Cir. 1997) (quoting *Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 33 n.7 (1997)).

and GLP-1. (*See, e.g.*, Ex. 11, 120 prosecution summary at page 48 (describing "first type of granule, second type of granule, no GLP-1 in the first granule and no [SNAC] in the second granule" as "key limitations," and quoting and emphasizing that dissolution, and hence bioavailability, "**was determined by the design of the granules from which the tablets were formed**" (original emphasis)), page 48 (Novo distinguished tablet compositions C, D and E "with SNAC and semaglutide together (as in the prior art)," and argued that prior art references "teach a composition in which GLP-1 and the delivery agent are mixed together in a tablet"), page 59 (Novo: "The existence of the two types of granules enables the independent release of the components of each granule type," distinguishing prior art where the "SNAC and semaglutide are mixed together"), page 83 (Novo distinguished design of separate granules from prior art granules based on separate content), page 100-101 (Novo repeatedly emphasized "***design of the granules from which the tablets were formed***," "***design of the granules forming the tablet***," "Applicants' data in the specification as filed demonstrate the correlation between ***design of the granules*** . . . and ultimate bioavailability of the GLP-1 peptide" (original emphasis)), page 101 (Novo directed the Examiner to Table 3 showing "the **design** of tablet Compositions B through F" (original emphasis), and distinguished the two types of granules in Compositions B and F from "Compositions C, D and E . . . designed as a simple mixture made up of one type of granules"), page 102 (Novo: "As discussed above, the inventors have surprisingly discovered that the ***design of the granules*** as a two-granule system forming a solid composition determines the dissolution properties of the composition resulting in higher bioavailability for the GLP-1 peptide." (original emphasis)), page 102 (Novo described prior art as "mixing SNAC and semaglutide together in the same granules," "similar to tablet Compositions C, D and E . . . which are designed by mixing

12

SNAC and semaglutide together"), page 104 (Novo distinguished a double patenting reference[4] "where the SNAC and semaglutide are mixed together"), page 138 (Novo distinguished the same double patenting reference based on the claimed "***first type of granules*** and a ***second type of granules***" (original emphasis) compared to the "<u>claims</u>" (original emphasis) of the reference, which "do not recite a first type of granules or a second type of granules"),  page 141 (Examiner: "The following is an examiner's statement of the reasons for allowance: the instant invention is drawn to a two part granular composition as in Claim 1.  The prior art teaches them together, but not as separate granules whereby the SNAC release and the semaglutide (Novo) release can be separately controlled.")).

During the prosecution of the 501, 502, and 503 patents, the Examiner issued a non-statutory double patenting rejection over the 120 patent, stating that the pending claims are "not patentably distinct."  (Exs. 12-14).  In response to the double patenting rejection, Novo filed a terminal disclaimer based on the 120 patent.  (*Id.*).

## III.    LEGAL STANDARDS

The construction of patent terms is exclusively for the Court to determine.  *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 835 (2015).  To ascertain claim meaning, a court looks first to the intrinsic evidence: the claims, specification and prosecution history.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "Claim terms are generally given their plain and ordinary meaning." *Magēmā Tech. LLC v. Phillips 66 et al.*, 153 F.4th 1248, 1260 (Fed. Cir. 2025) (J. Bumb sitting by designation) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313-14 (Fed. Cir. 2005) (en banc)).  A party seeking to alter the

---

[4] The double patenting reference was the 123 patent (covering single granule compositions) also asserted against Apotex in this case.  (*See, e.g.*, Ex. 15, 123 patent at 12:20 (describing use of granules in tableting material), claim 2 ("tablet"), claim 11 (semaglutide and SNAC)).

ordinary and customary meaning of a clear claim term must demonstrate "why such an alteration is required." *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1363 (Fed. Cir. 1999).

Courts also must "assess whether a patentee relinquished a particular claim construction based on the totality of the prosecution history, which includes amendments to claims and arguments made to overcome or distinguish references." *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1326 (Fed. Cir. 2002). "The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Id.* at 1325 (citations omitted); *see also Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1378-79 (Fed. Cir. 1998) (statements distinguishing prior art may limit claim scope). "[A]ny explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to 'capture the scope of the actual invention' that is disclosed, described, and patented." *Aptalis Pharmatech, Inc. v. Apotex Inc.*, 718 F. App'x 965, 971 (Fed. Cir. 2018) (quoting *Fenner Invs., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1323 (Fed. Cir. 2015)).

"When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999). Further, "[i]n construing the scope of claims, [courts] give considerable weight to statements made by patent applicants during prosecution in order to overcome examiner rejections" and there is "no reason to treat terminal disclaimers any differently." *SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1168 (Fed. Cir. 2018). "Thus, a terminal disclaimer is a strong clue that a patent examiner and, by concession, the applicant, thought the claims in the continuation lacked a patentable distinction over the parent." *Id.*

14

Extrinsic evidence is "less reliable" than intrinsic evidence in determining how to read claim terms. *Phillips*, 415 F.3d at 1318. Moreover, "[w]hen an analysis of *intrinsic* evidence resolves any ambiguity in a disputed claim term, it is improper to rely on extrinsic evidence to contradict the meaning so ascertained." *Azurity Pharm., Inc. v. Alkem Labs. Ltd.*, No. 22-cv-143-KMW-EAP, Dkt. 153 at 12 (D.N.J. Aug. 30, 2023) (original italics) (quoting *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003)).

## IV.    APOTEX'S POSITIONS AND PROPOSED CONSTRUCTIONS

### A.    The Two Types of Granules Phrases

The disputes about the "first type" and "second type" of granule phrases are largely the same so they are discussed together below. The parties proposed constructions are:

| Claim Term | Apotex Construction | Novo Construction |
|---|---|---|
| "first type of granule" / "first type of granules" / "first granule" | "granule designed to be a homogenous mixture with SNAC at least substantially free of semaglutide" | "a first kind of granules" |
| "second type of granule" / "second type of granules" | "granules designed to be a homogenous mixture with semaglutide at least substantially free of SNAC" | "a second kind of granules" |

### 1.    Meaning Conferred by the Claims

The two types of granule phrases appear in the 120 and 503 patents. A POSA would understand that the claims are describing the use of two types of granules designed to separately release SNAC and semaglutide. (Buckton ¶¶ 80, 104).[5] Although the claims of the 503 patent do not state "no" semaglutide or "no" SNAC like the 120 patent, a POSA would understand that any

---

[5] "Buckton" refers to the Declaration of Graham Buckton, Ph.D. dated September 17, 2025 filed today (November 7, 2025). Dr. Buckton has previously been accepted by this Court to testify as an expert in pharmaceutical formulation.

substantial amount of semaglutide in the SNAC granule (or SNAC in the semaglutide granule) would defeat Novo's stated purpose of two types of granules. (*Id.*). The invention claimed in the 120 patent (*i.e.*, two types of granules designed to allow separate release of the delivery agent and active ingredient to improve bioavailability) is the "true spirit" of the alleged invention. (*Id.* ¶¶ 80, 92, 104). The claims in the continuation patents (501, 502 and 503 patents) appear directed to potential design-around formulations, such as insubstantial amounts of semaglutide in the SNAC granule (or insubstantial amounts of SNAC in the semaglutide granule). (*Id.* ¶¶ 80, 104). But an interpretation allowing a granule with a mixture of SNAC and semaglutide would be contrary to the "true spirit" of Novo's alleged improvement on the prior art.

Novo's proposed interpretation merely replaces the word "type" with "kind," and does not add any meaning to the claims or address Novo's apparent interpretation of the claims. Indeed, the substitution of the word "kind" does not resolve the question of whether the 503 patent literally covers two "populations" of granules containing substantial amounts of SNAC and semaglutide, or even mixtures of the same ingredients. For example, claim 1 of 503 patent requires: (a) that the "first type" of granule comprises at least 75% SNAC and less than 10% lubricant; and (b) the "second type" of granule comprises semaglutide, at least 15% filler, and less than 40% binder. (Ex. 4, 503 patent at claim 1). Novo's expert, Dr. Sinko, testified that (*contrary to the claim language*) some lubricant and some binder would be required in the claimed granules. (*See, e.g.*, Ex. 17, Sinko Dep. 115:11-19, 122:22-123:3). Even assuming Dr. Sinko were correct, Table 2 below shows that, according to Novo's proposed interpretation, the claimed "first type" and "second type" of granule could be at least substantially the same and even identical:

16

**Table 2: Example of Claimed Granules According to Novo**

|  | "First Type" | "Second Type" |
|---|---|---|
| **SNAC** | 75% | 75% |
| **Lubricant** | 3% | 3% |
| **Semaglutide** | 3% | 3% |
| **Filler** | 15% | 15% |
| **Binder** | 4% | 4% |
| **Total** | 100% | 100% |

The claims only differentiate between the "first type" and "second type" of granule based on the composition of the granules, so if the "first type" and "second type" of granule have the same composition there would only be one "type" or "kind" of granule. (*See* Ex. 17, Sinko Dep. 93:19-94:5). Consequently, Novo's construction runs counter to the claim construction principle that claim terms should not be construed "in a way that renders them void, meaningless, or superfluous." *See, e.g.*, *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 809-10 (Fed. Cir. 2021).

### 2. Meaning Conferred by the Written Description

The written description also supports Apotex's construction. "A patent's express purpose of the invention 'informs the proper construction of claim terms.'" *Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317, 1326 (Fed. Cir. 2023) (quoting *Kaken Pharm. Co. v. Iancu*, 952 F.3d 1346, 1352 (Fed. Cir. 2020). Here, the express purpose of the alleged invention was to improve the bioavailability of oral GLP-1s, like semaglutide, using the delivery agent, SNAC. (Ex. 4, 503 patent at 1:37-43). To achieve that goal, the written description explains that the "invention relates to pharmaceutical compositions comprising a first type of granules and a second type of granules, wherein said first type of granules comprises [SNAC] and no [semaglutide], and wherein said

17

second type of granules comprises [semaglutide] and no [SNAC]." (*Id.* at Abstract).  The written description also explains that the "inventors surprisingly found that the dissolution properties of tablets manufactured from the ***same composition*** (i.e. same type and the same amounts of excipients and delivery agent) ***was determined by the design of the granules***" and "the dissolution behavior surprisingly had a marked effect on the bioavailability of GLP-1 peptide from the composition." (*Id.* at 2:59-67).  Like the claims, the written description provides no guidance about designing two types of granules with substantially the same composition.  It does, however, describe designing two types of granules with different compositions, one without semaglutide and one without SNAC.  (*E.g.*, *id.* at 3:24-56, 7:41-63).

The Examples provide more detail and explanation for how the two types of granules with different compositions achieve the goal of improving bioavailability.  Example 1 shows the preparation of the claimed tablet compositions (two types of granules) versus prior art tablet compositions (containing a single type of granule) having the same types and amounts of ingredients.  (*Id.* at Example 1). Table 3 describes the "design" of four compositions with separate granules (Compositions B, F, G and H) versus the "design" of three compositions with prior art granules (Compositions C, D and E).  (*Id.* at Table 3).  Examples 2 through 6 state that, in Compositions B and F (two types of granules), SNAC released faster than semaglutide, and in Compositions C through E, SNAC released slower than semaglutide.  (*Id.* at Examples 2-6).  Table 9 compares the bioavailability of the Table 3 compositions.  (*Id.* at Table 9).  Read together, a POSA would understand that the patents are describing and explaining the basis for the statements that dissolution properties and bioavailability of the GLP-1 peptide (semaglutide) are determined by the design of two types of granules (a first type separately releasing a delivery agent to improve absorption, a second type separately releasing a GLP-1 peptide (semaglutide)).  (Buckton ¶ 90).

18

To confirm, Apotex's proposed construction is not limited to some selected embodiments. Various embodiments describe and distinguish two types of granules, allowing the possibility of an insubstantial amount of semaglutide in the "first type of granules" and an insubstantial amount of SNAC in the "second type of granules."  (Ex. 4, 503 patent 21:1-16, 25:34-51; Buckton ¶ 89). The written description does not include any disclosures of a "first type" of granule with semaglutide or a "second type" of granule with SNAC, or any limit on the amount that can be in or on the granules.  However, a POSA would understand the embodiments in the context of the claimed invention, as two types of granules designed to improve bioavailability due to differential dissolution rates of SNAC and semaglutide, achieved by separating the SNAC granules from the semaglutide granules.  (Buckton ¶¶ 91, 106).  This insubstantial transfer is illustrated in Example 1, where a POSA would understand that, during preparation of Composition B, there could have been insubstantial transfer of SNAC to semaglutide granules when they were mixed or compressed together to form a tablet.  (*Id.*).

Further, the patents explain that "modifications" and "changes" will "occur to those of ordinary skill in the art," but the claims are "intended to cover all such modifications and changes as fall within the true spirit of the invention."  (Ex. 4, 503 patent at 42:18-27).  The "true spirit" of the claimed two types of granules is to separately release SNAC and semaglutide to improve dissolution and bioavailability compared to prior art compositions, where SNAC and semaglutide were mixed together, as illustrated by Table 3.  (Buckton ¶ 92).  That does not mean that there cannot be insubstantial transfer of ingredients, but there is nothing in the written description that suggests designing or mixing of semaglutide with SNAC, or SNAC with semaglutide, before making the claimed two types of granules.  Accordingly, Apotex's proposed constructions allow "modifications and changes" that "fall within the true spirit of the invention."

19

Novo's proposed construction "does not align with the stated purposes of the invention and makes little sense." *See Tris Pharma, Inc. v. Teva Pharms. USA, Inc.*, No. 20-05212, 2021 WL 3879153, at \*6 (D.N.J. Aug. 25, 2021) (rejecting construction that "does not align with the stated purposes of the invention and makes little sense."). Because Novo's construction allows for the two "types" of granules to have same composition, there would only be one "type" of granule. And the written description does not describe how to "design" granules with the same composition to achieve the goal of improved bioavailability of oral semaglutide using SNAC. Instead, the written description compares and contrasts the claimed two "types" of granules (with SNAC and semaglutide separated) to prior art compositions where SNAC and semaglutide were mixed together. (*See* Ex. 4, 503 patent at Examples 1-7). Thus, Novo's construction "that renders asserted claims facially nonsensical cannot be correct." *See Neville v. Found. Constructors, Inc.*, 972 F.3d 1350, 1357 (Fed. Cir. 2020).

In sum, the intrinsic evidence fully supports Apotex's construction. As shown below, Apotex's construction confirms and clarifies the scope of the claims, whereas Novo's says nothing to leave the door open to obscure and vague infringement contentions:

| Claim Term | Apotex Construction | Novo Construction |
|---|---|---|
| "first type of granule" / "first type of granules" / "first granule" | "granule designed to be a homogenous mixture with SNAC at least substantially free of semaglutide" | "a first kind of granules" |
| "second type of granule" / "second type of granules" | "granules designed to be a homogenous mixture with semaglutide at least substantially free of SNAC" | "a second kind of granules" |

20

### 3.    Meaning Supported by the Prosecution History

The prosecution history further supports Apotex's construction. As explained above, during prosecution of the 120 patent, Novo clearly and repeatedly distinguished prior art granules by stating that the claimed invention requires separate granules of SNAC and semaglutide, thereby distinguishing prior art compositions where SNAC and semaglutide were mixed and present together in a single granule or composition by emphasizing its "design" of two types of granules. (*Supra* § II.C). Novo's arguments "emphasiz[ing] the importance" of the "design" of two types of separate granules of SNAC and semaglutide in contrast to prior art mixture indicates that Novo intended to limit its claimed inventions to compositions with two different types of granules and not one type of granule with at least substantially the same composition. *See Curia IP Holdings, LLC v. Salix Pharms., Ltd.*, No. 21-19293, 2024 WL 4039583, at *12 (D.N.J. Sept. 4, 2024) ("applicants' statements during prosecution of the '915 Patent, which emphasized the importance of the consistency of the polymorphic form . . . in contrast to other known polymorphs . . . indicate that the applicant intended to limit the claims").

Moreover, during prosecution of the 120 patent, the Examiner rejected the pending claims, stating that "Claim 1 is drawn to two things that are obvious to combine, GLP-1 and [SNAC]." (Ex. 11, 120 prosecution summary at page 41). In that rejection, the Examiner deleted "no GLP-1 peptide" from the "first type" of granule and "no SNAC" from the "second type" of granule to confirm that the claims are "two things to be put together." (*Id.*). Novo responded by stating that the Examiner "has read key limitations (first type of granule, second type of granule, no GLP-1 in the first granule and no [SNAC] in the second granule) out of the claims." (*Id.* at 48). Novo further explained that dissolution, and hence bioavailability, "**was determined by the design of the granules from which the tablets were formed.**" (*Id.*) (original emphasis). Novo then directed the Examiner to the Examples and distinguished tablet compositions C, D and E "with SNAC and

21

semaglutide together (as in the prior art)," and argued that prior art references "teach a composition in which GLP-1 and the delivery agent are mixed together in a tablet." (*Id.*). Novo summarized its position by stating that, "to read limitations out of the claims as the Office has done ignores what Applicants have stated is their invention in the specification and claims as well as the data presented in the Examples." (*Id.*). Novo repeatedly made statements distinguishing prior art mixtures from its claimed separate granules during the prosecution. (*See, e.g.*, *id.* at 59, 68-69, 82-83, 100-104). Novo's repeated statements are a "clear and unmistakable" disavowal of granules with a mixture of SNAC and semaglutide. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1327 (Fed. Cir. 2003) (finding clear and unmistaken disclaimer where patentee "repeatedly insisted that its invention differed from the prior art" noting "the patentee has rejected the examiner's broad assessment of the claim scope and stated in a public record what his invention could not be").

Novo's mere word change, likewise, reads "key limitations" out of the two types phrases. The result is Novo's ability to maintain its contention that a ██████████████████ ███████████████████████████████████████████████████████ What's worse is that Novo's interpretation not only allows a mixture, but even "two types" of granules with the exact same composition. But that is exactly what the prior art taught and Novo disclaimed. (Ex. 11, 120 prosecution summary at page 143 (Examiner's reasons for allowance: "Applicants have submitted . . . [a] reference teaching semaglutide in combination with SNAC . . . . The prior art teaches this combination as a whole, i.e., a single composition where the whole formulation is at the molecular level for each and every ingredient, completely blended." But "[t]here is nothing that informs the skilled artisan to separate these components out into separate granules to be pressed into a final composition (tablet).")). Novo "cannot recapture claim scope that was

22

surrendered or disclaimed." *See Hakim v. Cannon Avent Group, PLC*, 479 F.3d 1313, 1317 (Fed. Cir. 2007).

Further, even though the 503 patent does not include the same claim language as the 120 patent, the disavowals made during the prosecution of the 120 patent are relevant to construction of the 503 patent claims because they concern the same subject matter. *See Heuft Systemtechnik GMBH v. Industrial Dynamics Co., Ltd.*, 282 Fed. App'x 836, 839-40 (Fed. Cir. 2008) ("When the application of prosecution disclaimer involves statements from prosecution of a familial patent relating to the same subject matter as the claim language at issue in the patent being construed, those statements in the familial application are relevant in construing the claims at issue."); *Taction Tech., Inc. v. Apple Inc.*, No. 2023-2349, 2025 WL 2336950, at *4 (Fed. Cir. Aug. 13, 2025) ("Identicality in claim language is not required for disclaimer to flow through a family."). For example, in *Heuft*, the claims of the parent application included a limitation that required an exit angle between 30° and 100°. 282 Fed. App'x at 839-40. The Federal Circuit held that statements made during the prosecution of a parent application distinguishing the invention from the prior art by having an exit angle of at least 30° created a disclaimer for the scope of the claims in a child application to exclude devices that did not have at least a 30° exit angle, even though the claims of the child application did not include the same limitation. *Id.* Like *Heuft*, even though the 503 patent claims do not state "no" semaglutide or "no" SNAC, the arguments Novo made during prosecution of the 120 patent still expressly and unequivocally disclaim granules with prior art mixtures of SNAC and semaglutide from the scope of the claims in the 503 patent. *See id.*

Moreover, the terminal disclaimer that Novo filed in the 503 patent is a "strong clue that a patent examiner and, by concession, the applicant, thought the claims in the continuation lacked a patentable distinction over the [120 patent]." *See SimpleAir*, 884 F.3d at 1168. Thus, the two types

23

of granule phrases in the 120 patent provide a "strong clue" about the proper construction of the same limitations in the 503 patent—*i.e.*, "it is appropriate to construe them to mean the same thing." *See Upaid Systems, Ltd. v. Card Concepts*, Inc., No. 17-8150, 2020 WL 1955156, at *12 (N.D. Il. 2020) (finding that "it is appropriate to construe" similar claim terms in related patents "to mean the same thing," and relying on terminal disclaimers as a "strong clue" that similar terms in related patents had the same meaning).

*    *    *

As explained above, the intrinsic evidence confirms Apotex's proposed construction of the two types of granule phrases. Apotex's construction confirms and clarifies the disputed claim scope, and is supported by the claims, written description and prosecution history. Novo's construction, on the other hand, is a mere substitution of words that allows Novo to read out the obvious distinction between the claimed two types of granules:

| Claim Term | Apotex Construction | Novo Construction |
|---|---|---|
| "first type of granule" / "first type of granules" / "first granule" | "granule designed to be a homogenous mixture with SNAC at least substantially free of semaglutide" | "a first kind of granules" |
| "second type of granule" / "second type of granules" | "granules designed to be a homogenous mixture with semaglutide at least substantially free of SNAC" | "a second kind of granules" |

*    *    *

24

**B.    923 Preamble**

The parties' proposed constructions for "[a] method for treating diabetes and/or obesity in a subject in need of such treatment" are:

| Novo's Position | Apotex's Position |
|---|---|
| The preamble is limiting.<br><br>It requires that the method be employed for the purpose of management and care of a patient with diabetes and/or obesity to combat the condition.[6] | The preamble is limiting (because it provides antecedent basis for the claimed effective amount), and does not require construction.<br><br>To the extent the Court decides to construe the preamble, plain and ordinary meaning—i.e., "a method for treating diabetes and/or obesity in a subject in need of such treatment" |

**1.    There is No Need for Construction**

Claim construction "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). While claim construction may be necessary "when the meaning or scope of technical terms and words of art is unclear," *id.*, the preamble contains "commonly understood words," and needs no further elaboration. *See, e.g., Phillips*, 415 F.3d at 1314; *see also In re Ciprodex*, No. 15-cv-5756 (PGS) (DEA), 2017 WL 2784410, at *11 (D.N.J. June 27, 2017) ("'[T]reating a human patient,' as understood by a person of ordinary skill in the art, is readily apparent to the Court, and claim construction 'involves little more than the application of the widely accepted meaning of commonly understood words.'"); *Corcept Therapeutics, Inc. v. Teva Pharms. USA, Inc.*, No. 18-3632 (SDW) (LDW), 2020 WL 3425302, at *4 (D.N.J. June 23, 2020) (rejecting proposal to restrict method of treating term to a particular

---

[6] This is the construction Novo proposed in the parties' Joint Claim Construction and Prehearing Statement filed July 16, 2025. (Dkt. 68-1 at 5). At about noon on the day of filing of opening briefs (November 7, 2025), Novo revised its proposed construction of the preamble. Apotex objects to Novo's day-of-filing revision, and will address Novo's untimely revision in Apotex's responsive brief.

purpose and finding no construction required); *Jang v. Boston Sci. Corp.*, 532 F.3d 1330, 1336 (Fed. Cir. 2008); *Jazz Pharms., Inc. v. Amneal Pharms., LLC*, No. CV130391ESJAD, 2017 WL 5128748, at *11 (D.N.J. Nov. 6, 2017).

Because the "language of the claims is paramount," *Supernus Pharms., Inc. v. TWI Pharms., Inc.*, 265 F. Supp. 3d 490, 497 (D.N.J. 2017) (citing *Phillips*, 415 F.3d at 1312-13), a skilled person need look no further than the words of the claim's preamble, which already convey the plain and ordinary meaning to a skilled person.  Indeed, as the Federal Circuit stated, "[i]n some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges." *Phillips*, 415 F.3d at 1314.  Apotex submits that the meaning of the commonly understood words of the preamble is readily apparent, and therefore no construction is required.

### 2. Novo's Position is Not a Proposed Construction

Instead of proposing a construction of the preamble, Novo provides its interpretation of what the preamble "requires."  To the extent Novo is inviting the Court to redraft the preamble with Novo's interpretation in mind, there is no need to do so.  Novo has not provided any reason to redraft the preamble.  *See, e.g.*, *Microlinc, LLC v. Intel Corp.*, No. 2:07-cv-488, 2013 WL 2471551, at *30 (E.D. Tex. June 7, 2013) ("Defendants fail to point to any evidence that would justify significantly redrafting one term in the disputed phrase.  Moreover, the Court concludes that the disputed phrase is unambiguous, is easily understandable by a jury, and requires no construction.").

For example, during prosecution the Examiner stated: "The claims are drawn to a method of treating diabetes and/or obesity in a subject in need thereof . . . ."  (Ex. 18, 923 prosecution summary at 8; *id.* at 11).  When evaluating that language, the Examiner understood the preamble without adding any complication or elaboration such as Novo's proposed additions of

26

"management," "care" or "combat." Nor did Novo add such words when responding to the Examiner: "The claims in the present application recite a method of treating diabetes and/or obesity in a subject in need thereof." (Ex. 18, 923 prosecution summary at 26; *see also id.* at 27 ("Nowhere does Beglinger *et al.* teach or suggest . . . a method of treating diabetes and/or obesity . . . ."; "There is nothing in these references to suggest . . . a method of treating diabetes and/or obesity . . . .").

Thus, even if Novo had proposed a construction of the preamble (instead of stating what it "requires"), Novo has not provided any reason to redraft any aspect of the preamble.

## V.    CONCLUSION

Apotex respectfully requests that this Court: (1) adopt its proposed constructions for the disputed claim phrases; and (2) conclude that the preamble does not require construction.

Dated: November 7, 2025

Respectfully submitted,

*s/ Rebekah R. Conroy*

Rebekah R. Conroy
**STONE CONROY LLC**
25A Hanover Road, Suite 301
Florham Park, NJ 07932
rconroy@stoneconroy.com
(973) 400-4181

*Of Counsel*
William A. Rakoczy (wrakoczy@rmmslegal.com)
Joseph T. Jaros (jjaros@rmmslegal.com)
Katie A. Boda (kboda@rmmslegal.com)
Conly S. Wythers (cwythers@rmmslegal.com)
Steven J. Birkos (sbirkos@rmmslegal.com)
**RAKOCZY MOLINO MAZZOCHI SIWIK LLP**
6 West Hubbard Street, Suite 500
Chicago, Illinois 60654
(312) 527-2157

*Attorneys for Apotex Inc.*

27